**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEYs**

| | |
|---|---|
| IN RE: INSULIN PRICING LITIGATION | Case No. 2:23-md-03080 (BRM)(LDW)<br>MDL No. 3080 |
| RAD SUB-TRUST A; 20230930-DK-BUTTERFLY-1, INC.; STERLING JEWELERS, INC.; MONDELEZ GLOBAL LLC; US FOODS, INC.; TENNECO AUTOMOTIVE OPERATING COMPANY; DRIV, INC.; KRAFT HEINZ FOODS COMPANY; THE BOEING COMPANY; THE BOEING COMPANY MASTER WELFARE PLAN; and THE BOEING COMPANY MASTER RETIREE WELFARE PLAN,<br><br>Plaintiffs<br><br>ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; CVS HEALTH CORPORATION; CVS PHARMACY, INC.; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; CAREMARK RX, LLC; ZINC HEALTH SERVICES, LLC; EVERNORTH HEALTH, INC. (F/K/A EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; EXPRESS SCRIPTS PHARMACY, INC.; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL PHARMACY SERVICES, INC.; ASCENT HEALTH SERVICES LLC; UNITEDHEALTH GROUP, INC.; UNITED HEALTHCARE SERVICES, INC.; UNITEDHEALTHCARE INSURANCE CO.; OPTUM, INC.; OPTUMRX INC.; OPTUMRX HOLDINGS, LLC; OPTUMINSIGHT, INC.; and EMISAR PHARMA SERVICES LLC,<br><br>Defendants. | Judge Brian R. Martinotti<br>Judge Leda D. Wettre<br><br>DIRECT-FILED COMPLAINT PURSUANT TO CASE MANAGEMENT ORDER NO. 9<br><br>Civil Action No.: ______________<br><br>**COMPLAINT**<br><br>**and**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. INTRODUCTION ....................1

II. BACKGROUND ....................3

III. THE INSULIN PRICING SCHEME....................9

IV. PARTIES ....................16

A. Plaintiffs....................16

B. The Manufacturer Defendants ....................21

a) Eli Lilly ....................21

b) Sanofi ....................22

c) Novo Nordisk....................24

C. The PBM Defendants....................25

a) CVS Caremark ....................25

b) Express Scripts....................31

c) United Healthcare ....................40

V. JURISDICTION AND VENUE ....................47

A. Subject-Matter Jurisdiction....................47

B. Personal Jurisdiction ....................48

C. Venue ....................49

VI. ADDITIONAL FACTUAL ALLEGATIONS ....................49

A. The History of Insulin....................49

B. The Current Landscape for Insulin Production....................53

1. Insulin Adjuncts: Type 2 Medications....................59

C. The Pharmaceutical Payment and Supply Chains ....................65

D. The PBMs' Role in the Pharmaceutical Payment Chain ....................67

1. The Rise of the PBMs in the Pharmaceutical Supply Chain ....................70

2. The Insular Nature of the Pharmaceutical Industry ....................... 71

E. The Dramatic Rise in U.S. Prices for Diabetes Medications ................................ 75

F. The Insulin Pricing Scheme ................................................................... 100

G. The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates Offered to the PBMs ............................................................... 113

H. Defendants Downplay the Insulin Pricing Scheme and Its Harms ...................... 108

I. All Defendants Profit from the Insulin Pricing Scheme ..................................... 121

1. The PBMs Pocket a Substantial Share of Manufacturers' Secret Payments ........................................................................ 122

2. The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies ............................................................................ 131

3. The Insulin Pricing Scheme Increases PBM Mail-Order Profits ..................................................................................... 137

J. Plaintiffs Purchased At-Issue Drugs Directly from Defendants .......................... 138

K. Defendants Deceived Plaintiffs........................................................................... 140

1. The Manufacturer Defendants Deceived Plaintiffs...................... 140

2. The PBM Defendants Deceived Plaintiffs .................................. 144

L. The Insulin Pricing Scheme Has Damaged Plaintiffs........................................ 155

M. Defendants' Recent Efforts in Response to Rising Insulin Prices ....................... 157

VII. TOLLING OF THE STATUTES OF LIMITATION.................................................... 159

A. Discovery Rule.................................................................................... 160

B. Fraudulent Concealment ...................................................................... 161

C. Equitable Estoppel ............................................................................. 163

D. Continuing Violations.......................................................................... 164

E. Bankruptcy Tolling ............................................................................ 165

F. Tolling by Parallel Actions by State and Federal Government Entities .............. 165

VIII. CLAIMS FOR RELIEF ............................................................................... 167

IX. PRAYER FOR RELIEF ....................................................................................................240

X. JURY DEMAND ............................................................................................................242

# TABLE OF FIGURES


Figure 1: General diagram of the flow of products and payments ....... 10

Figure 2: List and net prices of GLP-1 agonists ....... 61

Figure 3: The pharmaceutical payment chain ....... 66

Figure 4: Insulin distribution and payment chain ....... 67

Figure 5: PBM Consolidation ....... 71

Figure 6: Rising list prices of Humulin R (500U/mL) from 1997-2021 ....... 76

Figure 7: Rising list prices of Humalog vials and pens, 1996-2021 ....... 76

Figure 8: Rising list prices of Levemir, 2006-2021 ....... 73

Figure 9: Rising list prices of Novolog vials and pens, 2002-2021 ....... 77

Figure 10: Rising list prices of Lantus vials and pens, 2001-2021 ....... 78

Figure 11: Rising list prices of long-acting insulins ....... 79

Figure 12: Rising list prices of rapid-acting insulins ....... 79

Figure 13: Rising list price increases for human insulins ....... 80

Figure 14: Rising list prices of Type 2 drugs ....... 80

Figure 15: Lockstep Insulin price increases ....... 81

Figure 16: Sanofi price-tracking ....... 84

Figure 17: Novo Nordisk pricing committee presentation ....... 89

Figure 18: Novo Nordisk presentation on reduced list prices ....... 93

Figure 19: Eli Lilly internal email re potential price reductions ....... 95

Figure 20: Insulin exclusions by plan year ....... 97

Figure 21: Sanofi memo on introduction of Basaglar ....... 106

Figure 22: Sanofi memo on Basaglar pricing ....... 107

Figure 23: Sanofi memo on increased rebates for Lantus ....... 108

Figure 24: Sanofi presentation on formulary threats to Lantus ....... 109

Plaintiffs RAD Sub-Trust A, 20230930-DK-BUTTERFLY-1, Inc., Sterling Jewelers, Inc., Mondelez Global LLC, US Foods, Inc., Tenneco Automotive Operating Company, DriV, Inc., Kraft Heinz Foods Company, The Boeing Company, The Boeing Company Master Welfare Plan, and The Boeing Company Master Retiree Welfare Plan, ("Plaintiffs"), by and through undersigned counsel and pursuant to Case Management Order No. 9 in the above-captioned action, hereby designate the United States District Court for the Northern District of Illinois as their Designated Forum and allege as follows:

## I. INTRODUCTION

1. Plaintiffs bring this action to redress an unlawful insulin pricing scheme orchestrated by the same drug manufacturers and pharmacy benefit managers named in the related actions now centralized in MDL No. 3080.

2. For years, the defendants have engineered supracompetitive list prices for the at-issue drugs and then exchanged undisclosed "Manufacturer Payments" in the form of rebates, administrative fees, inflation fees, and other forms of consideration to secure preferred formulary status.

3. This arrangement extracts hidden margins for the pharmacy benefits managers ("PBMs") while preserving and/or enlarging manufacturers' net revenues.

4. This quid pro quo has directly and foreseeably harmed Plaintiffs, who, like other payors, purchase the at-issue medications at false list prices and bear the burden of the resulting overcharges.

5. The defendants' scheme has driven the prices of life-sustaining diabetes medications far above levels that would prevail in a transparent and competitive market.

## II. BACKGROUND

6. Diabetes is a chronic condition characterized by elevated blood glucose. In individuals without diabetes, the pancreas secretes insulin, which regulates the conversion of food into blood glucose and facilitates cellular uptake of glucose. When insulin is deficient or when cells become resistant to insulin, glucose remains in the bloodstream, leading to serious complications over time, including heart disease, vision loss, and kidney disease.

7. Diabetes presents in two primary forms: Type 1 and Type 2. Type 1 diabetes accounts for approximately 5% to 10% of cases and arises when the pancreas produces no insulin or only a minimal amount. Individuals with Type 1 diabetes require treatment with insulin injections and other diabetes medications.

8. Type 2 diabetes comprises roughly 90% to 95% of cases and develops when the body produces insufficient insulin or becomes resistant to its effects. Although Type 2 diabetes can initially be managed with oral medications, most patients ultimately require insulin injections.

9. Diabetes is widespread in the United States, and its occurrence has increased significantly over time. In 1958, approximately 1.6 million Americans had diabetes. By around 2000, that number exceeded ten million. An estimated 38.4 million people—about 11.6% of the U.S. population—had diabetes in 2021, including approximately 29.7 million with a diagnosis and another 8.7 million adults who met laboratory criteria but were undiagnosed.[1] Recent data from the National Health and Nutrition Examination Survey indicates that roughly 1 in 6 U.S. adults

[1] *National Diabetes Statistics Report*, CENTER FOR DISEASE CONTROL (May 15, 2024), https://www.cdc.gov/diabetes/php/data-research/index.html#:~:text=38.4%20million%20people%20of%20all,or%20older%20(Table%201a).

had total diabetes during 2021–2023, with prevalence increasing sharply with age and rising alongside higher weights.[2]

10. The condition imposes a substantial health burden. Beyond diabetes itself, about 97.6 million adults—more than one in three—have prediabetes, underscoring the scale of the at-risk population and the likelihood of continued growth in the number of Americans with diabetes absent effective prevention.[3] Diabetes also remains a leading cause of serious complications such as cardiovascular disease, chronic kidney disease, vision loss, and lower-extremity amputation, and it was the eighth leading cause of death in 2021 based on the number of death certificates listing diabetes as the underlying cause.[4]

11. The economic toll on consumers is immense. The American Diabetes Association estimates that the total cost of diagnosed diabetes in 2022 was roughly $413 billion, comprising roughly $307 billion in direct medical costs and $106 billion in reduced productivity.[5] On average, people with diagnosed diabetes incur medical expenditures about 2.6 times higher than they would in the absence of diabetes, with excess per-person medical costs exceeding $12,000 in 2022 dollars.[6] And while the United States comprises only 15% of the global insulin market, it accounts

---

[2] Cheryl D. Fryar *et al.*, *Prevalence of Total, Diagnosed, and Undiagnosed Diabetes in Adults: United States, August 2021–August 2023*, CENTER FOR DISEASE CONTROL: NATIONAL CENTER FOR HEALTH STATISTICS (Nov. 2024), https://www.cdc.gov/nchs/products/databriefs/db516.htm#:.

[3] *National Diabetes Statistics Report*, *supra* note 1.

[4] *Fact Sheet on Diabetes*, WORLD HEALTH ORGANIZATION (Nov. 14, 2024), https://www.who.int/news-room/fact-sheets/detail/diabetes#:~:text=Diabetes%20causes%20blindness%2C%20kidney%20failure%2C%20heart%20attacks%2C%20stroke%20and%20lower%20limb%20amputation.

[5] *Statistics About Diabetes*, AMERICAN DIABETES ASSOCIATION, https://diabetes.org/about-diabetes/statistics/about-diabetes#:~ (last visited Dec. 22, 2025).

[6] *Id.*

for almost 50% of insulin-related revenue.[7] This is because the most widely used analog insulins are priced roughly ten times higher in the United States than in other developed nations.[8]

12. In Illinois, the percentage of adults with diabetes is on the rise. About 1 in 8 Illinois adults have been told they have diabetes and 12.0% have been told they have prediabetes, with state health officials noting that both conditions remain underdiagnosed.[9] Total direct medical expenses for diagnosed diabetes in Illinois was estimated at $11.9 billion in 2022.[10]

13. About 12.2% of Michigan adults have diagnosed diabetes, and approximately 34.7% of adults have prediabetes.[11] Every year an estimated 59,201 additional people in Michigan are diagnosed with diabetes.[12] Total direct medical expenses for diagnosed diabetes in Michigan was estimated at $10 billion in 2022. [13]

14. About 9.6% of New Jersey adults have diagnosed diabetes, and approximately 34% of adults have prediabetes.[14] Every year, an estimated 54,644 additional people in New Jersey are

---

[7] Ryan Knox, *Insulin insulated: barriers to competition and affordability in the United States insulin market*, 7 JOURNAL OF LAW AND THE BIOSCIENCES 1, 2 (2016).

[8] S. Vincent Rajkumar, *The High Cost of Insulin in the United States: An Urgent Call to Action*, 95 MAYO CLINIC PROCEEDINGS 22, 22 (Jan. 2020).

[9] *The Burden of Diabetes in Illinois*, AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2025-04/state-fact-sheet-4-15-25-illinois.pdf# (last visited Dec. 22, 2025).

[10] *Id.*

[11] *The Burden of Diabetes in Michigan*, AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_Michigan.pdf# (last visited Dec. 22, 2025)

[12] *Id.*

[13] *The Burden of Diabetes in Michigan*, AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-02/adv_2024_state_fact_sheets_2_3_25_final_mi_2.pdf

[14] *The Burden of Diabetes in New Jersey*, AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_New_Jersey.pdf (last visited Jan. 9, 2026).

diagnosed with diabetes.[15] Total direct medical expenses for diagnosed diabetes in New Jersey was estimated at $6.7 billion in 2022.[16]

15. About 9.9% of New York adults have diagnosed diabetes, and approximately 33.5% of adults have prediabetes.[17] Every year, an estimated 116,095 additional people in New York are diagnosed with diabetes.[18] Total direct medical expenses for diagnosed diabetes in New York was estimated at $19.2 billion in 2022.[19]

16. About 11.3% of Pennsylvania adults have diagnosed diabetes, and approximately 34.1% of adults have prediabetes.[20] Every year, an estimated 76,535 additional people in Pennsylvania are diagnosed with diabetes.[21] Total direct medical expenses for diagnosed diabetes in Pennsylvania was estimated at $ 12.3 billion in 2022.[22]

---

[15] *Id.*

[16] *The Burden of Diabetes in New Jersey*, AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-05/the-burden-of-diabetes-new-jersey-05-08-25.pdf.

[17] *The Burden of Diabetes in New York,* AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_New_York.pdf (last visited Jan. 9, 2026).

[18] *Id.*

[19] *The Burden of Diabetes in New York,* AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-05/the-burden-of-diabetes-new-york-05-08-25.pdf.

[20] *The Burden of Diabetes in Pennsylvania,* AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_Pennsylvania.pdf (last visited Jan. 9, 2026).

[21] *Id.*

[22] *The Burden of Diabetes in Pennsylvania,* AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-05/the-burden-of-diabetes-pennsylvania-05-08-25.pdf

17. About 10% of California adults have diagnosed diabetes, and approximately 33.4% of adults have prediabetes.[23] Every year, an estimated 230,273 additional people in California are diagnosed with diabetes.[24] Total direct medical expenses for diagnosed diabetes in California were estimated at $34.1 billion in 2022.[25]

18. About 9.3% of Connecticut adults have diagnosed diabetes, and approximately 33.1% of adults have prediabetes.[26] Every year, an estimated 21,395 additional people in Connecticut are diagnosed with diabetes.[27] Total direct medical expenses for diagnosed diabetes in Connecticut were estimated at $3.5 billion in 2022.[28]

19. About 10.9% of Virginia adults have diagnosed diabetes, and approximately 33.3% of adults have prediabetes.[29] Every year, an estimated 51,233 additional people in Virginia are

---

[23] *The Burden of Diabetes in California,* AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_California.pdf (last visited Jan. 9, 2026).

[24] *Id.*

[25] *The Burden of Diabetes in California,* AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-05/the-burden-of-diabetes-california-05-08-25.pdf

[26] *The Burden of Diabetes in Connecticut,* AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_Connecticut.pdf (last visited Jan. 9, 2026).

[27] *Id.*

[28] *The Burden of Diabetes in Connecticut,* AMERICAN DIABETES ASSOCIATION (August 26, 2025), https://diabetes.org/sites/default/files/2025-08/connecticut-diabetes-08-26-25.pdf.

[29] *The Burden of Diabetes in Virginia,* AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_Virginia.pdf (last visited Jan. 9, 2026).

diagnosed with diabetes.[30] Total direct medical expenses for diagnosed diabetes in Virginia were estimated at $8.2 billion in 2022.[31]

20. About 12.3% of adults in Ohio have diagnosed diabetes, and approximately 33.6% of adults have prediabetes.[32] Every year, an estimated 69,361 additional people in Ohio are diagnosed with diabetes.[33] Total direct medical expenses for diagnosed diabetes in Ohio were estimated at $11.8 billion in 2022.[34]

21. About 12.3% of adults in Texas have diagnosed diabetes, and approximately 34% of adults have prediabetes.[35] Every year, an estimated 177,174 people in Texas are diagnosed with diabetes.[36] Total direct medical expenses for diagnosed diabetes in Texas were estimated at $25.4 billion in 2022.[37]

22. Much of this burden is driven by inflated insulin prices resulting from Defendants' scheme to raise and maintain those prices.

---

[30] *Id.*

[31] *The Burden of Diabetes in Virginia,* AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-05/the-burden-of-diabetes-virginia-05-08-25.pdf.

[32] *The Burden of Diabetes in Ohio*, AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_Ohio.pdf (last visited Jan. 9, 2026).

[33] *Id.*

[34] *The Burden of Diabetes in Ohio*, AMERICAN DIABETES ASSOCIATION (Aug. 26, 2025), https://diabetes.org/sites/default/files/2025-08/ohio-diabetes-08-26-25.pdf.

[35] *The Burden of Diabetes in Texas*, AMERICAN DIABETES ASSOCIATION, https://diabetes.org/sites/default/files/2023-09/ADV_2023_State_Fact_sheets_all_rev_Texas.pdf (last visited Jan. 13, 2026).

[36] *Id.*

[37] *The Burden of Diabetes in Texas*, AMERICAN DIABETES ASSOCIATION (May 8, 2025), https://diabetes.org/sites/default/files/2025-05/the-burden-of-diabetes-texas-05-08-25.pdf.

## III. THE INSULIN PRICING SCHEME

23. Defendants Eli Lilly, Novo Nordisk, and Sanofi[38] (collectively, the "Manufacturer Defendants") supply essentially all insulin used in the United States and control over 90% of the global insulin market.[39] As of 2020, the Manufacturer Defendants controlled 92% of global market share by volume and 96% of global market share by revenue for insulin products.[40]

24. Defendants CVS Caremark, Express Scripts, and OptumRx[41] (collectively, the "PBM Defendants") control national formularies used by most payors, including employer plans. The PBM Defendants control more than 80% of the PBM market and operate three of the top five dispensing pharmacies in the United States. The PBM Defendants are also owned and controlled by entities that own three of the largest insurance companies in the United States. CVS Health, Inc. owns Aetna and CVS Caremark. The Cigna Group owns Express Scripts. UnitedHealth Group owns OptumRx.

25. The prescription drug supply chain relevant to the at-issue diabetes medications involves four principal categories of market participants: payors, pharmacy benefit managers, rebate aggregators, and manufacturers. Each plays a distinct role in determining coverage, pricing, and net costs for prescription drugs, including insulin and other diabetes therapies.

26. **Payors**: Health insurance plans—often self-funded by employers such as Plaintiffs—provide coverage and pay for prescription drugs through their pharmacy benefits. In these arrangements, the plan pays a substantial portion of the purchase price of covered prescription medications, including the diabetes medications at issue. Operators of these plans

---

[38] Relevant entities named as defendants in this action are described in full in Section IV(B) below.

[39] Knox, *supra* note 7, at 8-9.

[40] *Id.*

[41] *See infra* Section IV(B).

may be referred to as payors, plan sponsors, or "PBM clients." The primary categories of payors include government or public payors and private payors such as Plaintiffs.

27. **Pharmacy Benefit Managers**: Payors customarily retain pharmacy benefit managers ("PBMs") to administer pharmacy benefits, to negotiate with drug manufacturers, and purportedly to assist in managing drug spending. PBMs maintain formularies—lists of covered drugs—and leverage their power to include or exclude drugs to influence manufacturer pricing and market access. PBMs also contract with retail or specialty pharmacies to dispense covered medications to plan beneficiaries. PBMs are compensated in part by retaining a portion of the savings they claim to generate on drug costs, as well as through various fees and retained rebates.

28. **Rebate Aggregators**: Rebate aggregators are group purchasing organizations ("GPO") that negotiate and collect manufacturer rebates and other fees on behalf of PBM clients. Between 2018 and 2022, each of the three PBM Defendants established its own rebate aggregator GPO—Zinc, Ascent, and Emisar (collectively, the Rebate Aggregator Defendants)—to which they outsourced the negotiation and collection of rebates and related fees, and through which they imposed additional fees on manufacturers for purported aggregator services. The Rebate Aggregator Defendants further obscure the rebate payment flows and enable PBMs to extract additional profits from payor contracts.

29. **Manufacturers**: Drug manufacturers produce prescription medicines, including the at-issue insulin and other diabetes medications. Each manufacturer sets a list price for its products, commonly referred to as the Wholesale Acquisition Cost (WAC). Manufacturers self-report list prices to drug databases such as First DataBank and similar price reporting services used throughout the industry for pricing references and reimbursement benchmarks.

30. A general diagram of the flow of products and payments is below:

**Figure 1: General diagram of the flow of products and payments**




31. Insulin medications span three principal categories. Biologics are insulins derived from living organisms. Biosimilars are "highly similar" versions of biologic reference products, conceptually akin to generics but evaluated against biologic, rather than small-molecule, comparators. Authorized generics are approved brand-name drugs marketed without the brand label, but they are not true generics. Historically, the FDA approved original insulins as drug products rather than biologics, which initially prevented the introduction of insulin biosimilars via the biologics pathway. In 2020, the FDA reclassified insulin to the biologic regulatory framework, thereby enabling approval of insulin biosimilars through an abbreviated pathway and altering market entry dynamics for follow-on insulin products.

32. For the purposes of this complaint, the at-issue drugs can be broken up into four categories: (1) rapid-acting insulins—Humalog (Eli Lilly), Novolog (Novo Nordisk), and Apidra

(Sanofi)[42]; (2) human insulins—Humulin R, Humulin N, Humulin 70/30 (Eli Lilly), Novolin R, Novolin N, Novolin 70/30 (Novo Nordisk), and Humulin R U-500 (concentrated) (Eli Lilly); long-acting/basal insulins—Lantus (Sanofi), Levemir (Novo Nordisk), Basaglar (Eli Lilly), Toujeo (Sanofi), Tresiba (Novo Nordisk); and (4) GLP-1 products—Ozempic (Novo Nordisk), Trulicity (Eli Lilly), Mounjaro (Eli Lilly), Xultolphy (Novo Nordisk), Rybelsus (Novo Nordisk), and Victoza (Novo Nordisk)—as well as the combination product Soliqua (Sanofi).

33. The Manufacturer Defendants set the initial list prices for their respective insulin medications. Over the last twenty years, the list prices for insulins have increased fivefold even as the cost of producing the drugs has decreased.[43] Today, manufacturers produce insulin for as little as $2 per vial;[44] manufacturers price the vials between $300 and $700.[45] As an example, in 1999, Eli Lilly charged $21 for a vial of Humalog. In 2019, Eli Lilly charged $332 for a vial, reflecting a price increase of more than 1000%.[46]

34. During the relevant period, the Manufacturer Defendants increased insulin prices, moving their list prices together rather than competing on price. Even when the Manufacturer Defendants later announced price cuts in 2023, they did so within weeks of each other,

---

[42] Eli Lilly and Novo Nordisk also manufacture pre-mixed varieties of the rapid-acting insulin products listed, including Humalog 50/50 (Eli Lilly), Humalog 75/25 (Eli Lilly), and Novolog 70/30 (Novo Nordisk).

[43] Arthur Allen, *Why Does Insulin Cost So Much? Big Pharma Isn't the Only Player Driving Prices*, KFF HEALTH NEWS (March 9, 2023), https://kffhealthnews.org/news/article/insulin-costs-pharmacy-benefit-managers-drug-manufacturers/#:~:text=For%20example%2C%20Sanofi%20paid%20rebates,type%20used%20by%20most%20patients.

[44] *Id.*

[45] Mike Hoskins, *Why Is Insulin So Expensive?*, HEALTHLINE (Aug. 20, 2025), https://www.healthline.com/health/diabetes/insulin-pricing.

[46] Rajkumar, *supra* note 8, at 22.

underscoring their long-running practice of colluding on price rather than competing to bring costs down for patients.[47]

35. Self-funded health plans cover a substantial share of pharmacy costs for beneficiaries and rely on PBMs to negotiate terms with manufacturers and to build formularies that ostensibly lower drug spend.

36. PBMs maintain national formularies that largely determine which drugs are available to tens of millions of Americans. Formulary placement determines whether and on what terms a drug is covered nationwide. Placement on a preferred tier boosts sales; exclusion can make a drug effectively unavailable to many patients. As Eli Lilly explained to its investors in its 2019 Form 10-K filing with the SEC, failing to secure formulary placement can "lead to reduced usage of a product for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to reimbursement limitations that result in higher consumer out-of-pocket cost, such as non-preferred co-pay tiers, increased co-insurance levels, and higher deductibles."[48]

37. In a fair market, this power should push manufacturers to lower list prices to gain access. Instead, manufacturers "compete" for preferred placement by raising list prices and paying back a significant, undisclosed portion of those increases to PBMs and their affiliates in the form of rebates, inflation or price-protection fees, administrative fees, credits, and other disguised transfers (collectively, the "Manufacturer Payments"). As a result, PBMs sell formulary access

---

[47] Brian Bushard, *Sanofi Cuts Insulin Prices Up To 78%—Following Eli Lilly And Novo Nordisk*, FORBES (Mar. 16, 2023), https://www.forbes.com/sites/brianbushard/2023/03/16/sanofi-cuts-insulin-prices-up-to-78-following-eli-lilly-and-novo-nordisk/.

[48] Eli Lilly and Co., Annual Report (Form 10-K) (FYE Dec. 31, 2024) at 35, https://investor.lilly.com/static-files/ff06ed54-9f64-4b7f-8529-c0278d635eac.

based on the size of manufacturer payments that are tied to list price—not on lower net costs to payors—so drugs with higher list prices are rewarded.

38. By labeling these sums as "fees," rather than "rebates," PBMs prevent payors from verifying what was paid, retained, or reclassified. PBMs keep large sums outside the "rebate" definition despite promising full pass-through of "savings."

39. For transactions in which the PBM Defendants control the insurer, the PBM, and the pharmacy (as is the case here), the PBM Defendants capture as much as half of the money spent by the payor on each insulin prescription, despite adding little value in terms of the innovation, development, manufacture, or production of the drugs. As an example, Sanofi paid 2% to 4% in rebates of its insulin list price in 2013. In 2018, Sanofi paid 58% of the insulin list price in rebates. During the same period, Sanofi tripled the price of Lantus to $275 per vial.[49]

40. The PBM Defendants falsely represent to payors—publicly and directly—that they leverage their market power to reduce costs. These representations were false and deceptive. In reality, the PBM Defendants intentionally structured their negotiations and formulary strategies to incentivize Manufacturers to raise list prices, thereby increasing rebate spreads and fee-based revenues for PBMs and profits for Manufacturers. This conduct directly caused substantial escalation in prices for the at-issue diabetes medications and conferred unearned financial benefits on both sets of Defendants.

41. Through the Insulin Pricing Scheme, the PBM Defendants profit at both ends. In a pre-PBM market, a competitively priced drug might have cost a health plan $50, and that is what it paid. Now, the PBM Defendants coordinate with Manufacturer Defendants to raise the list price to $150, then "negotiate" it down to $100 while taking a $50 rebate. Although some portion of that

[49] Allen, *supra* note 46.

rebate may be passed to the payor, the payor's net cost—while lower than the inflated list price—is still substantially higher than it would have been without PBM involvement.

42. Defendants' scheme operates by tying market access and preferred formulary placement to higher list prices and associated rebates and fees rather than to lower net costs. Because the purchase price for every at-issue diabetes medication flows from the inflated list prices generated by this unfair and deceptive conduct, the resulting prices do not reflect transparent or competitive market forces. Instead, they derive from opaque and unlawful practices designed to maximize PBM and Manufacturer revenues. The foreseeable and intended effect of this scheme has been sustained anti-competitive inflation of list prices, distorted reimbursement benchmarks, and higher costs borne by payors for life-sustaining diabetes medications.

43. Every payor in the United States that purchases the at-issue diabetes medications, including Plaintiffs, have been directly and proximately harmed by the Insulin Pricing Scheme. As payors for and purchasers of the at-issue drugs during the relevant period, Plaintiffs paid prices that were substantially higher than they would have paid in a free and open market. A significant portion of the amounts paid by Plaintiffs reflect artificially inflated prices that arose not from legitimate competition or transparent price setting, but from Defendants' undisclosed, deceptive, and unlawful conduct.

44. This action alleges that by engaging in and profiting from the Insulin Pricing Scheme, Defendants violated the Racketeer Influenced and Corrupt Organizations Act[50], Section 1 of the Sherman Act, the Robinson-Patman Act, and state antitrust and consumer protection

---

[50] Plaintiffs acknowledge that the Court has dismissed the civil RICO and RICO-conspiracy claims brought under 18 U.S.C. § 1962(c) and § 1962(d) by Lake County, Albany County, and King County (the "County Plaintiffs"), and denied the motion for reconsideration of this decision. *See* ECF No. 827; *see also* ECF Nos. 729, 730, 731, 732. To the extent those decisions are applicable to Plaintiffs, Plaintiffs plead those claims here to preserve all issues for appellate review.

laws[51]. Defendants' conduct directly and foreseeably caused harm to Plaintiffs and continues to do so, as the inflated pricing framework remains in place and continues to drive supracompetitive costs for the at-issue diabetes medications.

45. Plaintiffs seek injunctive relief, restitution, disgorgement, actual damages, treble damages, statutory damages and penalties, punitive damages, attorneys' fees and costs, and all other available relief to address and abate the harm caused by the Insulin Pricing Scheme.

46. Unless otherwise stated, the "relevant period" alleged is from 2007 to the present.

## IV. PARTIES

### A. Plaintiffs

**RAD Sub-Trust A**

47. Rite Aid Corporation is a Delaware corporation with its principal place of business at 30 Hunter Lane, Camp Hill, Pennsylvania. Rite Aid Corporation is a parent company to various subsidiaries, including Rite Aid Hdqtrs. Corp. (collectively, "Rite Aid").

48. Rite Aid provided health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who numbered in the thousands throughout the relevant period. One benefit Rite Aid provided the beneficiaries of its healthcare plan was paying for their pharmaceutical needs. Rite Aid, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Rite Aid had PBM service agreements ("PBM Agreement") in place with OptumRx, Inc. for PBM services.

---

[51] Plaintiffs also assert claims under New York General Business Law § 349. Plaintiffs recognize that the Court previously dismissed Albany County's claim under N.Y. G.B.L. § 349 with prejudice. *See* ECF No. 731 at 18-22. To the extent that decision is applicable to Plaintiffs, Plaintiffs plead their N.Y. G.B.L. § 349 claim here to preserve all issues for appellate review.

49. Plaintiff RAD Sub-Trust A is the assignee and holder of the claims previously held by Rite Aid prior to its bankruptcy in 2023.

50. On October 15, 2023, the Rite Aid filed for protection under chapter 11 of title 11 of the Unites States Code in the U.S. Bankruptcy Court for the District of New Jersey. Chapter 11 Voluntary Pet., *In re Rite Aid Corp.*, No. 23-1899, *aff'd* (Bankr. D.N.J. Oct. 15, 2023), ECF No. 1.

51. On August 16, 2024, the Bankruptcy Court entered an Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Rite Aid Corporation and its Debtor Affiliates (with further modifications). *See In re Rite Aid Corp.*, No. 23-1899 (Bankr. D.N.J. Aug. 16, 2024), ECF No. 4532 (referred to herein as the "Confirmation Order"); *see also id.* at Ex. A, Plan, (referred to herein as the "Plan"). On August 30, 2024, the "Effective Date" of the Plan occurred, and the Plan was consummated. *In re Rite Aid Corp.*, No. 23-1899 (Bankr. D.N.J. Sept. 3, 2024, 2023), ECF No. 4800.

52. The Plan assigned certain of the Rite Aid's insurance rights to a "Litigation Trust." Pursuant to the "Master Trust Agreement" governing the Litigation Trust and its associated "Sub-Trust A Agreement," Sub-Trust A has been assigned and is responsible for pursuing the "Assigned Claims," which are defined broadly under the Plan to mean "all of the Debtors' claims and Causes of Action, including all of the Debtors' claims against Excluded Parties" that are specifically enumerated under the Plan.

53. The Confirmation Order further provides that "the Litigation Trust or GUC Sub-Trust(s) as may be applicable, shall have exclusive standing to pursue the Assigned Claims . . . and … the Litigation Trustee or GUC Sub-Trust Trustee(s), pursuant to the Committee Settlement

Documents, shall … retain and may exclusively enforce any and all Assigned Claims and Assigned Insurance Rights." Confirmation Order at ¶ 144.

**Bed Bath & Beyond**

54. Plaintiff 20230930-DK-Butterfly-1, Inc. is a New York corporation with its principal place of business located at 650 Liberty Avenue, Union, New Jersey. Plaintiff 20230930-DK-Butterfly-1, Inc. was formerly known as Bed Bath & Beyond until Bed Bath & Beyond's bankruptcy and reorganization in 2023.

55. For the purposes of this complaint, 20230930-DK-Butterfly-1 is referred to as "Bed Bath & Beyond."

56. Bed Bath & Beyond provided health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period. One benefit Bed Bath & Beyond provided the beneficiaries of its healthcare plan was paying for their pharmaceutical needs. Bed Bath & Beyond had, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Bed Bath & Beyond had PBM service agreements ("PBM Agreement") in place with OptumRx, Inc. for PBM services.

**Sterling Jewelers, Inc.**

57. Plaintiff Sterling Jewelers Inc. is a Delaware corporation with its principal place of business located at 375 Ghent Road, Akron, Ohio 44333. Sterling Jewelers, Inc., together with its affiliates, including Zale Corporation and Zale Delaware Inc. ("Sterling Jewelers"), is a global leading jewelry company. Its parent company is Signet Jewelers Ltd.

58. Sterling provides health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the

relevant period. One benefit Plaintiff provides the beneficiaries of its healthcare plan is paying for their pharmaceutical needs. Plaintiff has, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Plaintiff had PBM service agreements ("PBM Agreement") in place with OptumRx, Inc. and CaremarkPCS Health, L.L.C. ("CVS Caremark") for PBM services.

**Mondelez Global LLC**

59. Plaintiff Mondelez Global LLC is a Delaware limited liability company with its principal places of business located at 100 Deforest Ave, East Hanover, New Jersey 07936 and West Fulton Market, Ste. 200, Chicago, IL 60607.

60. Plaintiff provides health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period. One benefit Plaintiff provides the beneficiaries of its healthcare plan is paying for their pharmaceutical needs. Plaintiff has, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Plaintiff had PBM service agreements ("PBM Agreements") in place with CaremarkPCS Health, L.L.C. ("CVS Caremark") for PBM services.

**US Foods, Inc.**

61. Plaintiff US Foods, Inc. is a Delaware corporation with its principal place of business located at 9399 W. Higgins Road, Suite 500 Rosemont, Illinois 60018.

62. Plaintiff provides health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period. One benefit Plaintiff provides the beneficiaries of its healthcare plan is paying for their pharmaceutical needs. Plaintiff has, for years, interacted with and/or engaged in business

with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Plaintiff had PBM service agreements ("PBM Agreement") in place with CaremarkPCS Health, L.L.C. ("CVS Caremark") for PBM services.

**Tenneco Automotive Operating Company**

63. Plaintiff Tenneco Automotive Operating Company is a Delaware corporation with its principal place of business located at 15701 Technology Drive, Northville, Michigan 48168.

64. Tenneco Automotive Operating Company, with its associated entity DriV, Inc. (together, "Tenneco"), provides health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period. One benefit Plaintiff provides the beneficiaries of its healthcare plan is paying for their pharmaceutical needs. Plaintiff has, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Plaintiff had PBM service agreements ("PBM Agreement") in place with CaremarkPCS Health, L.L.C. ("CVS Caremark") for PBM services.

**Kraft Heinz Foods Company**

65. Plaintiff Kraft Heinz Foods Company is a Delaware corporation with its principal places of business located at 200 E. Randolph Street, Suite 7600, Chicago, Illinois 60601 and 1 PPG Place, Pittsburgh, Pennsylvania 15222.

66. Plaintiff provides health and pharmacy benefits to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period. One benefit Plaintiff provides the beneficiaries of its healthcare plan is paying for their pharmaceutical needs. Plaintiff has, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications.

During the relevant period, Plaintiff had PBM service agreements ("PBM Agreement") in place with CaremarkPCS Health, L.L.C. ("CVS Caremark") for PBM services.

**The Boeing Company**

67. Plaintiff The Boeing Company is a Delaware corporation with its principal place of business located at 929 Long Bridge Drive, Arlington, Virginia 22202.

68. Plaintiff provides health and pharmacy benefits, through its plans, The Boeing Company Master Welfare Plan and The Boeing Company Master Retiree Welfare Plan (together, with The Boeing Company, "Boeing") to its beneficiaries, including employees, retirees, and their dependents, who have numbered in the thousands throughout the relevant period. One benefit Plaintiff provides the beneficiaries of its healthcare plans is paying for their pharmaceutical needs. Plaintiff has, for years, interacted with and/or engaged in business with the PBM Defendants concerning pharmacy services and the at-issue diabetes medications. During the relevant period, Boeing had PBM service agreements ("PBM Agreements") in place with Express Scripts, Inc. for PBM services.

**B. The Manufacturer Defendants**

**Eli Lilly**

69. Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

70. Eli Lilly is registered to do business in Illinois.

71. In Illinois, and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications, including: Humulin N (first U.S. approval in 1982), Humulin R (first U.S. approval in 1982), Humalog (first U.S. approval in 1996), Trulicity (first U.S. approval in 2014), and Basaglar (first U.S. approval in 2015).

72. Eli Lilly employs sales representatives throughout Illinois, to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar, and it utilizes wholesalers—McKesson, AmerisourceBergen, and Cardinal Health—to distribute these products to pharmacies and healthcare professionals within those states.

73. Eli Lilly directs advertising and informational materials to physicians and potential users of its products in Illinois.

74. Eli Lilly transacts business in Illinois targeting these markets for its products, including the at-issue diabetes medications.

75. Eli Lilly's domestic revenues from 2019 to 2021 were $11.9 billion from Trulicity, $4.48 billion from Humalog, $2.58 billion from Humulin, and $2.31 billion from Basaglar.[52]

76. Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.

77. At all times relevant hereto, and in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout Illinois with the express knowledge that payment by Plaintiffs would be based on those false list prices.

78. During the relevant period, Plaintiffs purchased Eli Lilly's at-issue drugs through its employee health plans at prices based on the false list prices generated by the Insulin Pricing Scheme.

79. All Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Illinois based on the specific false and inflated prices Eli Lilly caused to be published in those states in furtherance of the Insulin Pricing Scheme.

**Sanofi**

---

[52] *See* Eli Lilly and Co., Annual Report (Form 10-K) (FYE Dec. 31, 2021).

80. Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

81. Sanofi is registered to do business in Illinois.

82. Sanofi manufactures, promotes, and distributes pharmaceutical drugs both nationally and in Illinois.

83. These include several at-issue diabetes medications: Lantus (first U.S. approval in 2000), Apidra (first U.S. approval in April 2004), Toujeo (first U.S. marketing authorization in February 2015), and Soliqua (first U.S. approval in November 2016).

84. Sanofi touts Lantus as one of its flagship products and one of Sanofi's leading products in 2021, with net sales of €2,494 million ($2.95 billion), as well as net sales of €2,661 million ($3.04 billion) in 2020, representing 7.4% of the company's net sales for 2020.[53]

85. Sanofi's U.S. net sales in 2019 were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.[54]

86. The foregoing figures are reported in Sanofi's Annual Reports (Forms 20-F) for fiscal years ending December 31, 2021, 2020, and 2019.

87. Sanofi transacts business in Illinois, targeting that market for its products, including the at-issue diabetes medications.

88. Sanofi employs sales representatives throughout Illinois to promote and sell Lantus, Toujeo, Apidra, and Soliqua, and it utilizes wholesalers to distribute these products to pharmacies and healthcare professionals within the state.

---

[53] Sanofi, Annual Report (Form 20-F) (FYE Dec. 31, 2021); Sanofi, Annual Report (Form 20-F) (FYE Dec. 31, 2020).

[54] Sanofi, Annual Report (Form 20-F) (FYE Dec. 31, 2021); Sanofi, Annual Report (Form 20-F) (FYE Dec. 31, 2020).

89. Sanofi also directs advertising and informational materials to physicians and potential users of its products in Illinois for the specific purpose of selling the at-issue drugs in those states.

90. At all relevant timses, in furtherance of the alleged Insulin Pricing Scheme, Sanofi published the prices of its at-issue diabetes medications in Illinois for the purpose of payment by payors, including Plaintiffs.

91. During the relevant period, Plaintiffs purchased Sanofi's at-issue drugs through their employee health plans at prices based on false list prices generated by the alleged Insulin Pricing Scheme.

92. All Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Illinois based on the specific false and inflated prices that Sanofi caused to be published in Illinois in furtherance of the alleged Insulin Pricing Scheme.

**Novo Nordisk**

93. Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

94. Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs in Illinois and nationally, including Novolin R (first U.S. approval in 1991), Novolin N (first U.S. approval in 1991), Novolog (first U.S. approval in June 2002), Levemir (first U.S. approval in June 2005), Victoza (first U.S. approval in January 2010), Tresiba (first U.S. approval in 2015), and Ozempic (first U.S. approval in 2017).

95. Novo Nordisk transacts business in Illinois targeting these markets for its products, including the at-issue diabetes medications.

96. Novo Nordisk employs sales representatives throughout Illinois to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic, and it utilizes

wholesalers to distribute the at-issue products to pharmacies and healthcare professionals within Illinois.

97. Novo Nordisk directs advertising and informational materials to physicians and potential users of Novo Nordisk's products in Illinois.

98. Novo Nordisk's combined net sales of these drugs in the United States from 2018 to 2020 totaled approximately $18.1 billion (approximately $6.11 billion for Victoza alone).

99. Novo Nordisk's global revenues for total diabetes care over that three-year period exceeded $41 billion.

100. At all times relevant hereto, and in furtherance of the Insulin Pricing Scheme, Novo Nordisk published the prices of its at-issue diabetes medications throughout Illinois for the purpose of payment by Plaintiffs.

101. During the relevant period, Plaintiffs purchased Novo Nordisk's at-issue diabetes medications at prices based on false list prices generated by the Insulin Pricing Scheme through their employee health plans.

102. All Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or reimbursed in Illinoisbased on the specific false and inflated prices Novo Nordisk caused to be published in Illinois in furtherance of the Insulin Pricing Scheme.

### C. The PBM Defendants

**CVS Caremark**

103. Defendant CVS Health Corporation is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

104. CVS Health conducts business across the United States, including in Illinois, and its conduct had direct effects in that state.

105. CVS Health's executives and employees, including its senior leadership, create and implement policies that govern its PBM services and formularies, including for the diabetes drugs at issue.

106. CVS Health regularly communicates with and directs its subsidiaries regarding PBM services and formulary decisions.

107. In public filings over the past decade, CVS Health stated that it designs pharmacy benefit plans to reduce client costs while protecting member safety, negotiates drug discounts with manufacturers to lower client costs, and uses a Pharmacy and Therapeutics Committee to select safe and effective drugs for its formularies.

108. CVS Health publicly claims to lower diabetes drug costs. In 2016, it announced a nationwide program, including in Illinois to reduce overall diabetes spending for PBM clients and to lower pharmacy costs for diabetes medications, projecting per-member annual savings for improved diabetes control.[55]

109. In 2017, CVS Health reported that its PBM strategies reduced drug trend to 1.9% per member per year and held drug price growth to 0.2% despite manufacturer price increases of nearly 10%.[56]

110. In November 2018, CVS Health acquired Aetna for $69 billion, becoming a combined health insurer, PBM, and mail-order and retail pharmacy chain, thereby controlling the drug payment chain for approximately 40 million Aetna members nationwide, including in Illinois.

---

[55] *CVS Health Introduces New "Transform Diabetes Care" Program to Improve Health Outcomes and Lower Overall Health Care Costs*, PHARMACY TIMES (Dec. 13, 2016), https://www.pharmacytimes.com/view/cvs-health-introduces-new-transform-diabetes-care-program-to-improve-health-outcomes-and-lower-overall-health-care-costs.

[56] *Current and New Approaches to Making Drugs More Affordable*, CVS HEALTH (Aug. 2018), https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/ingestion/cvs-health-current-and-new-approaches-to-making-drugs-more-affordable.pdf

111. CVS Health directly or indirectly owns numerous pharmacy subsidiaries operating hundreds of pharmacies in Illinois including CVS Pharmacy, Inc., which is registered to do business in those states. These pharmacies dispensed and were paid for the at-issue diabetes medications during the relevant period.

112. According to CVS Health's 2024 Form 10-K, it maintains a national network of approximately 65,000 U.S. retail pharmacies, including CVS Pharmacy locations and independent pharmacies.[57]

113. **Defendant CVS Pharmacy, Inc.** is a Rhode Island corporation with its principal place of business at the same address as CVS Health and is registered to do business in Illinois.

114. CVS Pharmacy directly or indirectly owns and operates hundreds of pharmacies in Illinois and is involved in dispensing and payment policies for the at-issue diabetes medications.

115. CVS Pharmacy is the direct parent of Defendant Caremark Rx, LLC and holds numerous Illinois pharmacy licenses while providing retail pharmacy services in Illinois during the relevant period that contributed to the Insulin Pricing Scheme and harmed payors, including Plaintiffs.

116. **Defendant Caremark Rx, LLC** is a Delaware limited liability company that directly or indirectly owns PBM and mail-order subsidiaries engaged in the conduct at issue in Illinois. It is a subsidiary of CVS Pharmacy, which is wholly owned by CVS Health, and shares the same principal place of business.

---

[57] CVS Health Corp., Annual Report (Form 10-K) (FYE Dec. 31, 2024), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000064803/69ae70d3-3fe0-44a0-b601-f21026f8a49a.pdf

117. During the relevant period, Caremark Rx, LLC provided PBM and mail-order pharmacy services in in Illinois that contributed to the Insulin Pricing Scheme and harmed payors, including Plaintiffs.

118. **Defendant Caremark, LLC** is a California limited liability company with its principal place of business at the same address as CVS Health. It is a subsidiary of Caremark Rx, LLC, which is a subsidiary of CVS Pharmacy, which is wholly owned by CVS Health, and it is registered to do business in Illinois.

119. Caremark, LLC holds Illinois pharmacy licenses and, during the relevant period, provided PBM and mail-order services in Illinois that contributed to the Insulin Pricing Scheme and harmed payors, including Plaintiffs.

120. **Defendant CaremarkPCS Health, LLC** is a Delaware limited liability company with its principal place of business at the same address as CVS Health. It is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Caremark Rx, LLC, which is a subsidiary of CVS Pharmacy Inc., which is wholly owned by CVS Health, and it is registered to do business in Illinois.[58]

121. CaremarkPCS Health, doing business as CVS Caremark, provides PBM services and, during the relevant period, provided PBM services in Illinois that implemented the Insulin Pricing Scheme and harmed payors, including Plaintiffs.

122. **Defendant Zinc Health Services**, **LLC** is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Zinc is a direct subsidiary of CVS Pharmacy, which is a direct subsidiary of CVS Health.

---

[58] *Id.*

123. CVS Health formed Zinc in March 2020 as a group purchasing organization for CVS Caremark's PBM business to negotiate rebates with drug manufacturers, including for the at-issue drugs sold and distributed in Illinois during the relevant period.

124. CaremarkPCS Health, Caremark, LLC, and Zinc act as agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

125. CVS Health, CVS Pharmacy, and Caremark Rx, LLC control CaremarkPCS Health's and Caremark, LLC's operations, management, and business decisions concerning formulary design, manufacturer payments, and mail-order and retail pharmacy services through interlocking directors and shared executives.

126. Many of the same officers and directors have held roles across these entities, including shared legal, finance, treasury, risk, and tax leadership positions, evidencing unified control and management.

127. CVS Health owns all stock of CVS Pharmacy, which owns all stock of Caremark Rx, LLC, which owns all stock of Caremark, LLC. CVS Health directly or indirectly owns CaremarkPCS Health and Zinc.

128. CVS Health presents these entities in public filings as parts of a single, diversified health services company that coordinates across divisions, including a group purchasing function that negotiates drug prices and rebates.[59] Their day-to-day operations reflect a single business enterprise and should be treated as such for the obligations at issue.[60]

---

[59] CVS Health Corp., Annual Report (Form 10-K), (FYE Dec. 31, 2020-24).

[60] CVS Caremark Corp./CVS Health Corp., Annual Report (Form 10-K) (Dec. 31, 2009-2024); *Our Purpose*, CVS HEALTH, https://cvshealth.com/about-cvs-health/our-purpose (last visited Jan. 10, 2026); *Outcomes and quality*, CVS HEALTH, https://cvshealth.com/health-with-heart/improving-health-care/quality- of-care (last visited Jan. 10, 2026).

129. Executives of CaremarkPCS Health, Caremark, LLC, Caremark Rx, LLC, CVS Pharmacy, and Zinc ultimately report to CVS Health leadership, including its President and CEO. And CVS Health's senior executives are directly involved in policies and decisions by Caremark, LLC and CaremarkPCS Health.

130. Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, CaremarkPCS Health, and Zinc, including all predecessors and successors, are referred to collectively as "CVS Caremark."

131. CVS Caremark is sued in its capacities as a PBM, a rebate aggregator, and a mail-order pharmacy.

132. As a PBM, CVS Caremark coordinated with Novo Nordisk, Eli Lilly, and Sanofi on pricing of the at-issue diabetes medications and their placement on CVS Caremark formularies.

133. CVS Caremark holds the largest PBM market share by prescription claims managed and offers plan design, formulary management, network management, mail-order and specialty pharmacy, clinical services, and medical spend management. Its pharmacy services segment reported record new business and more than $153 billion in 2021 revenue, atop substantial 2019–2020 revenues.[61]

134. At all relevant times, CVS Caremark offered PBM services nationwide, including to Illinois's payors, derived substantial revenue from those services, made misrepresentations while concealing the Insulin Pricing Scheme, and used false list prices produced by that scheme.

---

[61] CVS Health Corp., Annual Report (Form 10-K) (FYE Dec. 31, 2021), https://www.sec.gov/Archives/edgar/data/64803/000006480322000008/cvs-20211231.htm.

135. CVS Caremark maintained standard formularies used nationwide, including in Illinois, which included the at-issue diabetes medications. CVS Caremark participated in pricing those drugs based on list prices it knew were false.

136. CVS Caremark purchased drugs directly from manufacturers for dispensing through its pharmacy network.

137. As a retail pharmacy, CVS Caremark profited from the false list prices by keeping the spread between its acquisition costs (below the false list prices) and the amounts paid by payors, which were based on those false list prices and often set by CVS Caremark in its PBM role.

138. During the relevant period, CVS Caremark provided mail-order and retail pharmacy services nationwide and in Illinois using prices based on the false list prices generated by the Insulin Pricing Scheme and derived substantial revenue in Illinois from dispensing the at-issue medications.

139. During the relevant period, CVS Caremark made representations to Plaintiffs in response to requests for proposals for PBM services and, in doing so, reinforced the false list prices for the at-issue drugs.

140. CVS Caremark had express agreements with Novo Nordisk, Sanofi, and Eli Lilly concerning manufacturer payments to CVS Caremark and the sale of the at-issue drugs through CVS Caremark's mail-order pharmacies.

**Express Scripts**

141. **Defendant Evernorth Health, Inc.** ("Evernorth"), formerly known as Express Scripts Holding Company until 2021, is a Delaware corporation with its principal place of

business at One Express Way, St. Louis, Missouri 63121.62 For purposes of this Complaint, "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

142. Evernorth, through its executives and employees (including its CEO and Vice Presidents), directly shapes company policies governing PBM services and formulary construction related to the at-issue drugs and the Insulin Pricing Scheme.

143. Regularly, Evernorth executives and employees communicate with and direct Evernorth's subsidiaries regarding the at-issue PBM services and formulary activities.

144. Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries operating throughout Illinois that engaged in the activities giving rise to this action.

145. In 2018, Evernorth merged with Cigna in a $67 billion deal consolidating the health insurer, PBM, and mail-order pharmacy businesses. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies used by approximately fifteen million Cigna members nationwide, including in Illinois, and controls the drug payment chain for these members.

146. In annual reports filed with the SEC throughout the last decade, Evernorth repeatedly and explicitly acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."[63]

147. In those same reports, Evernorth stated that it "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-

---

[62] Until 2021, Evernorth Health, Inc. did business as Express Scripts Holding Company; for purposes of this Complaint, "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

[63] Express Scripts Holding Co.; Cigna Group, Annual Reports (Form 10-K) (FYE Dec. 31, 2009-2024).

effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."[64]

148. Post-merger, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the Pharmacy Rebate Program, while subsidiary Express Scripts provides "formulary management services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability."[65] In 2021, Evernorth reported adjusted revenues of $131.9 billion (75.8% of Cigna Corporation's revenues), up from $116.1 billion in 2020.[66]

149. **Defendant Express Scripts, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth. Its principal place of business is at Evernorth's address.

150. Express Scripts, Inc. is registered to do business in Illinois.

151. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries operating throughout Illinois that engaged in the conduct giving rise to this action.

152. **Defendant Express Scripts Administrators, LLC**, doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth.

153. Express Scripts Administrators, LLC's principal place of business is One Express Way, St. Louis, Missouri 63121—the same as Evernorth.

---

[64] *Id.*

[65] Cigna Corp., Annual Report (Form 10-K) (FYE Dec. 31, 2021).

[66] *Id.*

154. During the relevant period, Express Scripts Administrators, LLC provided PBM services in Illinois that gave rise to the Insulin Pricing Scheme and damaged payors.

155. **Defendant Medco Health Solutions, Inc.** ("Medco") is a Delaware corporation with its principal place of business located at the same address as Evernorth. Until its acquisition by Express Scripts, Medco's principal place of business was in Franklin Lakes, New Jersey.

156. In 2012, Express Scripts acquired Medco for $29 billion.

157. Before the merger, Express Scripts and Medco were among the largest PBMs in the United States, including in Illinois.

158. Before the merger, Medco provided the at-issue PBM and mail-order services within Illinois which gave rise to the Insulin Pricing Scheme and damaged payors.

159. Following the merger, all of Medco's PBM and mail-order functions were combined into Express Scripts, which continued under the Express Scripts name; all Medco payor customers became Express Scripts customers. The combined company covered over 155 million lives at the time.

160. At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, David Snow, then-CEO of Medco, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater purchasing volume discounts [i.e., Manufacturer Payments] from drug manufacturers and other suppliers."[67]

---

[67] *Hearing on The Proposed Merger between Express Scripts and Medco Before the Subcomm. on Antitrust, Competition Policy, and Consumer Rights,* 112th Cong. (2011) (statement of David B. Snow, Jr., Chairman and CEO, Medco Health Solutions Inc.), available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6SnowTestimony.pdf (last visited Jan. 10, 2026).

161. At the same time, the then-CEO of Express Scripts, George Paz, provided written testimony to the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights, stating: "[a] combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."[68] First on Mr. Paz's list of "benefits of this merger" was "[g]enerating greater cost savings for patients and plan sponsors." [69]

162. **Defendant ESI Mail Pharmacy Service, Inc**. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth.

163. ESI Mail Pharmacy Service, Inc.'s principal place of business is the same as Evernorth's.

164. ESI Mail Pharmacy Service, Inc. is registered to do business in Illinois.

165. ESI Mail Pharmacy Service, Inc. holds active pharmacy licenses in Illinois.

166. During the relevant period, ESI Mail Pharmacy Service, Inc. provided the mail-order pharmacy services in Illinois discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged payors.

167. **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth.

168. Express Scripts Pharmacy, Inc.'s principal place of business is the same as Evernorth's.

---

[68] *Hearing on The Proposed Merger between Express Scripts and Medco Before the Subcomm. on Intellectual Property, Competition, and the Internet*, 112th Cong. (2011) (statement of George Paz, Chairman and CEO, Express Scripts Inc.), available at https://www.judiciary.senate.gov/imo/media/doc/11-12-6PazTestimony.pdf (last visited Jan. 10, 2026).

[69] *Id.*

169. Express Scripts Pharmacy, Inc. is registered to do business in Illinois.

170. During the relevant period, Express Scripts Pharmacy, Inc. provided the mail-order pharmacy services in Illinois discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged payors.

171. **Defendant Ascent Health Services LLC** ("Ascent") is a Delaware limited liability company with its principal place of business at Mũhlentalstrasse 36, 8200 Schaffhausen, Switzerland.

172. Ascent is part of Evernorth and a Cigna Corporation subsidiary.

173. Express Scripts established Ascent in 2019 as a GPO for Express Scripts' PBM business. Ascent was founded, at least in part, to negotiate rebates with drug manufacturers for Express Scripts and now performs this service for Express Scripts and third-party clients.

174. During the relevant period, Ascent negotiated rebates with the Manufacturers for at-issue drugs sold and distributed in Illinois.

175. Numerous interlocking directorships and shared executives allow Evernorth (f/k/a Express Scripts Holding Company, Inc.) and Express Scripts, Inc. to control Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Ascent's operations, management, and business decisions related to at-issue formulary construction, negotiations, and mail-order pharmacy services, to the detriment of payors.

176. During the relevant period, Defendants shared senior officers and directors across Evernorth, Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc.

177. Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc., and Ascent.[70]

178. The Evernorth corporate family does not operate as separate entities.[71] Public filings present its subsidiaries—including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc., and Ascent—as divisions or departments of a single company that "includes a broad range of coordinated and point solution health services and capabilities, as well as those from partners across the health care system, in pharmacy solutions, benefits management solutions, care delivery and care management solutions and intelligence solutions to deliver custom and flexible solutions that meet the needs of our clients and customers."[72] Day-to-day operations reflect these statements. These entities comprise a single business enterprise and should be treated as such for all legal obligations detailed in this Complaint.

179. During the relevant period, all executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc., and Ascent reported to Evernorth's executives, including the CEO.

180. Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy

---

[70] Express Scripts Hold. Co., Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

[71] Evernorth Health, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., and several other Express Scripts and Evernorth entities are subsidiaries of The Cigna Group and in recent years have been included in the same Form 10-k. *See* Cigna Group, Annual Report (Form 10-k) (FYE Dec. 31, 2024), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001739940/64c4c39f-1b4e-4979-8b4a-bfc403377665.pdf.

[72] Cigna Annual Report (Form 10-K) (FYE Dec. 31, 2021).

Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc., and Ascent that gave rise to Plaintiffs's claims in this Complaint.

181. Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Ascent—including all predecessor and successor entities—are referred to collectively as "Express Scripts."

182. Express Scripts is named as a Defendant in its capacities as a PBM, rebate aggregator, and mail-order pharmacy.

183. In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these Manufacturers' diabetes medications on Express Scripts' formularies.

184. Before merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States and, during the period covered by this Complaint, controlled up to 30% of the U.S. PBM market.[73]

185. Evernorth's conduct directly affected Illinoisand harmed Plaintiffs.

186. The Express Scripts network offers more than 68,000 retail pharmacies nationwide, including in Illinois.

187. Express Scripts transacts business throughout the United States, including in Illinois.

188. At all relevant times, Express Scripts derived substantial revenue from providing retail and mail-order pharmacy benefits in Illinois using prices based on the false list prices for the at-issue drugs.

---

[73] Express Scripts Holding Co., Annual Report (Form 10-K, Exhibit 21) (FYE Dec. 31, 2018).

189. At all times relevant, and contrary to its express representations, Express Scripts knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for payment for the at-issue drugs.

190. At all times relevant, Express Scripts concealed its critical role in the generation of those false list prices.

191. At all times relevant, Express Scripts maintained standard formularies that are used nationwide, including in Illinois. Those formularies included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

192. As a mail-order pharmacy, Express Scripts received payments from payors, like Plaintiffs, in Illinois and set out-of-pocket prices for the at-issue drugs based on falsely inflated prices generated by the Insulin Pricing Scheme, thereby damaging Plaintiffs.

193. At all relevant times, Express Scripts offered PBM services nationwide and maintained standard formularies used nationwide, including in Illinois. During the relevant period, those formularies included the diabetes medications at issue in this action.

194. Express Scripts purchases drugs directly from Manufacturers for dispensing through its mail-order pharmacy.

195. During years with some of the largest at-issue price increases, including 2013 and 2014, Express Scripts worked with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. In a February 2014 email released with the January 2021 Senate Insulin Report, Eli Lilly described a “Russian nested doll

situation" in which Express Scripts negotiated rebates on behalf of OptumRx related to the at-issue drugs for Cigna (which later became part of Express Scripts).[74]

196. At all relevant times, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' pharmacies.

**United Healthcare**

197. **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group") is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

198. UnitedHealth Group is a diversified managed healthcare company whose total revenues exceeded $324 billion in 2022 and $287 billion in 2021, reflecting annual growth of more than $30 billion per year since 2020, and it currently ranks fifth on the Fortune 500 list.[75]

199. UnitedHealth Group offers a broad spectrum of products and services, including health insurance plans through its wholly owned subsidiaries and prescription drug services through its pharmacy benefit manager ("PBM"), OptumRx, which accounts for more than one-third of overall revenues and operates a network of more than 67,000 pharmacies.

200. Acting through its executives and employees, UnitedHealth Group is directly involved in the policies that shape its PBM services and formulary construction, including those

[74] Letter from Joseph B. Kelley, VP of Glob. Gov. Affairs to Hon. Charles E. Grassley & Hon. Ron Wyden (on file with S. Fin. Comm.), available at https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited Jan 10. 2026).

[75] UnitedHealth Group, Inc., Annual Report (Form 10-K) (FYE Dec. 31, 2022), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2022/UNH-Q4-2022-Form-10-K.pdf.

concerning the at-issue drugs and the Insulin Pricing Scheme; executives structure, analyze, and direct overarching corporate policies—covering PBM and mail-order pharmacy services—to maximize profitability across the organization.

201. UnitedHealth Group's 2020 Sustainability Report states that OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower medication costs and to create tailored formularies to ensure patients receive appropriate medications.[76] UnitedHealth Group claims that it negotiates with pharmacies to lower costs at the point of sale, operates mail-order pharmacies, and works with wholesalers and distributors to ensure a consistent supply of brand and generic drugs.[77]

202. UnitedHealth Group owns and controls the major health insurance company UnitedHealthcare and, by virtue of that ownership and control, oversees the health plan/insurer, PBM, and mail-order pharmacies used by over 26 million UnitedHealthcare members in the United States, thereby controlling the entire drug payment chain for these Americans.[78]

203. UnitedHealth Group's annual reports represent that it uses Optum's capabilities to coordinate patient care, improve medical affordability, analyze cost trends, manage pharmacy benefits, work more effectively with care providers, and create a simpler consumer experience.[79] Its 2022 annual report further states that the company is involved in establishing prices charged by

---

[76] *2020 Sustainability Report*, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_SustainabilityReport.pdf (last visited Dec. 30, 2025).

[77] *Id.*

[78] *Overviews and Highlights*, UNITEDHEALTHCARE, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2022/conference/UHG_IC_22_UHC_Consolidated.pdf (last visited Dec. 30, 2025).

[79] UnitedHealth Group Inc., Annual Report (Form 10-K) (FYE Dec. 31, 2023).

retail pharmacies, determining which drugs are included on formularies, and selecting the retail pharmacies included in the networks offered to plan sponsors' members.[80]

204. As of year-end 2022 and 2021, UnitedHealth Group reported total pharmaceutical manufacturer rebates receivable of $8.2 billion and $7.2 billion, respectively, up from $6.3 billion in 2020.[81]

205. UnitedHealth Group's conduct had direct effects in Illinois.

206. **Defendant United Healthcare Services, Inc.** is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota, and is a direct subsidiary of UnitedHealth Group, Inc.; it provides administrative services to UnitedHealthcare payors.

207. **Defendant UnitedHealthcare Insurance Company** ("UHI") is a Connecticut corporation with its principal place of business in Hartford, Connecticut. It is an indirect subsidiary of UnitedHealth Group, Inc., and provides health insurance coverage to payors and insureds.

208. **Defendant Optum, Inc.** is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota; it is a health services company that manages subsidiaries administering pharmacy benefits, including Defendant OptumRx, Inc.

209. Optum, Inc., through its executives and employees, is directly involved in policies governing PBM services and formulary construction, including those related to the at-issue drugs and the Insulin Pricing Scheme, which had direct effects in Illinois.

210. According to an Optum, Inc. press release, Optum is UnitedHealth Group's information and technology-enabled health services platform serving care providers, plan

---

[80] UnitedHealth Group Inc., Annual Report (Form 10-K) (FYE Dec. 31, 2022).

[81] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2021); UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

sponsors, payers, life sciences companies, and consumers.[82] In that role, Optum, Inc. is directly responsible for the business units OptumInsight, OptumHealth, and OptumRx, and the CEOs of those units report directly to Optum, Inc. regarding their policies, including those affecting formulary construction and mail-order activities.[83]

211. **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main Street, Irvine, California 92614. It operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Defendant Optum, Inc.

212. OptumRx, Inc. is registered to do business in Illinois and, during the relevant period, provided PBM and mail-order pharmacy services in those states that gave rise to the Insulin Pricing Scheme and caused harm to payors, including Plaintiffs.

213. **Defendant OptumInsight, Inc.** ("OptumInsight") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota; it is registered to do business in Illinois.

214. OptumInsight is an integral part of the Insulin Pricing Scheme and, during the relevant period, coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy, analyzing data and advising the other Defendants regarding the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

215. **Defendant Emisar Pharma Services LLC** ("Emisar") is a Delaware limited liability company with its principal place of business at 1 Optum Circle, Eden Prairie, Minnesota

---

[82] *See Our Businesses*, UNITEDHEALTH GROUP,https://www.unitedhealthgroup.com/uhg/businesses.html (last visited Dec. 30, 2025); UnitedHealth Group Inc., Annual Report (Form 10-K) (Dec. 31, 2024).

[83] UnitedHealth Group Inc., Annual Report (Form 10-K) (FYE Dec. 31, 2024).

55344, with operations in the United States and Ireland. It is a wholly owned indirect subsidiary of UnitedHealth Group, Inc.

216. Optum established Emisar in June 2021 as a GPO for Optum's PBM business, and Emisar negotiates rebates with drug manufacturers on behalf of Optum's commercial clients. During the relevant period, Emisar negotiated rebates with the Manufacturer Defendants for at-issue drugs sold and distributed in Illinois.

217. Through numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC, and Optum, Inc. are directly involved in and control the operations, management, and business decisions of United Healthcare Services, Inc., UHI, OptumInsight, OptumRx, Inc., and Emisar related to formulary construction, negotiations, and mail-order pharmacy services.

218. These entities share common officers and directors.

219. UnitedHealth Group directly or indirectly owns all stock of Optum, Inc., OptumRx, Inc., OptumInsight, and Emisar.

220. The UnitedHealth Group corporate family does not operate as separate, independent entities. Public filings, documents, and statements by UnitedHealth Group present its subsidiaries—including United Healthcare Services, Inc., UHI, Optum, Inc., OptumRx, Inc., OptumInsight, and Emisar—as divisions, departments, or "segments" of a single company that is a "diversified family of businesses" leveraging core competencies to advance shared objectives.[84]

221. UnitedHealth Group's annual filings state that the terms "we," "our," "us," "its," "UnitedHealth Group," or the "Company" "refer to UnitedHealth Group Incorporated and its subsidiaries," and that it provides pharmacy care services through its OptumRx and

[84] *See, e.g.*, UnitedHealth Group Inc., Annual Report (Form 10-K) (FYE Dec. 31, 2019).

UnitedHealthcare businesses.[85] Those filings further state the Company is involved in determining which drugs are included in formulary listings and, in offering PBM services, administers the payment of customer funds to physicians and other health care professionals from customer-funded bank accounts.

222. The day-to-day operations of this corporate family reflect these public statements; these entities function as a single business enterprise and should be treated as such for all legal obligations at issue in this Complaint. Executives of United Healthcare Services, Inc., UHI, Optum, Inc., OptumRx, Inc., OptumInsight, and Emisar ultimately report to UnitedHealth Group executives, including the Chief Executive Officer, whose executives and officers are directly involved in the policies and business decisions that gave rise to Plaintiffs' claims.

223. Defendants UnitedHealth Group, Inc., United Healthcare Services, Inc., UHI, OptumRx, Inc., OptumInsight, Inc., Optum, Inc., and Emisar, including all predecessor and successor entities, are collectively referred to as "OptumRx." Together, United Healthcare Services, Inc. and UHI are referred to as "United Healthcare."

224. OptumRx is named as a Defendant in its capacities as a PBM, rebate aggregator, and mail-order pharmacy.

225. As a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications and the placement of those medications on OptumRx's drug formularies.

226. OptumRx provides pharmacy care services to more than 65 million people nationwide through a network of more than 67,000 retail pharmacies and multiple delivery

[85] *See, e.g.*, UnitedHealth Group Inc., Annual Report (Form 10-K) (FYE Dec. 31, 2024).

facilities.[86] OptumRx is one of UnitedHealth Group's four reportable segments, along with UnitedHealthcare, Optum Health, and OptumInsight.

227. In 2022, OptumRx managed $124 billion in pharmaceutical spending.[87] For the years 2018 through 2022, OptumRx managed $91 billion, $96 billion, $105 billion, $112 billion, and $124 billion in pharmaceutical spending, respectively.[88] OptumRx's revenues (excluding UnitedHealthcare) totaled $74 billion in 2019 and rose to more than $99 billion by 2022.[89]

228. Throughout the relevant period, OptumRx offered PBM services nationwide and maintained standard formularies used nationwide, including in Illinois. Those formularies included diabetes medications, including all medications at issue in this Complaint.

229. OptumRx purchased drugs directly from the Manufacturer Defendants for dispensing through its mail-order pharmacies and contracted retail pharmacy network.

230. Contrary to its express representations, OptumRx knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for payment for the at-issue drugs and concealed its critical role in generating and sustaining those false list prices.

231. In its capacity as a mail-order pharmacy with a contracted network of retail pharmacies, OptumRx received payments from payors and set the out-of-pocket amounts paid by patients for the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme, thereby damaging payors, including Plaintiffs.

---

[86] *Differentiated Pharmacy Benefit Solutions*, OPTUMRX, https://www.unitedhealthgroup.com/ns/optum-rx/differentiated-pharmacy-benefit-solutions.html (last visited Dec. 30, 2025).

[87] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

[88] *Id.*

[89] *Id.*

232. During the relevant period, OptumRx dispensed the at-issue medications nationwide and in Illinois through its mail-order pharmacies and derived substantial revenue from those activities in Illinois.

233. OptumRx purchased drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail-order pharmacies and retail pharmacy network.

234. At all relevant times, OptumRx had express agreements with Novo Nordisk, Sanofi, and Eli Lilly regarding Manufacturer Payments made by the Manufacturer Defendants to OptumRx and agreements related to the Manufacturers' at-issue drugs sold through OptumRx pharmacies.

235. UnitedHealth Group, Optum, and their affiliated entities' conduct, as described above, caused direct effects and harm in Illinois including to payors such as Plaintiffs.

236. Plaintiffs seek relief for the harms caused by Defendants' integrated PBM, insurer, and mail-order pharmacy operations and their role in the Insulin Pricing Scheme as detailed herein.

## V. JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

237. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1331 because Plaintiffs assert claims arising under the law of the United States, including violations of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (enforceable through 15 U.S.C. § 15), violations of the Robinson-Patman Act, 15 U.S.C. § 13, and claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (enforceable 18 U.S.C. § 1964(c)).

238. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiffs' Sherman Act and RICO claims.

### B. Personal Jurisdiction

239. This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is registered to conduct business in Illinois, (b) maintains substantial contacts in Illinois, and (c) committed the violations of Illinois statutes, federal statutes, and common law at issue in this lawsuit in whole or part within Illinois.

240. The Insulin Pricing Scheme has been directed at and has had the foreseeable and intended effect of causing injury to persons residing in, located in, or doing business in Illinois, including Plaintiffs. All transactions at issue came from decisions and conduct made in Illinois.

241. Each Defendant has purposefully availed itself of the privilege of doing business within Illinois, including within the Northern District of Illinois; and each has derived substantial financial gain from doing so. These continuous, systematic, and case- related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into this Court.

242. Each Defendant submitted itself to jurisdiction through, among other things, pervasive marketing; encouraging the use of its services; and its purposeful cultivation of profitable relationships in Illinois.

243. Each Defendant has systematically served a market in Illinois related to the Insulin Pricing Scheme and has caused injury in Illinois such that there is a strong relationship between Defendants, this forum, and the litigation.

244. This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Illinois.

245. This Court also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the

"ends of justice" require national service and Plaintiffs demonstrate national contacts. Here, the interests of justice require that Plaintiffs be allowed to bring all members of the nationwide RICO enterprises described herein before the Court in a single action for a single trial.

### C. Venue

246. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 22, because each Defendant transacts business, is found, and/or has agents there, and because some of the actions giving rise to the Complaint took place or had their ultimate injurious impact there. Specifically, at all relevant times, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications, and published prices of the at issue drugs in the Northern District of Illinois.

247. Venue is also proper in the Northern District of Illinois pursuant to 18 U.S.C. § 1965 because all Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## VI. ADDITIONAL FACTUAL ALLEGATIONS

### A. The History of Insulin

248. Although diabetes is the eighth leading cause of death in the United States, many patients who follow a prescribed treatment plan avoid severe health complications associated with the disease. For this reason, scientists have spent more than a century researching and developing treatments for diabetes.

249. In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. Banting and Best obtained a patent and sold their patent rights to the

University of Toronto for $1 (equivalent to $18 today), reasoning that "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[90] Banting stated further that "[i]nsulin does not belong to me, it belongs to the world."[91]

250. After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale up its production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

251. The earliest insulin was derived from animals. Until the 1980s, animal-derived insulin was the only treatment for diabetes. However, while effective, animal-derived insulin created the risk of allergic reaction.

252. This risk was reduced in 1982 when synthetic insulin—known as human insulin because it mimics the insulin that the human body naturally generates—was developed by Eli Lilly. Compared to animal-derived insulin, human insulin is cheaper to produce on a mass scale and causes fewer allergic reactions. Eli Lilly marketed this synthetic human insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institutes of Health and the American Cancer Society.

253. In the mid-1990s, Eli Lilly introduced the first analog insulin—a laboratory-grown and genetically altered insulin. These altered forms of human insulin are called "analogs" because they are analogous to the human body's natural pattern of insulin release and more quickly lower

---

[90] Michael Bliss, *The Discovery of Insulin* (2013).

[91] *Id.*

blood sugar. Eli Lilly released this analog in 1996 under the brand name Humalog at a cost of $21 per vial (equivalent to $40 in 2022).[92]

254. Other rapid-acting analogs include Novo Nordisk's Novolog and Sanofi's Apidra, which have similar profiles. Rapid-acting insulins are used in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

255. The Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

256. In 2015, Sanofi introduced Toujeo, another long-acting insulin similar to Lantus. Toujeo, however, is highly concentrated, reducing injection volume as compared to Lantus.

257. In December 2015, Eli Lilly introduced Basaglar—a long-acting insulin that is biologically similar to Sanofi's Lantus.

258. Most insulin presently used in the United States is analog insulin—not human insulin. In 2000, of privately insured adults with Type 2 diabetes using insulin, 19% were using analog insulins.[93] By 2010, 92% were using analog insulins.[94] Studies indicate that the more

---

[92] *How Much Difference Will Eli Lilly's Half-Price Insulin Make?,* KFF HEALTH NEWS (Mar. 12, 2019), https://kffhealthnews.org/news/how-much-difference-will-eli-lillys-half-price-insulin-make/#:~:text=No%20Panacea,May%202011%2C%20and%20so%20on.

[93] Helen Dodson, *Dramatic increase in use of costly insulin analogs in type 2 diabetes*, YALENEWS (June 10, 2014), https://news.yale.edu/2014/06/10/dramatic-increase-use-costly-insulin-analogs-type-2-diabetes#:~:text=Insulin%20analogs%20are%20synthetic%2C%20molecularly,Center%20for%20Clinical%20Investigation%20scholar.

[94] *Id.*

expensive analogs do not seem to provide any advantage over regular insulin in controlling glucose levels or preventing diabetes-related complications.[95]

259. Even though insulin was first extracted one hundred years ago, and despite its profitability, Eli Lilly, Novo Nordisk, and Sanofi still make nearly all of the insulin sold in the United States. This did not happen by chance.

260. Many of the at-issue medications are now off-patent. The Manufacturers maintain market domination through patent "evergreening." Drugs usually face generic competition when their twenty-year patents expire. While original insulin formulas may technically be available for generic use, the Manufacturers "stack" patents around the original formulas, making new competition riskier and more costly. For example, Sanofi has filed more than seventy patents on Lantus—more than 95% of which were filed after the drug was approved by the FDA[96]—potentially providing more than three additional decades of patent "protection" for the drug. The market therefore remains concentrated.

261. In 2021, the U.S. House of Representatives Committee on Oversight and Reform issued a report following its investigation into drug pricing ("Drug Pricing Investigation").[97] It

---

[95] Janet Byron, *Expensive Insulin Analogs Perform No Better Than NPH Insulin for Type 2 Diabetes*, KAISER PERMANENTE DIVISION OF RESEARCH (June 23, 2018), https://divisionofresearch.kaiserpermanente.org/expensive-insulin-analogs-human-insulin-for-type-2-diabetes/.

[96] Tahir Amin, *Patent abuse is driving up drug prices. Just look at Lantus*, STAT10 (Dec. 7, 2018), http://statnews.com/2018/12/07/patent-abuse-rising-drug-prices-lantus/#:~:text=Lantus%20is%20also%20highly%20overpatented,duration%20provided%20under%20U.S.%20law.

[97] U.S. House of Representatives, *Drug Pricing Investigation: Industry Spending on Buybacks, Dividends and Executive Compensation* (July 2021), at 3, https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/COR%20Staff%20Report%20-%20Pharmaceutical%20Industry%20Buybacks%20Dividends%20Compared%20to%20Research.pdf [hereinafter "Drug Pricing Investigation"].

expressly included an inquiry into the Manufacturer Defendants' insulin pricing strategies,[98] and concluded: "Every company in the Committee's investigation engaged in one or more strategies to suppress competition from generics or biosimilars, and keep prices high."[99] It continued:

> Insulin manufacturers have also used secondary patents to extend their market monopolies. A 2020 study by the State of Colorado found, "Many insulin products have received additional patents, exclusivities, and extensions, adding decades of protection and monopoly prices." According to this study, secondary patents enabled Eli Lilly to add 17 years of protection for Humalog, Novo Nordisk to add 27 years of protection for NovoLog, and Sanofi to add 28 years of protection for Lantus.[100]

### B. The Current Landscape for Insulin Production

262. While insulin today is generally safer and more convenient to use than when originally developed in 1922, questions remain about whether the overall efficacy of insulin has significantly improved over the last twenty years.

263. For example, while long-acting analogs may have certain advantages over human insulins (e.g., they provide greater flexibility around mealtime planning), it has yet to be shown that analogs lead to better long-term outcomes. Recent work suggests that older human insulins may work as well as newer analog insulins for patients with Type 2 diabetes.[101]

264. Moreover, all insulins at issue in this case have either been available in the same form since the late 1990s or early 2000s or are biologically equivalent to insulins that were available then.

---

[98] *Id.*at 4, n.5.

[99] *Id.* at 13.

[100] *Id.* at 103.

[101] Karen N. Peart, *Human insulin as safe and effective as costlier insulin analogs*, YaleNews (June 26, 2023), https://news.yale.edu/2018/06/26/human-insulin-safe-and-effective-costlier-insulin-analogs.

265. As explained in the Journal of the American Medical Association by Dr. Kasia Lipska, an endocrinologist at the Yale School of Medicine and Clinical Investigator at the Yale-New Haven Hospital Center for Outcomes Research and Evaluation:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . . [T]here's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.[102]

266. Moreover, production costs have decreased in recent years. A September 2018 study in BMJ Global Health calculated that, based on production costs, a reasonable and profitable price for a one-year supply of human insulin is between $48 and $71 per person and between $78 and $133 for analog insulin.[103] Another recent study found that the Manufacturer Defendants could be profitable charging as little as $2 per vial.[104] A third study, based on data collected through 2023, concluded that sustainable cost-based prices "for treatment with insulin in a reusable pen device could cost as little as $96 (human insulin) or $111 (insulin analogues) per year for a basal-bolus regimen, $61 per year using twice-daily injections of mixed human insulin, and $50 (human insulin) or $72 (insulin analogues) per year for a once-daily basal insulin injection (for Type 2 diabetes), including the cost of injection devices and needles."[105]

---

[102] Natalie Shure, *The Insulin Racket*, AM. PROSPECT (June 24, 2019), https://prospect.org/health/insulin-racket/ (last visited Dec. 30, 2025).

[103] Melissa J. Barber *et al.*, *Production costs and potential prices for biosimilars of human insulin and insulin analogues*, BMJ Global Health (Sept. 25, 2018), https://gh.bmj.com/content/3/5/e000850.

[104] *Id.*

[105] Melissa J. Barber, *et al., Estimated Sustainable Cost-Based Prices for Diabetes Medicines,* JAMA NETWORK: OPEN (Mar. 27, 2024).

267. Yet, in 2016, diabetics spent an average of $5,705 for insulin.[106] According to a 2020 RAND report, the 2018 list price per vial across all forms of insulin was just $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom, and less than $7.00 in Australia.[107] In the United States, it was $98.70.[108]

268. RAND issued an updated report in 2024 using 2022 data. In its report, RAND explained that the gross (or list) price of insulin in the United States had "increased dramatically since the early 2010s in the United States."[109] The report pointed to studies showing that "manufacturer gross prices increased annually by an average of 13 percent from 2007 to 2018," which was "far above general inflation over the same periods."[110]

269. The RAND report also found that insulin prices in the United States far exceeded insulin prices abroad; U.S. manufacturer gross prices were 971% (or 9.71 times) higher than in the thirty-three countries who belong to the Organisation for Economic Co-operation and Development (OECD) combined.[111] In other words, insulin in the United States was more than nine times higher than in thirty-three middle-to high-income comparison countries.[112] Once

---

[106] *US insulin costs per patient nearly doubled from 2012 to 2016*, CNBC News (Jan. 22, 2019), https://www.cnbc.com/2019/01/22/us-insulin-costs-per-patient-nearly-doubled-from-2012-to-2016.html#:~:text=US%20insulin%20costs%20per%20patient%20nearly%20doubled,to%20put%20their%20own%20health%20at%20risk.

[107] *The Astronomical Price of Insulin Hurts American Families,* RAND (Jan. 6, 2021), https://www.rand.org/pubs/articles/2021/the-astronomical-price-of-insulin-hurts-american-families.html.

[108] *Id.*

[109] Andrew W. Mulcahy, Daniel Schwam, *Comparing Insulin Prices in the United States to Other Countries,* RAND (Feb. 1, 2024), at 1.

[110] *Id.*

[111] *Id.* at v, 22, 30.

[112] *Id.*

rebates and other discounts were applied, net prices in the United States remained 2.33 times higher than in the OECD countries.[113] The gross price is the price paid by patients who are uninsured, in the deductible phase of their plan, or otherwise paying out-of-pocket for insulin.[114]

270. While research and development (or "R&D") costs often contribute significantly to the price of a drug, the initial basic insulin research—original drug discovery and patient trials — occurred one hundred years ago and those costs have long since been recouped. Even recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were, at this point, incurred decades ago. In recent years, the vast majority of R&D costs are incurred in connection with the development of new insulin-related devices and equipment—not in connection with the drug formulations themselves.

271. The House Committee on Oversight and Reform also found that R&D costs "d[id] not justify price increases."[115] According to the committee, when drug companies did invest in R&D, those expenditures often went to "research intended to extend market monopolies, support the companies' marketing strategies, and suppress competition."[116]

272. In response to rising scrutiny, the Manufacturer Defendants recently announced limited pricing changes and out-of-pocket limits. On March 1, 2023, Eli Lilly announced that it would cap the prices of certain insulin medications at $35 per month, with additional reductions to follow later in the year.[117] Specifically, Eli Lilly promised that it would list its Lispro injection at $25 per vial effective May 1, 2023, and slash the price of its Humalog and Humulin injections

---

[113] *Id.* at v, 28, 30.

[114] *Id.* at vi.

[115] Drug Pricing Investigation at 164-65.

[116] *Id.*

by 70% starting in the fourth quarter of 2023.[118] The price reductions to date are limited to these medications and do not apply to other Eli Lilly diabetes medications like Trulicity and Basaglar. These decisions suggest that, prior to March 1, 2023, the prices of these medications had not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense.

273. Two weeks after Eli Lilly announced that it would be implementing pricing changes, on March 14, 2023, Novo Nordisk announced that it would also lower the U.S. list prices of several insulin products by up to 75%—specifically, Levemir, Novolin, NovoLog, and NovoLog Mix 70/30.[119] Novo Nordisk also reduced the list price of unbranded biologics to match the lowered price of each respective branded insulin.[120] The price reductions to date are limited to these medications and do not apply to other Novo Nordisk diabetes medications like Victoza and Ozempic.[121] These changes went into effect on January 1, 2024, and, as with Eli Lilly's price reduction, suggest that the prices of these medications before that date were not increased to cover costs of research and development, manufacture, distribution, or any other necessary expense.

274. These three announcements (the "Price Cuts") are prospective and do not mitigate damages already incurred by payors like Plaintiffs.

---

[118] *Eli Lilly cuts the price of insulin, capping drug at $35 per month out-of-pocket*, NPR (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160339792/eli-lilly-insulin-price.

[119] *Id.*

[120] *Novo Nordisk to lower U.S. prices of several pre-filled insulin pens and vials up to 75% for people living with diabetes in January 2024*, PR NEWSWIRE (Mar. 14, 2023), https://www.prnewswire.com/news-releases/novo-nordisk-to-lower-us-prices-of-several-pre-filled-insulin-pens-and-vials-up-to-75-for-people-living-with-diabetes-in-january-2024-301771409.html#:~:text=Lowering%20the%20list%20price%20of,Insulin%20Aspart%20Protamine/Insulin%20Aspart.

[121] *Id.*

275. The Price Cuts are limited to certain insulin medications, and do not encompass all at-issue medications. As part of the Insulin Pricing Scheme, PBMs provide preferred formulary placement to the most expensive insulins based on list prices. Accordingly, the Insulin Pricing Scheme will proceed, with the PBMs continuing to target the most expensive at-issue medications, which will likely be the at-issue medications not included in the Price Cuts.

276. The Price Cuts are woefully insufficient. An Eli Lilly spokeswoman represented that the list price for a ten-milliliter vial of the fast-acting, mealtime insulin Humalog would drop to $66.40 from $274.70, and a ten-milliliter vial of Humulin will fall from $148.70 to $44.61.[122] These prices still far exceed the Manufacturer Defendants' costs and remain significantly higher than prices for the same and similar drugs in other countries.

277. To aggravate the issue, on November 8, 2023, before the 65% price cut for its long-acting insulin Levemir had taken effect, Novo Nordisk announced that it would be discontinuing Levemir in the United States.[123] In doing so, Novo Nordisk cited manufacturing constraints, formulary-placement issues, and "alternative treatments" for patients.[124] Levemir is the only branded, long-acting insulin product for which Novo Nordisk announced a list price reduction and the only long-acting insulin FDA- approved for pregnancy. Yet, Novo Nordisk discontinued

---

[122] Tom Murphy, *Lilly plans to slash some insulin prices, expand cost cap,* AP NEWS (Mar. 2, 2023) (available at https://apnews.com/article/insulin-diabetes-humalog-humulin-prescription-drugs-eli- lilly-lantus-419db92bfe554894bdc9c7463f 2f3183).

[123] *Novo Nordisk to discontinue Levemir insulin in U.S. market*, REUTERS (Nov. 8, 2023), https://www.reuters.com/business/healthcare-pharmaceuticals/novo-nordisk-discontinue-levemir-insulin-us-market-2023-11-08/.

[124] *Levemir Discontinued*, PEDIATRIC ENDOCRINE SOCIETY (Nov. 7, 2023), https://pedsendo.org/drug-alerts/levemir-discontinued/.

Levemir—before allowing the price reduction to take effect—with supply disruptions beginning in early 2024, with all vials pulled out of the market by the end of 2024.[125]

**1. Insulin Adjuncts: Type 2 Medications**

278. Over the past fifteen years, the Manufacturer Defendants have released several non-insulin medications that help control insulin levels. In 2010, Novo Nordisk released Victoza, and thereafter Eli Lilly released Trulicity and Sanofi released Soliqua. Novo Nordisk further expanded their GLP-1 patent portfolio with the approval of Xultophy and Ozempic.[126] In 2022, Eli Lilly received approval for another GLP-1, Mounjaro. Each of these medications can be used in conjunction with insulins to control diabetes.

279. The Manufacturer Defendants negotiate rebates and other fees with the PBMs for "bundles" of insulin and GLP-1 receptor agonist (GLP-1) medications, packaging them as a single class of diabetes medications. This practice is known as "bundling."

280. The Manufacturer Defendants bundle medications to gain formulary access for multiple drugs in exchange for increased manufacturer payments to the PBMs.

281. In 2013, Novo Nordisk tied its "exclusive" rebates for insulin to formulary access for GLP-1 medication, Victoza.[127] The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included

[125] *Novo Nordisk to discontinue Levemir insulin in U.S. market*, REUTERS (Nov. 8, 2023), https://www.reuters.com/business/healthcare-pharmaceuticals/novo-nordisk-discontinue-levemir-insulin-us-market-2023-11-08/.

[126] Victoza, Trulicity, Ozempic, and Mounjaro are glucagon-like peptide-1 receptor agonists ("GLP- 1") and mimic the GLP-1 hormone produced in the body. Soliqua and Xultophy are combination long-acting insulin and GLP-1 drugs.

[127] Staff of S. Finance Comm., Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug Rep., at 78-79, https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf [hereinafter "Senate Insulin Report"].

two insulin products on their formulary.[128] In order to qualify for the exclusive rebate, the plans would also need to list Victoza on their formulary, exclude all competing insulin products, and ensure existing patients switch from competitor diabetes medications.[129]

282. Upon information and belief, each of the Manufacturer Defendants negotiates the prices of insulin and GLP-1 medications through bundling.

283. The first GLP-1 was approved by the FDA in 2005 and was indicated for the treatment of Type 2 diabetes. Currently, the GLP-1 market is consolidated among a limited number of patent-holding entities, with Manufacturer Defendants Eli Lilly, Novo Nordisk, and Sanofi controlling much of this market.[130]

284. Through extensive patents and regulatory exclusivities, the Manufacturer Defendants have effectively barricaded competition from the GLP-1 market, giving them the ability to exercise comprehensive control over the price of GLP-1 medications.

285. To date, no generic alternative exists for any GLP-1 medication. The Manufacturer Defendants will continue to enjoy patent protection of their respective GLP-1 agonist molecules through at least 2030, if not later.[131]

286. Novo Nordisk developed and sells three GLP-1 drugs indicated for Type 2 diabetes: Victoza (liraglutide), Xultophy (insulin degludec/liraglutide), and Ozempic (semaglutide). Novo

---

[128] *Id.*

[129] *Id.*

[130] Alex Knapp, *Why Lilly And Novo Nordisk Will Keep Dominating The Market For Blockbuster GLP-1 Drugs*, FORBES (May 15, 2024), https://www.forbes.com/sites/alexknapp/2024/05/15/why-lilly-and-novo-nordisk-will-keep-dominating-the-market-for-blockbuster-glp-1-drugs/.

[131] Rasha Alhiary, *et al., Patents and Regulatory Exclusivities on GLP-1 Receptor Agonists,* J. OF THE AM. MED. ASS'N, Vol. 330, at 650-57 (2023).

Nordisk holds sixty-two patents related to semaglutide and liragutide, forty-six of which are device patents unrelated to the therapeutic molecule of the GLP-1.[132]

287. Eli Lilly developed and sells two GLP-1 drugs indicated for Type 2 diabetes: Trulicity (dulaglutide) and Mounjaro (tirzepatide/GIP). Eli Lilly holds eighteen patents related to dulaglutide and tirzepatide. Of the four patents related to tirzepatide, two are device patents unrelated to the therapeutic molecule of the GLP-1. Eli Lilly has applied for seventy-eight patents related to dulaglutide, seventeen of which have been granted to date.[133]

288. Sanofi developed Adylxin (lixisenatide) and Soliqua (insulin glargine/lixisenatide) but currently only sells Soliqua in the United States. Sanofi holds forty-two patents related to lixisenatide, twenty-nine of which are device patents unrelated to the therapeutic molecule of the GLP-1.[134]

289. This patent stacking and evergreening ensures that generic and other branded GLP-1 cannot enter the market and gives Novo Nordisk, Eli Lilly, and Sanofi disproportionate pricing power over GLP-1 medications.

290. In addition to the limited competition in the GLP-1 landscape, the Manufacturer and PBM Defendants use this disproportionate pricing power to inflate the prices of GLP-1s, consistent with the broader Insulin Pricing Scheme.

**Figure 2: List and net prices of GLP-1 agonists**

---

[132] Rasha Alhiary, *et al., Delivery Device Patents on GLP-1 Receptor Agonists,* J. OF THE AM. MED. ASS'N, Vol. 331, at 794-96 (2024).

[133] *Id.*

[134] *Id.*




291. As shown above, counterintuitively, list and net prices increased as more GLP-1 medications were approved and introduced. Between 2007 and 2017, the average list price of GLP-1s rose 15% per year despite the introduction of competing brands. The net price increased an average of 10% per year during the same time period.[135]

292. The PBM Defendants are also central to these untethered price increases. As shown in the chart above, the growing disconnect between the list and net prices of these drugs further reflects the PBM Defendants' ill-gotten gains through identical methods to those employed in the Insulin Pricing Scheme.

293. The absence of generics in the GLP-1 market allows manufacturers to keep prices artificially high. PBMs then realize the benefit of these artificially high prices through manufacturer payments in exchange for formulary placement. PBMs and manufacturers are thus incentivized to increase prices or maintain high, untethered prices for GLP-1s.

---

[135] Ameet Sarpatwari, *et al.*, *Diabetes Drugs: List Price Increases Were Not Always Reflected In Net Price; Impact Of Brand Competition Unclear*, HEALTH AFFAIRS, Vol. 40, at 772-78 (2021).

294. GLP-1s are significantly more expensive in the United States than in other countries, indicating that the increasing price of GLP-1s are untethered to any legal, competitive, or fair market price. For example, in 2023, the list price for a one-month supply of Ozempic was about $936 in the United States, $147 in Canada, $103 in Germany, $93 in the United Kingdom, $87 in Australia, and $83 in France.[136]

295. In 2018, Victoza's list price in the United States was more than double its average list price in eleven comparable countries and Trulicity's list price in the United States was more than six times its average list price in eleven comparable countries. One study found that drug companies could profitably sell certain GLP-1s, including Ozempic, for $0.89-$4.73 per month.[137]

296. In March 2024, PBM Defendant Evernorth entered into a financial guarantee agreement for GLP-1 spend with Manufacturer Defendants Novo Nordisk and Eli Lilly to limit the annual cost increase of GLP-1s to 15%.[138]

297. Like the caps put in place for insulins, Evernorth, Eli Lilly, and Novo Nordisk's agreement suggests that the prices of GLP-1s before March 2024 were not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense. Such cost caps and savings guarantees indicate that the increasing price of GLP-1s were untethered to any

---

[136] Krutika Amin et al., *How do prices of drugs for weight loss in the U.S. compare to peer nations' prices?*, PETERSON – KFF HEALTH SYSTEM TRACKER (Aug. 17, 2023), https://www.healthsystemtracker.org/brief/prices-of-drugs-for-weight-loss-in-the-us-and-peer-nations/#Prevalence%20of%20obesity%20(body%20mass%20index%20%E2%89%A5%2030),%20age%20standardized%20estimates,%202021%20or%20nearest%20year.

[137] Barber, *supra* note 106.

[138] *Evernorth Announces Industry-First Financial Guarantee for GLP-1 Spend,* EVERNORTH HEALTH SERVICES (Mar. 7, 2024), https://www.evernorth.com/articles/evernorth-announces-industry-first-financial-guarantee-glp-1-spend.

legal, competitive, or fair market price. Further, this agreement is prospective and does not mitigate damages already incurred by payors like Plaintiffs.

298. The following is a table of diabetes medications at issue in this lawsuit:

| Insulin Type | Action | Name | Mfr. | FDA Appr. | Current/Recent List Price |
|---|---|---|---|---|---|
| **Human** | *Rapid-Acting* | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial)<br>$689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial)<br>$312 (pens) |
| | *Intermediate* | Humulin N | Eli Lilly | 1982 | $178 (vial)<br>$566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial)<br>$566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial)<br>$312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial)<br>$312 (pens) |
| **Analog** | *Rapid-Acting* | Humalog | Eli Lilly | 1996 | $342 (vial)<br>$636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial)<br>$671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial)<br>$658 (pens) |
| | *Pre-mixed* | Humalog 50/50 | Eli Lilly | 1999 | $93 (vial)<br>$180 (pens) |
| | | Humalog 75/25 | Eli Lilly | 1999 | $99 (vial)<br>$140 (pens) |
| | | Novolog 70/30 | Novo Nordisk | 2001 | $203 (vial)<br>$246 (pens) |
| | *Long-Acting* | Lantus | Sanofi | 2000 | $340 (vial)<br>$510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial)<br>$555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens)<br>$622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial)<br>$610 (pens – 100u)<br>$732 (pens – 200u) |
| **Type 2 Medications** | *GLP-1* | Trulicity (Dulaglutide) | Eli Lilly | 2014 | $1013 (pens) |

| | | | | | |
|---|---|---|---|---|---|
| | | Mounjaro (Tirzepatide/GIP) | Eli Lilly | 2022 | $1068 (pens) |
| | | Victoza (Liraglutide) | Novo Nordis k | 2010 | $813 (2 pens) $1220 (3 pens) |
| | | Xultophy (insulin degludec/liraglutide) | Novo Nordisk | 2016 | $1295 (pens) |
| | | Ozempic (Semaglutide) | Novo Nordisk | 2017 | $1022 (pens) |
| | | Rybelsus (semaglutide tablets) | Novo Nordisk | 2019 | $1029 (30 day supply) |
| | | Adylxin (lixisenatide) | Sanofi | 2016 | Discontinued 2023 |
| | | Soliqua (insulin glargine/lixisenatide) | Sanofi | 2016 | $928 (pens) |

### C. The Pharmaceutical Payment and Supply Chains

299. The prescription drug industry is comprised of an intentionally opaque network of entities engaged in multiple distribution and payment structures. These entities include manufacturers, wholesalers, PBMs, pharmacies, payors, and patients.

300. Given the complexities of the different parties involved in the pharmaceutical industry, pharmaceuticals are distributed in many ways. Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of three ways: (a) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient; (b) from manufacturer to mail-order pharmacy to patient; or (c) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and self-insured payor to patient.

301. The pharmaceutical industry, however, is unique in that the payment chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity—that is, different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is necessarily tied to the price set by the manufacturer.

302. Here is how the payment chain often works:[139]

**Figure 3: The pharmaceutical payment chain**




303. The payment chain includes self-insured payors like Plaintiffs, who paid the PBM Defendants directly for its purchases of the at-issue diabetes medications.

304. But there is zero transparency in this pricing system. Typically, there are two kinds of published prices. One is the WAC, which is a manufacturer's price for the drug to wholesalers (and excludes any discounts, rebates, or price reductions). The other is the AWP, which is the

[139] *See* Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA HEALTH FORUM (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

price wholesalers charge retailers for a drug. Both WAC and AWP, depending on the context, are sometimes colloquially referred to as "list price."[140]

305. AWP is usually calculated by applying a significant mark-up (such as 20%) to the manufacturer's WAC. AWP does not account for discounts available to various payers, nor is it based on actual sales transactions.

306. Publishing compendia such as First DataBank report both the WAC and the AWP.

307. As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used benchmark price in negotiating payment calculations for both payors and patients.

### D. The PBMs' Role in the Pharmaceutical Payment Chain

308. The PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 4 below.

**Figure 4: Insulin distribution and payment chain**

[140] In general, when this complaint references Defendants' conspiracy to inflate "list prices," Plaintiffs are referring to WAC. Because AWP is based on WAC, when a manufacturer raises its WAC, that necessarily results in an increase to the AWP.




309. Pharmacy benefit managers (including the PBM Defendants) develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturer Defendants that the payor will pay for prescription drugs, and are paid by the payor for the drugs utilized by the payor's beneficiaries.

310. The PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs.

311. The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here.

312. Often—including for the at-issue drugs—the PBM Defendants purchase drugs from the Manufacturer Defendants.

313. Even where the PBM Defendants' mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

314. In addition, and of particular significance here, the PBM Defendants contract with drug manufacturers, including the Manufacturer Defendants. The PBMs extract from the

Manufacturer Defendants rebates, fees, and other consideration that are paid back to the PBM, including the Manufacturer Payments related to the at-issue drugs.

315. The Manufacturer Defendants also interact with the PBMs in connection with services outside the Insulin Pricing Scheme's scope, such as health and educational programs and patient and prescriber outreach with respect to drugs not at issue here.

316. These relationships place PBMs at the center of the flow of pharmaceutical money and allow them to exert tremendous influence over what drugs are available nationwide, on what terms, and at what prices.

317. Historically and today, the PBM Defendants:

- negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);
- separately negotiate a different (and often lower) price that pharmacies in their networks receive for the same drug;
- set the amount in fees that the pharmacy pays the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);
- set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and
- negotiate the amount that the Manufacturer Defendants pay the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

318. Yet, for the majority of these transactions, only the PBM Defendants are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs. This absence of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

319. In every interaction the PBM Defendants have within the pharmaceutical payment chain, they stand to profit from the prices generated by the Insulin Pricing Scheme.

### 1. <u>The Rise of the PBMs in the Pharmaceutical Supply Chain</u>

320. In the 1960s, pharmacy benefit managers functioned largely as claims processors. Over time, however, they have assumed an ever-expanding role as power brokers in pharmaceutical payment and distribution chains.

321. One key role pharmacy benefit managers took on was negotiating with drug manufacturers, ostensibly on behalf of payors. In doing so, pharmacy benefit managers affirmatively represented that they were using their leverage to drive down drug prices.

322. In the early 2000s, pharmacy benefit managers started buying pharmacies, thereby creating an additional incentive to collude with manufacturers to keep certain prices high.

323. These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBM Defendants' corporate families. Further recent consolidation in the industry has given the PBM Defendants disproportionate market power.

324. Nearly forty pharmacy-benefit-manager entities combined into what are now the PBM Defendants, each of which now is affiliated with another significant player in the pharmaceutical chain, e.g., Express Scripts merged with Cigna; CVS bought Caremark (and now also owns Aetna); and UnitedHealth Group acquired OptumRx.

325. Figure 5 depicts this market consolidation.

**Figure 5: PBM consolidation**




326. After merging with or acquiring all competitors, and now backed by multibillion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of drug benefits for more than 270 million Americans.

327. Together, the PBM Defendants report more than $300 billion in annual revenue.

328. The PBMs use this market consolidation and the resulting purchasing power as leverage when negotiating with other entities in the pharmaceutical payment chain.

### 2. <u>The Insular Nature of the Pharmaceutical Industry</u>

329. The insular nature of the pharmaceutical industry has provided Defendants with ample opportunity for secretive contact and coordination with their competitors, as well as the other PBM and Manufacturer Defendants.

330. For example, each Manufacturer Defendant is a member of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely

communicated through PhRMA meetings and platforms in furtherance of the Insulin Pricing Scheme. According to PhRMA's 2019 IRS Form 990, it received more than $515 million in "membership dues." All members are pharmaceutical companies.[141]

331. David Ricks (Chair and CEO of Eli Lilly), Paul Hudson (CEO of Sanofi), and Douglas Langa (President of Novo Nordisk and EVP of North American Operations), serve on the PhRMA Board of Directors and/or part of the PhRMA executive leadership team.

332. The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and industry conferences.

333. Each year during the relevant period, the main PBM trade association, the industry-funded Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.[142]

334. The PCMA is governed by PBM executives. As of April 2024, the board of the PCMA included Adam Kautzner (President of Express Scripts), Patrick Conway (CEO of OptumRx), and David Joyner (Executive Vice President and President of Pharmacy Services at CVS Health).

335. All PBM Defendants are members of the PCMA and, due to their leadership positions, wield substantial control over it.

336. Additionally, the Manufacturer Defendants are affiliate members of the PCMA.

---

[141] Pharmaceutical Research & Manufacturers of America, Form 990 (submitted Nov. 13, 2020), https://projects.propublica.org/nonprofits/organizations/530241211/202133169349306718/full; *About PhRMA,* PhRMA, https://cdn.aglty.io/phrma/global/resources/import/pdfs/About%20PhRMA2.pdf.

[142] The PCMA's industry funding in the form of "membership dues" is set out in its 2019 Form 990. Pharmaceutical Care Management Association, Form 990 (submitted Oct. 22, 2020), https://projects.propublica.org/nonprofits/organizations/383676760/202042969349301134/full (last visited Dec. 30, 2025).

337. Every year, high-level representatives anro corporate officers from both the PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

338. In fact, for at least the last eight years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences.

339. Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. Upon information and belief, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted private meeting rooms that offer opportunities for one-on-one interactions between PBM and pharma executives.

340. Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during the Annual Meetings and Business Forum conferences that the PCMA holds (and drug manufacturers, including the Manufacturer Defendants, sponsor) each year.

341. In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[143]

342. As PCMA members, the PBM Defendants and Manufacturer Defendants undoubtedly used both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

343. Key at-issue lockstep price increases occurred immediately after Defendants had convened at PCMA meetings. For example, on September 26 and 27, 2017, the PCMA held its

---

[143] *PCMA-Connect,* PCMA, https://www.pcmanet.org/contact/pcma-connect/ (last visited Apr. 5, 2024).

annual meeting, at which each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. On October 1, 2017, just a few days after the conference, Sanofi increased Lantus's list price by 3% and Toujeo's list price by 5.4%.[144] Novo Nordisk recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.[145]

344. Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir a matter of hours after Sanofi made its list price increase on Lantus.[146] These price hikes occurred just weeks after the 2014 PCMA spring conference in Washington, D.C., attended by representatives of all three PBM Defendants.

345. In addition, communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. For example:

- Mark Thierer worked as an executive at Caremark Rx, LLC (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (and also served as Chairman of the Board for PCMA starting in 2012);
- CVS Health's current President and CEO Karen Lynch held an executive position at Cigna;
- Amar Desai served as President for Health Care Delivery at CVS Health before joining Optum Health, where he now serves as CEO.
- Trip Hofer served in leadership at CVS Health before becoming CEO of Behavioral Health for Optum Health.
- Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (and also served as a PCMA board member from 2015-2017 while with Aetna Rx);

---

[144] Senate Insulin Report at 7.

[145] *Id.*

[146] *Id.* at 53-54.

- Derica Rice former EVP for CVS Health and President of CVS Caremark previously served as EVP and CFO for Eli Lilly;
- Duane Barnes was the Vice President of Medco (now Express Scripts) before becoming division President of Aetna Rx in 2006 (and also served as a PCMA board member);
- Everett Neville was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts;
- Albert Thigpen was a Senior Vice President at CVS Caremark for eleven years before becoming a Senior Vice President at OptumRx in 2011;
- Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008; he also served as SVP Member Services Operations for CVS Caremark from 2020-2022; and
- Bill Kiefer was a Vice President of Express Scripts for fourteen years before becoming Senior Vice President of Strategy at OptumRx in 2013.

### E. The Dramatic Rise in U.S. Prices for Diabetes Medications

346. Over the past twenty-five years, the list price of certain insulins has increased by more than 1000% (10x). By comparison, $165 worth of consumer goods and services in 1997 dollars would, in 2021, have cost $289 (1.75x).[147]

347. Since 1997, Eli Lilly has raised the list price of a vial of Humulin R (500U/mL) from $165 to $1784 in 2021 (10.8x).

---

[147] *CPI Inflation Calculator,* U.S. BUREAU OF LABOR STATISTICS, *https*://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 30, 2025). The Consumer Price Index (CPI) measures "the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." (https://www.bls.gov/cpi/).

**Figure 6: Rising list prices of Humulin R (500U/mL) from 1997-2021**




348. Since 1996, Eli Lilly has raised the price for a package of Humalog pens from less than $100 to $663 (6.6x) and from less than $50 per vial to $342 (6.8x).

**Figure 7: Rising list prices of Humalog vials and pens, 1996-2021**




349. 277. From 2006 to 2020, Novo Nordisk has raised Levemir's list price from $162 to $555 (3.4x) for pens and from under $100 to $370 per vial (3.7x).

**Figure 8: Rising list prices of Levemir, 2006-2021**




350. From 2002 to 2021, Novo Nordisk raised Novolog's list price from $108 to $671 (6.2x) for a package of pens and from less than $50 to $347 (6.9x) per vial.

**Figure 9: Rising list prices of Novolog vials and pens, 2002-2021**




351. Defendant Sanofi has kept pace. It manufactures a top-selling analog insulin—Lantus—which has been and remains a flagship brand for Sanofi. Sanofi has raised the list prices for Lantus from less than $200 in 2006 to more than $500 in 2020 (2.5x) for a package of pens and from less than $50 to $340 per vial (6.8x).

**Figure 10: Rising list prices of Lantus vials and pens, 2001-2021**




352. The Manufacturer Defendants have similarly increased the prices for non-insulin diabetes medications.

353. Driven by these price hikes, payors' and diabetics' spending on these drugs has steadily increased with totals in the tens of billions of dollars.

354. The timing of the price increases reveals that the Manufacturer Defendants have not only dramatically increased prices for the at-issue treatments but have also done so in lockstep.

355. Between 2009 and 2015, for example, Sanofi and Novo Nordisk raised the list prices of their insulins in tandem thirteen times, taking the same price increase down to the decimal point within days of each other (sometimes within a few hours).[148]

356. This practice, through which competitors communicate their intention not to price-compete against one another, is known as "shadow pricing."[149]

357. In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs represented the highest drug price increases in the pharmaceutical industry.

---

[148] Senate Insulin Report at 53-54.

[149] *Id.* at 5.

358. Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 11 demonstrates this behavior with respect to Lantus and Levemir. Figure 12 demonstrates this behavior with respect to Novolog and Humalog.

**Figure 11: Rising list prices of long-acting insulins**




**Figure 12: Rising list prices of rapid-acting insulins**




359. Figure 13 demonstrates this behavior with respect to the human insulins—Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 13: Rising list price increases for human insulins**




360. Figure 14 below demonstrates Novo Nordisk and Eli Lilly's lockstep price increases for their Type-2 drugs Trulicity, Victoza, and Ozempic.

**Figure 14: Rising list prices of Type 2 drugs**



361. Figures 15 below show how the Manufacturers have raised the prices of insulin products in near-perfect unison.[150]

**Figure 15: Lockstep Insulin price increases**







362. There is clear evidence that these lockstep price increases were carefully coordinated to preserve formulary placement for the at-issue medications and to allow greater rebates to the PBM Defendants and further illustrate the perverse economics of competing by increasing prices in lockstep.

---

150 William Newton, *Insulin Pricing: could an e-commerce approach cut costs?*, PHARMACEUTICAL TECHNOLOGY (Mar. 31, 2022), https://www.pharmaceutical-technology.com/features/insulin-pricing-could-an-e-commerce-approach-cut-costs/?cf-view.

363. Eli Lilly was not inclined to lower prices of its insulin products to compete with the other drug makers. Documents produced to the House Committee on Oversight and Reform show that Eli Lilly regularly monitored competitors' pricing activity and viewed competitors' price increases as justification to raise the prices of their own products.[151]

364. On May 30, 2014, a senior vice president at Eli Lilly sent a proposal to Enrique Conterno—then-President of Lilly Diabetes—for June 2014 price increases for Humalog and Humulin.[152] The executive reported that Novo Nordisk had just executed a 9.9% price increase across its insulin portfolio.[153] Mr. Conterno remarked, "While the list price increase is higher than we had planned, I believe it makes sense from a competitive perspective."[154] Eli Lilly took a 9.9% price increase shortly thereafter, on June 5, 2014.[155]

365. Six months later, on November 19, 2014, Mr. Conterno reported to then-CEO John Lechleiter that Novo Nordisk had taken another 9.9% price increase on NovoLog—the direct competitor to Eli Lilly's Humalog. Mr. Conterno wrote, "[a]s you are aware, we have assumed as part of our business plan a price increase of 9.9% for Humalog before the end of the year."[156] The following Monday—six days after Mr. Conterno's initial email to the CEO—Eli Lilly took price increases of 9.9% on all Humalog and Humulin products.[157]

---

[151] Drug Pricing Investigation at 162.

[152] *Id.* at 140.

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

366. Sanofi also closely monitored competitors' pricing activity and planned its own pricing decisions around Eli Lilly's and Novo Nordisk's price increases. Executives were aware that Sanofi's long-acting insulin competitors—particularly Novo Nordisk—would likely match its pricing actions on long-acting insulin. In internal documents, Sanofi leaders welcomed competitors' price increases because they allowed Sanofi to claim it was maintaining pricing "parity" with competitors.[158]

367. Sanofi had no incentive or intention to compete to lower its insulin pricing. For example, on November 7, 2014, Sanofi executed a price increase of approximately 12% across its family of Lantus products.[159] The following week, a Sanofi senior vice president sent an email asking, "[d]id Novo increase the price of Levemir following our price increase on Lantus last week? I just want to confirm we can still say that Lantus and Levemir are still priced at parity on a WAC [wholesale acquisition cost] basis."[160] The head of Sanofi pricing responded that Novo Nordisk had not yet taken the price increase, but noted, "[o]ver the past four price increases on Lantus they have typically followed within 1 month."[161] Novo Nordisk raised the price of Levemir by 12% the following week.[162]

368. An internal Sanofi chart shows that, between April 2013 and November 2014, each time Sanofi raised the price of Lantus, Novo Nordisk followed suit for Levemir[163]:

**Figure 16: Sanofi price-tracking**

---

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.* at 141.

[163] *Id.*




| Lantus | | | Levemir | | |
|---|---|---|---|---|---|
| Date | % Incr Vial | % Incr Pen | Date | % Incr Vial | % Incr Pen |
| | | | 08/25/15 | 8.2% | 8.2% |
| 11/07/14 | 11.9% | 11.9% | 11/18/14 | 11.9% | 11.9% |
| 05/30/14 | 16.1% | 9.9% | 05/31/14 | 16.1% | 9.9% |
| 12/13/13 | 14.9% | 9.9% | 12/19/13 | 14.9% | 9.9% |
| 08/02/13 | 14.9% | 9.9% | 08/27/13 | 12.1% | 10.5% |
| 04/26/13 | 9.9% | 9.9% | 05/03/13 | 9.9% | 9.9% |

* No price increases for Toujeo & Tresiba since launching

- Parity was obtained on the 5/30/14 price increase for Lantus Vial & Pen
- Tresiba currently at 19% premium and to Sanofi Glargine
- Levemir currently at 8% premium to Sanofi Glargine

369. The Manufacturer Defendants often used their competitors' price increases as justification for their own increases. For example, before taking price increases on Lantus, Sanofi compared the new list price to the prices of competitor products.[164] In an April 2018 email exchange about accelerating and increasing previously planned price increases for Lantus and Toujeo (from July to April, and from 3% on Lantus to 5.3%), one senior director requested, "[p]lease confirm how the new WAC of Lantus/Toujeo would compare with the WAC of Levemir/Tresiba."[165] In reply, another senior Sanofi leader provided a chart comparing Sanofi prices to those of its competition.[166]

370. Sanofi also engaged in shadow pricing with its rapid-acting insulin products, including Apidra.[167] Sanofi was not the market leader in the fast-acting insulin space and typically

[164] *Id*. at 141-42.

[165] *Id*.

[166] *Id*. at 142.

[167] *Id*.

did not act first to raise prices.[168] But when its competitors raised prices on their fast-acting insulins, Sanofi quickly followed suit. As a Sanofi slide deck explained: "Over the past three years, we have executed a 'fast follower' strategy for Apidra and have executed price increases only after a price increase was announced."[169]

371. In December 2018, Sanofi's director of strategic pricing and planning emailed diabetes and cardiovascular pricing committee members seeking approval for across-the-board price increases for its rapid- and long-acting insulin products, including Lantus, Toujeo, and Apidra.[170] The then-Senior Vice President and Head of Sanofi's North America General Medicines group forwarded the proposal to the then-Senior Vice President and Head of Sanofi's External Affairs and inquired, "[p]rior to my approval, just confirming that we are still on for these."[171] The Head of Sanofi's External Affairs wrote back, "Yes. As of now I don't see any alternative. Not taking an increase won't solve the broader policy/political issues, and based on intel, believe many other manufacturers plan to take increases next year as well."[172] He added, "[s]o while doing it comes with high political risk, I don't see any political upside to not doing it."[173]

372. Although Sanofi generally led price increases in the long-acting insulin market with its pricing for Lantus, Novo Nordisk often led in the rapid-acting insulin market with NovoLog.[174]

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

On May 8, 2017, Novo Nordisk CEO Lars Jorgenson learned that Eli Lilly had raised U.S. list prices by approximately 8% across its injectable diabetes drug portfolio.[175] Mr. Jorgenson emailed this information to a Novo Nordisk executive and asked, "[w]hat is our price increase strategy?"[176] The executive responded, "[Eli Lilly] followed our increase on NovoLog, so we're at parity here, so no action from us. They led with Trulicity and based on our strategy, we will follow which will likely be on June or July 1st."[177]

373. Further illustrating the anticompetitive scheme between the Manufacturer Defendants, rather than compete by lowering prices, Sanofi raised Lantus's list price to respond to rebate and discount competition from Novo Nordisk.[178] Novo Nordisk manufactures two long-acting insulins called Levemir and Tresiba, as well as two rapid-acting insulins, NovoLog and Fiasp. In the long-acting insulin category, Sanofi's Lantus and Novo Nordisk's Levemir often compete to win the same accounts.[179] According to internal memoranda, in 2013, Sanofi believed that Novo Nordisk was attempting to minimize the clinical difference between Lantus and Levemir and was offering "increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access." According to an internal Sanofi memo, "the strategy to close the price differential between the Lantus vial and pen before the LOE [loss of exclusivity] period was believed to be critical to the overall long-term success of the franchise."

374. At the time, Sanofi faced increased pressure from its payor and PBM clients to offer more generous rebates and price protection terms or face exclusion from formularies,

---

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] Senate Insulin Report at 49-50.

[179] *Id.* at 51.

developments that were described as "high risk for our business" that had "quickly become a reality."[180] This market environment created an enormous challenge for Lantus.[181] In order to protect its flagship diabetes franchise, Sanofi increased Lantus's list price so that it could improve its rebate and discount offerings to payors while still maintaining net sales.[182]

375. Sanofi understood the risk of its decision and "went into 2013 with eyes wide open that the significant price increases planned would inflame [its] customers," and that its aggressive pricing would cause a quick reaction from Novo Nordisk.[183] But Sanofi sought to make up for "shortfalls with Lantus demand generation and global profit shortfalls," which it said "put pressure on the US to continue with the price increases to cover gaps."[184] The company conceded that it was "difficult to determine whether we would face these risks anyway if we hadn't taken the price increases."[185]

376. Novo Nordisk also engaged in shadow pricing with its long-acting insulin, Levemir, increasing Levemir's list price in lockstep with Lantus in a continued effort to offer increased rebates and discounts to payors and displace Lantus from preferred formulary placement.[186] Novo Nordisk typically did not act first to raise prices.[187] However, when its competitors raised prices, Novo Nordisk followed suit.[188] A March 2015 Novo Nordisk pricing

---

[180] *Id.*

[181] *Id.*

[182] *Id.* at 51-52.

[183] *Id.* at 52.

[184] *Id.*

[185] *Id.*

[186] Drug Pricing Investigation at 142.

[187] *Id.*

[188] *Id.* at 153.

committee presentation slide articulated this strategy: "Levemir price strategy is to follow market leader."[189]

377. On May 19, 2014, Novo Nordisk's pricing committee discussed how to price Levemir in response to Sanofi's 2013 pricing actions.[190] Based on an internal presentation created for this meeting, Novo Nordisk's pricing committee discussed whether it should be a follower in the market in relation to Sanofi, and considered external factors like press coverage, payor reactions, profits, and performance.[191] In each case, the company's strategic recommendation was to follow Sanofi's moves, rather than lead.[192] Of note, the presentation shows that the pricing committee considered Levemir's performance, which was ahead of 2014's annual budgeting by $89 million, but that "overall company performance [was] behind."[193] The presentation recommends following Sanofi's pricing actions if the brand's performance is the priority, and to lead if the company's performance is the priority.[194] An excerpt of Novo Nordisk's presentation is shown below[195]:

**Figure 17: Novo Nordisk pricing committee presentation**

[189] *Id.*

[190] Senate Insulin Report at 52.

[191] *Id.* at 53.

[192] *Id.*

[193] *Id.*

[194] *Id.*

[195] *Id.*

**Changing and challenging 2014 environment**

| | Today's Environment | Considerations | NNI Strategic Recommendation |
|---|---|---|---|
| 1 | **SANOFI**<br>• Lilly biosimilar 18-month stay<br>• Improving financial performance | Sanofi doesn't need to be as aggressive | FOLLOW |
| 2 | **PRESS COVERAGE**<br>• New York Times 4/5 *"Even Small Medical Advances Can Mean Big Jumps in Bills"*<br>• Bloomberg 4/30 *"Drug Prices Defy Gravity, Doubling for Dozens of Products"*<br>• 60 Minutes story late May/June? | Sanofi feeling reputational pressure? | FOLLOW |
| 3 | **PAYER PRESSURES**<br>• Basal class reviews – big growth in spend<br>• Rebate pressure and price protection | Two key basal negotiations in progress: CVS July, ESI August | FOLLOW/WAIT |
| 4 | **PROFITS AND PERFORMANCE**<br>• Levemir® ARP ahead of AB14 +$89M<br>• But overall company performance behind | Brand versus Company? | Brand focus → FOLLOW<br>Company focus → LEAD? |

378. In alignment with this strategy, Novo Nordisk's pricing committee debated potential pricing scenarios based on Sanofi's actions, which they projected with a great deal of specificity.[196] The presentation provided options regarding whether the company should follow Sanofi—and increase list price in July—or lead with a 9.9% increase in August which it considered "optically less aggressive."[197] Based on internal memoranda, Novo Nordisk's pricing committee decided to revisit the issue with specific recommendations once Sanofi took action.[198]

379. Less than two weeks later, on May 30, 2014, Farruq Jafery, Vice President of Pricing, Contract Operations and Reimbursement, emailed Novo Nordisk's pricing committee to inform them that "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen."[199] He further wrote that the pricing committee had "agreed that the best strategy for Levemir is to observe the market and maintain list price parity to competitors."[200] Mr. Jafery then requested that Novo Nordisk's committee vote "ASAP" to raise the list price of Levemir effective May 31,

---

[196] *Id.*

[197] *Id.*

[198] *Id.*

[199] *Id.* at 53-54.

[200] *Id.* at 54.

2014 (the next day) from $191.28 to $222.08 for vials and from $303.12 to $333.12 for pens.[201] Only a few hours after Sanofi took its list price increase, members of the pricing committee approved Mr. Jafery's request and Novo Nordisk moved forward with a 16.1% increase on Levemir vial, and a 9.9% increase on Levemir FlexPen and FlexTouch.[202]

380. Another series of emails shows that Novo Nordisk again shadowed Sanofi's price increase in November 2014, increasing Levemir's list price immediately after Sanofi increased Lantus vials and pens by 11.9%.[203] On the morning of November 7, 2014, Novo Nordisk's pricing committee learned that Sanofi increased Lantus's list price overnight.[204] And, by the afternoon they were asked to approve the same exact price increase for Levemir, which was approved hours later.[205]

381. The speed with which Novo Nordisk reacted to Sanofi's price changes is significant.[206] Within twenty-five minutes of learning of Sanofi's price increase, Rich DeNunzio, Senior Director of Novo Nordisk's Strategic Pricing, emailed Novo Nordisk's pricing committee to alert them of the change and promise a recommendation the same afternoon after reviewing the financial impact of any move.[207] By late afternoon, Mr. DeNunzio had requested Novo Nordisk's pricing committee to again "follow [Sanofi's] 11.9% [list price increase] on November 18th" and

---

[201] *Id.*

[202] *Id.*

[203] *Id.* at 55.

[204] *Id.*

[205] *Id.*

[206] *Id.* at 56.

[207] *Id.*

vote to increase Levemir's list price, which was promptly approved by Novo Nordisk's Chief Financial Officer for U.S. operations, Lars Green.[208]

382. Novo Nordisk's pricing strategy for other diabetes products even became the subject of jokes among senior analysts within the company.[209] After a Novo Nordisk analyst shared news of an Eli Lilly price increase for a diabetes product on December 24, 2015, a senior director of national accounts wrote, "[m]aybe Sanofi will wait until tomorrow morning to announce their price increase . . . that's all I want for Christmas." The first analyst responded, "I actually started a drinking game—I have to take a shot for every response that says 'what about Sanofi,'" and then said, '[m]y poor liver.'"[210] The senior director responded, "Ho Ho Ho!!!"[211]

383. The back-and-forth between Novo Nordisk officials underscores how closely it was monitoring Sanofi's actions. The back-and-forth also appears to mirror the approach laid out in a January 27, 2014, presentation regarding the company's bidding strategy that hinged on CVS Caremark's business.[212] Novo Nordisk described its bids for the CVS Caremark business as "pivotal," and laid out a game of cat-and-mouse across different accounts in which company officials sought to have Levemir be the only therapeutic option on different PBM formularies.[213] Novo Nordisk recognized that offering "attractive exclusive rebates to large, receptive customers" would "encourage a stronger response from Sanofi."[214] However, Novo Nordisk was willing to

---

[208] *Id.*

[209] Drug Pricing Investigation at 143.

[210] *Id.*

[211] *Id.*

[212] Senate Insulin Report at 55.

[213] *Id.*

[214] *Id.*

take this risk because it would result in "immediate volume and value" for the company and could lead to an exclusive deal for CVS's commercial formulary.[215]

384. The agreements the Manufacturer Defendants had with the PBM Defendants deterred competition on lowering prices. For example, following its April 2018 list price increase, Novo Nordisk began to face pressure from payors, the media, and Congress to reduce the prices of its insulin drugs.[216] On May 29, 2018, Novo Nordisk's U.S. Pricing Committee debated whether it should reduce the list price of its insulin drugs by 50% after a string of news reports detailed how patients were struggling to afford their medications.[217] Novo Nordisk understood that a 50% cut would be a meaningful reduction to patients, significantly narrow the list-to-net gap, head off negative press attention, and reduce "pressure" from Congressional hearings.[218] However, Novo Nordisk was concerned that a list price reduction would pose significant financial risk to the company.[219]

385. The company's primary concerns were retributive action from other entities in the pharmaceutical supply chain, many of which derive payments that are based on a percentage of a drug's WAC price.[220] A PowerPoint slide created for this meeting suggests that the reasons not to lower prices were that "many in the supply will be negatively affected ($) and may retaliate" and that its "[c]ompetitors may not follow putting [Novo Nordisk] at a disadvantage"[221]:

---

[215] *Id.*

[216] *Id.* at 61.

[217] *Id.*

[218] *Id.*

[219] *Id.* at 62.

[220] *Id.*

[221] *Id.*

**Figure 18: Novo Nordisk presentation on reduced list prices**




386. Despite these concerns, internal memoranda suggest that Novo Nordisk was still prepared to lower its list price by 2019 or 2020 if its "must haves" were met.[222] Those "must haves" included an agreement from the PBMs that they would not retaliate against them by changing their formulary placement and would accept lower rebate percentages.[223]

387. According to internal memoranda, Novo Nordisk's board of directors voted against this strategy in June 2018 and recommended that the company continue its reactive posture.[224] The rationale for this decision was the "$33 million downside identified (NovoLog only)," "risk of payor [PBM] backlash or demand for current rebate on new NDC," and "high likelihood of immediate pressure to take similar action on other products."[225] Following the decision by its board of directors, on August 30, 2018, Novo Nordisk decided to continue its strategy to "monitor the market . . . to determine if other major pharma companies are taking list price [increases]."[226]

---

[222] *Id.*

[223] *Id.*

[224] *Id.*

[225] *Id.*

[226] *Id.*

388. Following years of rebate and list-price increases, the Manufacturers faced increased pressure from patients, payors, and the federal government to decrease insulin's list price.[227] However, internal memoranda and correspondence suggest that the downstream impact of lowering the list prices presented hurdles for pharmaceutical companies.[228]

389. There is also evidence of direct communications between the Manufacturer Defendants and the PBM Defendants regarding lowering the prices of insulins.[229] For example, a June 23, 2018 email memorializes a conversation Eli Lilly's President of the Diabetes Unit, Conterno, had with the CEO of OptumRx, who allegedly "re-stated that [OptumRx] would be fully supportive of Lilly pursuing a lower list price option," but indicated that OptumRx would encounter challenges, namely, "the difficulty of persuading many of their customers to update contracts without offering a lower net cost to them."[230]

390. In response, an Eli Lilly executive noted, "we wouldn't be able to lower our list price without impacting our net price," and counseled waiting until early 2020 to reduce prices.[231] Two weeks before this email, Eli Lilly executives had raised the possibility that PBMs would object to a list price reset because it would (a) result in a reduction in administrative fees for PBMs, (b) reduce rebates, which would impact PBMs' ability to satisfy rebate guarantees with some

[227] *Id.* at 79.

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] *Id.*

clients, and (c) impair their clients' ability to lower premiums for patients, thereby impacting their market competitiveness.[232] An excerpt of this email is shown below[233]:

**Figure 19: Eli Lilly internal email re potential price reductions**



Message

From: Terrence M Lyons [redacted]
Sent: 6/14/2018 2:56:33 PM
To: Enrique A Conterno [redacted]
CC: Frank D Cunningham [redacted] Michael B Mason [redacted]; Joshua L Smi ey [redacted]
Subject: Reply: Tomorrow

Enrique:

I anticipate that the PBMs may raise the following objections and/or considerations in connection with a contemplated list price reset:

(1) Reduction in the absolute amount of Admin Fees earned upon insulin claims/utilization (since this is expressed as a percentage) while still performing comparable/identical services governed by the Admin Fee:
(2) Reduction in absolute rebate amounts pressuring the PBMs ability to satisfy contractually obligated rebate guarantees with some clients (employers and insurance plans) in the near/intermediate term;
(3) Inability to modify/resubmit premiums and associated formularies for Part D plans for the 2018 (and perhaps 2019) plan year(s), or risk that such adjustments may impair market competitiveness (i.e rebate levels on lower gross price levels translating to higher plan premiums).

TML

Terrence M. Lyons
Vice President Finance | CFO Lilly Diabetes
[redacted]

391. Internal memoranda and correspondence confirm that PBM formulary exclusion lists have contributed to higher rebates in the insulin therapeutic class.[234] The Manufacturer Defendants have increased rebates in response to formulary exclusion threats, in order to preserve their revenue and market share through patient access.[235] In addition, increases in rebates are associated with increased list prices, such that the PBM Defendants' demands for increased rebates directly contributed to rising insulin prices.[236] As Eli Lilly's CEO, David Ricks, has explained at

[232] *Id.*

[233] *Id.* at 80.

[234] *Id.*

[235] *Id.*

[236] *Id.*

a May 2023 a Senate Hearing on Insulin Affordability, Eli Lilly agreed to raise list prices to fund higher rebates and fees for the PBMs[237]:

> Getting on [a] formulary is the best way to ensure most people can access our medicines affordably—once again, that's how insurance is supposed to work. But that requires manufacturers to pay ever-increasing rebates and fees, which can place upward pressure on medicines' list prices. If we cannot offer competitive rebates, our medicines may be excluded from formularies, and people cannot access them. Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees. Last year, about eighty cents of every dollar spent on our insulins went to pay rebates and fees.

392. Insulin was among the first classes of drugs to face PBM formulary exclusions, and the number of insulins excluded has increased over time.[238] In 2014, Express Scripts and CVS Caremark excluded six and seven insulins, respectively.[239] OptumRx excluded four insulins in 2016, its first year with an exclusion list. As of 2022, insulins have faced 193 total plan-years of exclusion across the PBMs since 2014[240]:

**Figure 20: Insulin exclusions by plan year**

[237] *Hearing of the Comm. on Health, Ed., Labor, and Pensions on Examining the Need to Make Insulin Affordable for All Americans,* 118th Cong. (2023), available at https://www.congress.gov/event/118th-congress/senate-event/LC72553/text (last visited Dec. 30, 2025). [hereinafter *Hearing on The Need to Make Insulin Affordable*].

[238] *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access,* XCENDA (May 2022), https://www.xcenda.com//media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_may_2022.pdf.

[239] *Id.*

[240] *Id.*




393. The Manufacturer Defendants have also made price-increase decisions due to countervailing pressures in their relationships with the PBM Defendants. A higher list-price increases the dollar value of rebates, discounts, and other fees that a Manufacturer can offer to a PBM—all of which are based on a percentage of the list price. Internal documents show that the Manufacturer Defendants were sensitive not only to their own bottom lines, but also to the bottom lines of PBMs that set formularies, without which a Manufacturer's product would likely lose significant market share.[241]

394. Exclusions, driven in part by perverse PBM incentives, have had a significant impact on patients' access to insulin. Lower list-priced insulins have been available since 2016—including follow-on insulins[242] (Admelog, Basaglar, Lyumjev, Fiasp), "authorized generic"

---

[241] Senate Insulin Report at 88.

[242] A "follow-on biologic" is an umbrella term for a copy of an originator (innovator) biologic. "Biosimilarity" is a regulatory designation: follow-on biologics licensed under the Public Health Service Act via the Biologics License Application (BLA) pathway are designated as biosimilars. By contrast, follow-on biologics approved under the Food, Drug, and Cosmetic Act via the New Drug Application (NDA) pathway retain the "follow-on biologic" designation rather than being called biosimilars. *See* Richard Dolinar, *et al.*, A Guide to Follow-on Biologics and Biosimilars with a Focus on Insulin, 24 Endocrine Practice 195-204 (Feb. 2018), https://www.sciencedirect.com/science/article/abs/pii/S1530891X20353982#:~:text=Follow%2Don%20biologics%20are%20copies,regulations%20involving%20biologics%20are%20complex (last visited Jan. 10, 2026).

insulins (Lispro, Insulin Aspart),[243] and, more recently, biosimilar insulins. PBMs, however, often exclude these insulins from their formularies in favor of products with higher list prices and larger rebates. For example, two of the three PBM Defendants (OptumRx and Express Scripts) have excluded the two insulin authorized generics since 2020, instead favoring the higher list-priced equivalents.[244] Remarkably, those PBM Defendants did so even though the list prices for these authorized generic insulins can be half the list price of the brand.[245]

395. In July 2024, the Federal Trade Commission released its Interim Staff Report related to its investigation of the PBM Defendants. The report found "evidence that [the PBM Defendants] and brand pharmaceutical manufacturers sometimes enter agreements to exclude generic drugs and biosimilars from certain formularies in exchange for higher rebates from the manufacturers."[246]

396. In addition to the exclusions of authorized generic insulins, lower list-priced biosimilar insulins have also faced PBM formulary exclusions. The first biosimilar insulin was launched in 2021. Due to prevailing market dynamics, two identical versions of the product were simultaneously introduced—one with a higher list price and large rebates, and one with a lower list price and limited rebates—giving payors the option of which to cover. All three PBMs

---

[243] An authorized generic medicine is a "brand name drug that is marketed without the brand name on its label." Additionally, "even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug." *See* Food and Drug Administration, *FDA listing of authorized generics*, https://www.fda.gov/media/77725/download (last visited Dec. 30, 2025).

[244] Xcenda, *supra* note 241.

[245] Tori Marsh, *Can't access generic Humalog? There's an even cheaper insulin option available,* GOODRX. (Aug. 26, 2019), https://www.goodrx.com/blog/admelog-now-cheaper-than-generic-humalog (last visited Dec. 30, 2025).

[246] FTC Interim Staff Report, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July 2024), at 4, https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

excluded the lower list-priced version in 2022, instead choosing to include the identical product with the higher list price.[247]

397. Excluding lower list-priced medicines from formularies can substantially increase out-of-pocket costs for patients in plans using deductibles or coinsurance, where cost-sharing is typically determined based on the medicine's full list price.[248] This trend of favoring higher list-priced products has dramatically affected patient affordability and access to insulins.

398. The PBM Defendants and the Manufacturer Defendants are complicit in this. There has been little, if any, attempt by the PBM Defendants to discourage the Manufacturer Defendants from increasing the list price of their products. Instead, the PBM Defendants used their size and aggressive negotiating tactics, such as the threat of excluding drugs from formularies, to extract even more generous rebates, discounts, and fees from the Manufacturer Defendants, who have increased their insulin list prices in lockstep.

399. The PBMs thus had every incentive to encourage the Manufacturer Defendants to raise list prices, since the rebates, discounts, and fees the PBMs negotiate are based on a percentage of a drug's list price—and the PBMs retain a large portion of what they negotiate. In fact, the Manufacturers have been dissuaded from decreasing list prices for their products, which would have lowered out-of-pocket costs for patients, due to concerns that the PBMs and health plans would react negatively.

---

[247] Adam Fein, *Five takeaways from the big three PBMs' 2022 formulary exclusions*, DRUG CHANNELS (Jan. 19, 2022), https://www.drugchannels.net/2022/01/five-takeaways-from-big-three-pbms-2022.html.

[248] Adam Fein, *Express Scripts vs. CVS Health: five lessons from the 2020 formulary exclusions and some thoughts on patient impact,* DRUG CHANNELS (Jan. 2020), available at https://www.drugchannels.net/2020/01/express-scripts-vs-cvs-health-five.html.

400. Diabetes medications have become unaffordable for many diabetics because of the Manufacturer Defendants' and PBM Defendants' collusive price increases.

### F. The Insulin Pricing Scheme

401. The market for the at-issue diabetes medications is unique in that it is highly concentrated with no true generics and few biosimilar options. The drugs and biosimilars have similar efficacy and risk profiles.

402. This affords the PBM Defendants significant leverage that, in theory, could be used to negotiate with the Manufacturer Defendants to drive down list prices for the at-issue drugs through open competition.

403. But the PBM Defendants do not want the prices for diabetes medications to decrease. A 2022 report by the Community Oncology Alliance put it this way:

> Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs extract in exchange for placing the manufacturer's product drug on a plan sponsor's formulary or encouraging utilization of the manufacturer's drugs. [T]he growing number and scale of rebates is the primary fuel of today's high drug prices. The truth is that PBMs have a vested interest to have drug prices remain high, and to extract rebates off of these higher prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates.[249]

404. The Manufacturer Defendants understand that they make more money as list prices increase. They also understand that PBM Defendants make more money as list prices increase. This is confirmed by the Senate Insulin Report after committee review of internal documents produced by the Manufacturer Defendants.

---

[249] Community Oncology Alliance & Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers* (Feb. 2022), https://communityoncology.org/research-publications/studies/pbm-dirty-tricks-expose/ [hereinafter Community Oncology Report].

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[250]

405. The documents eventually released by the Senate Finance Committee also indicate how the Manufacturer Defendants' pricing strategy focuses on the PBMs' profitability. In an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.[251]

406. The Manufacturer Defendants also understand that because of the PBM Defendants' market dominance, most payors accept the baseline national formularies offered by the PBMs with respect to the at-issue drugs.

407. The Insulin Pricing Scheme was born from these understandings. Both sets of Defendants realized that if the Manufacturer Defendants artificially inflated their list prices to facilitate large, undisclosed Manufacturer Payments back to the PBM Defendants, both the PBM Defendants and Manufacturer Defendants would generate billions of unearned dollars. The plan worked.

408. Over the past several years the Manufacturer Defendants have raised prices in unison and have paid correspondingly larger Manufacturer Payments to the PBMs.

---

[250] Senate Insulin Report at 89.

[251] Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf.

409. In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications elevated prices and preferred status on their national formularies.

410. During the relevant period, the rebate amounts (as a proportion of the list price) grew year-over-year while list prices themselves increased.

411. For example, in July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary.[252] Five years later, in 2018, Sanofi rebates were as high as 56% for preferred placement.[253] In 2015, Sanofi offered OptumRx rebates up to 42% for Lantus for preferred formulary placement.[254] That figure grew to 79.75% by 2019.[255] Similarly, in 2014, Novo Nordisk offered Express Scripts 25% rebates for Levemir.[256] That figure climbed to 47% in 2017.[257]

412. Beyond increased rebate demands, the PBM Defendants have also sought and received larger and larger administrative fees from the Manufacturer Defendants during the relevant period.

413. A study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBM Defendants requested and received from the

---

[252] Senate Insulin Report at 67.

[253] *Id.*

[254] *Id.*

[255] *Id.*

[256] *Id.*

[257] *Id.*

Manufacturer Defendants tripled, reaching more than $16 billion.[258] The study observed that although rebates were sent to payors during this period, PBM Defendants retained the same volume of rebates in pure dollars, due to the overall growth in rebate volume, as well as increases in administrative fees and spread pricing (charging a client payor more for a drug than the PBM pays the pharmacy).[259]

414. Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused and continue to cause precipitous price increases for the at-issue drugs.

415. As a result of the Insulin Pricing Scheme, every payor, including Plaintiffs, that pay for the at-issue drugs has been overcharged.

416. Moreover, the PBM Defendants use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary."[260] Likewise, in April 2019, CVS Caremark president Derica Rice stated: "Over the last three years . . . CVS Caremark has helped our clients save more

---

[258] *The Prescription Drug Landscape Explored*, PEW CHARITABLE TRUST (Mar. 2019), at 35,https://www.pew.org/-/media/assets/2019/03/the_prescription_drug_landscape-explored.pdf.

[259] *Id.*

[260] Surabhi Dangi-Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth,* AJMC (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth (last visited Jan. 10, 2026).

than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[261]

417. In making these representations, the PBM Defendants fail to disclose that the amount of "savings" generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical payment chain and which all Defendants are directly responsible for artificially inflating.

418. The Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants that created enormous profits for all Defendants. Each of the Defendants agreed to and participated in the scheme. For example:

a. **Upon information and belief**, the Manufacturer Defendants and the PBM Defendants are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that form and fuel the scheme. As part of these communications, the Manufacturer Defendants are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also in determining the same for competing products. Though their communications and written contracts, the Manufacturer Defendants and the PBM Defendants also agree to rebates, fees, and other payments—that is, kickbacks—in exchange for preferred formulary access.

[261] *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation, Helped Reduce Member Cost, and Improved Medication Adherence in 2018*, CVS HEALTH (Apr. 11, 2019), https://www.prnewswire.com/news-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price-inflation-helped-reduce-member-cost-and-improved-medication-adherence-in-2018-300830167.html.

b. **Upon information and belief**, the Manufacturer Defendants and the PBM Defendants share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBM Defendants' drug utilization tracking efforts and mail-order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and to construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx (which utilizes OptumInsight and Optum Analytics).

c. **Upon information and belief**, the Manufacturer Defendants and the PBMs engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients.

419. Rather than using their prodigious bargaining power to lower drug prices as they claim, Defendants used their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors and diabetics.

### G. The Manufacturers React to Threats of Formulary Exclusion by Increasing Rebates Offered to the PBMs

420. Although the PBM Defendants have insisted they had no control over how the Manufacturer Defendants price their insulin products, their threats of formulary exclusion illustrate

how they used new insulin competitors with lower prices to leverage even higher rebates on the existing insulin drugs.

421. In the face of formulary exclusion threats based on new entrants in the insulin market, the Manufacturer Defendants have willingly met the PBM Defendants' demands for increased rebates in order to retain preferred formulary placement and block competitors. For example, in 2016, Sanofi and Novo Nordisk enhanced their rebate offers at the same time Eli Lilly introduced Basaglar, a follow-on biologic to Lantus.[262] Basaglar is a long-acting insulin and is "[c]linically . . . very similar" to Sanofi's Lantus.[263] Because of its near clinical equivalence, Basaglar posed a competitive threat in the long-acting insulin market. The PBM Defendants threatened to switch to Basaglar because it was priced lower, and they expected Eli Lilly to offer larger discounts in response.[264]

422. A 2016 Sanofi memo describes the market dynamic whereby a threatened new market entrant would lead not to lower prices, but to greater rebates:

**Figure 21: Sanofi memo on introduction of Basaglar[265]**

- Lilly is actively engaged with Anthem for 2017 Medicare and commercial business. Anthem believes they would not have significant challenges moving to Basaglar in 2017 if the WAC price and discounts are in line with what they are thinking (20% lower WAC and discounts >40% )

423. In an attempt to avoid PBMs switching to Basaglar, Sanofi and Novo Nordisk increased their rebate bids to respond to Eli Lilly.[266] For example, according to Sanofi internal memoranda, sometime around April 2016, Express Scripts requested bids for its 2017 national

---

[262] Senate Insulin Report at 68.

[263] *Id.*

[264] *Id.*

[265] *Id.*

[266] *Id.* at 69.

commercial formulary and indicated its desire to add only one insulin glargine product to its basal insulin category.[267] Express Scripts communicated to Sanofi that "with the right competitive price, [it] would not have significant challenges moving [from Lantus and Toujeo] to Basaglar" and that Sanofi must enhance its current rebate rate of 42% to maintain access for their basal insulins.[268]

424. An internal Sanofi memo describes the dynamic where, at "the right competitive price," Express Scripts would not have a challenge moving Basaglar into a preferred position on its formulary[269]:

**Figure 22: Sanofi memo on Basaglar pricing**

**Likely Competitive Approach and Response:**

- Lilly is actively engaged with ESI for 2017 commercial business. Pricing has not been confirmed however ESI has informed that the following assumptions pose a threat to Sanofi's glargine franchise:
  - Discounts for Basaglar in the mid 60's have been communicated by ESI to Sanofi. This is likely a starter for ESI to consider excluding Lantus and Toujeo. Modeling assumed 70%.
  - Basaglar WAC will be 15% to 25% less than the WAC price of Lantus. Sanofi modeling assumed 15%.
- ESI has signaled, with the right competitive price, they would not have significant challenges moving to Basaglar in 2017 despite a follow-on biologic (Basaglar) approval.
- In addition ESI has indicated that Novo must also enhance its current rate to maintain current access for their basal insulin(s). Novo is likely to enhance its current rebates given recent Tresiba addition to part D formulary.

425. Rebate contracts confirm that Sanofi increased its offer up to almost 55% off its WAC of $248.51 for Lantus vials and $372.76 for Lantus pens.[270]

426. For the Manufacturer Defendants, the mere threat of exclusion has pressured them to offer substantially greater rebates to maintain formulary position. This is because formulary exclusions are likely to cause significant loss of a manufacturer's market share, leading to lower revenue. On the other hand, being the exclusive therapy on a formulary has the opposite effect, which incentivizes Manufacturer Defendants to offer large discounts to acquire or maintain such

[267] *Id.*

[268] *Id.*

[269] *Id.*

[270] *Id.*

status. The use of formulary exclusions has thus led to a market dynamic in which Manufacturer Defendants offer ever-higher rebates to avoid exclusion, which has led to higher list prices.

427. For example, before 2013, Sanofi offered an average rebate of 5% on Lantus.[271] However, beginning in 2013, competitors sought to "[d]isplace Lantus in High Control Plans and Markets . . . through increased rebates" to capture market share.[272] In response, Sanofi increased its rebate and discount offerings to remain on their formulary.[273] A Sanofi memo further explains this dynamic[274]:

**Figure 23: Sanofi memo on increased rebates for Lantus**



**MARKET OVERVIEW**
**Lantus**

- Aggressive Competitors
  - Displace Lantus in High Control Plans and Markets (i.e. Part D) through increased rebates and/or portfolio offers for the sole purpose of removing Lantus from favorable formulary access
  - Attempts to minimize the clinical differentiation between Lantus and Levemir
- Aggressive Payers
  - Price Predictability
    - Accounts requiring more value from price predictability
      - Extension of Timeline/WAC Evaluation periods lengthened, e g Caremark Price Protection from June 2013 thru December 2014 for the 2014 Contract, ESI Requesting 2-Year Price Protection
      - Demand for lower threshold percentages
      - Discontinue calculations that exclude prior pricing activity from carrying forward, e g no more Reset Calculations
  - Increased Discounts
    - Caremark increase in base rebates was needed to remain on formulary
      - Caremark Base 25% to 32% for 2014
  - Benefit Designs
    - Accounts have shown willingness and ability to remove Lantus from Formulary
    - Cigna 2012, Aetna 2013, OptumRx Saver Plus 2013, Coventry 2014

428. While the PBM Defendants have touted that using formulary exclusions in the insulin therapeutic class was a way to drive down costs for their clients, internal correspondence and memoranda show that increased use of formulary exclusions did exactly the opposite: WAC

---

[271] *Id.*

[272] *Id.* at 74.

[273] *Id.*

[274] *Id.* at 75.

(list) prices have continued to increase, leading to higher costs for payors and higher prices for patients at the pharmacy counter.

429. For example, in 2013, when Express Scripts threatened to move patients to other diabetes drugs in order to "break even on [the] rebate line" unless Sanofi increased its Medicare Part D rebate offer for Lantus, Sanofi considered increasing its rebate offer from 7.45% to 15% in order to prevent formulary exclusion.[275] Sanofi also faced similar pressure to increase rebates for Express Scripts' commercial contracts. Internal Sanofi memoranda show that "Sanofi was notified by [Express Scripts] that Lantus was positioned to be removed from the formulary effective 2013 . . . [and as a result] rebates were re-negotiated."[276] An excerpt from this memo, discussing the threat to Lantus, illustrates that the threats used by Express Scripts to drive up rebates on Sanofi's flagship insulin product Lantus[277]:

**Figure 24: Sanofi presentation on formulary threats to Lantus**

**Lantus Contracting History with ESI**
Account Management and Contracting have worked closely together to maintain a 5% rebate for Commercial contracts through 2012. Sanofi was notified by ESI that Lantus was positioned to be removed from formulary effective 2013. Rebates were re-negotiated resulting in a 6% Lantus Vial & 9% Lantus SoloStar rebate (no price protection).

**Lantus Overall Threat**
The Commercial business is at additional threat due to competitive rebate pressures and changing formulary design as well as Lantus pricing actions.

- ESI has shared that Novo has been extremely aggressive the last few months and this has triggered the need to revise our offer.
    - For 2014 ESI made Humalog exclusive in the RAI category, moving Novolog to Not Covered and made Byetta & Bydureon the only options in the GLP1 category, moving Victoza to Not Covered.
- Comments during discussion with ESI confirmed that modeling has occurred and that the current contracted offer will result in a Not Covered position for 2015. This is based on competitive offers by Novo and client plans requesting exclusive offers for comparison.
- They have shared that the basal category is under consideration for exclusion list status for 2015. This interest in an exclusive offer is consistent with recent actions they have taken to reduce the number of branded options available to patients.
- Lantus price increases over the past two years have positioned Sanofi as a cost driver that has triggered significant attention from ESI.

[275] *Id.*

[276] *Id.*

[277] *Id.* at 76.

430. According to internal memoranda, in 2014, Express Scripts and its affiliated businesses managed the prescription drug claims of over 4.6 million people, representing 15% of the total business in the Medicare Part D channel.[278] Rebate agreements confirm Sanofi renegotiated rebates and entered into an agreement to provide up to 10.625% for Lantus, effective January 1, 2014.[279] Rebates were renegotiated again that same year, and Sanofi increased its rebate offer up to 14.625%, effective October 1, 2014.[280]

431. CVS Caremark and OptumRx used similar formulary exclusion threats to drive up Lantus rebates. Around this same time, other PBMs learned that Sanofi had offered competitive rebates to Express Scripts which caused them to question their rebate status with Lantus.[281] As a result, they too demanded higher rebates and threatened to exclude Lantus from their formulary to achieve this result.[282]

432. For example, in 2014, UnitedHealthcare threatened to remove Lantus from its commercial formulary.[283] Sanofi offered an enhanced rebate for FY2015 in the 15% range, but OptumRx rejected Sanofi's offer and took steps to remove Lantus from its commercial formulary.[284] Sanofi responded with a last-minute bid of a 45% rebate for Tier 2, which OptumRx

---

[278] *Id.*

[279] *Id.*

[280] *Id.*

[281] *Id.*

[282] *Id.*

[283] *Id.*

[284] *Id.*

countered with 45% for Tier 3.[285] According to Sanofi, OptumRx's counteroffer was "ultimately accepted over access concerns to future products and the need to secure access to patient lives."[286]

433. Similarly, in 2016, Express Scripts threatened to remove Lantus and Toujeo from its Medicare Part D formulary and requested that Sanofi submit its "best and final offer" or else face formulary exclusion.[287] According to internal memoranda, during negotiations, Express Scripts told Sanofi that it was justified in removing Lantus and Toujeo from its Medicare Part D formulary because it had allowed "quite a few years of price increases" and that Novo Nordisk's rebate offer was more competitive.[288] In response to Express Scripts' threat, Sanofi discussed revising its rebate offer up to 40% with 4% price protection for Lantus and Toujeo.[289]

434. Although contracts with the PBM Defendants included larger and larger rebates, the Manufacturers Defendants still expected to remain profitable. For example, on July 28, 2017, one Sanofi official wrote to colleagues after considering their offer to CVS Caremark for placement on the Part D formulary: "After inclusion of additional fees, we are still profitable up to an 89% rebate."[290] The official included an analysis that assumed "CVS would need to shift 68.9% of [its] glargine volume to Novo to break even (at an assumed 81% rebate offer)."[291] In its analysis, Sanofi compared various negotiation scenarios including a "no contract" scenario, which it determined would be more profitable to the company even with the resulting reduction in sales

[285] *Id.*

[286] *Id.*

[287] *Id.* at 77.

[288] *Id.* at 78.

[289] *Id.*

[290] *Id.*

[291] *Id.*

volume and revenue. One of the deciding factors was optics. As one colleague put bluntly: "How would it look to be removed from the largest Medicare plan?"[292]

435. As the PBM Defendants expanded the practice of using formulary exclusions to extract greater rebates, Sanofi's counterstrategy was to bundle unrelated products that had been excluded—Lantus and an epinephrine injection called Auvi-Q—to win formulary inclusion for both. (Bundling is a practice where manufacturers offer rebates and discounts for multiple products, but only if certain conditions are met.)[293]

436. Sanofi faced significant financial pressure across all accounts and sought to include bundling agreements in several of its contracts. While negotiating contracts for the 2015/16 plan year, Express Scripts advised Sanofi that it needed to be far more aggressive with rebate offers to gain access to the PBM's commercial book of business than in past years. Internally, Sanofi officials warned in a memo that "Novo, specifically Levemir, has changed the game with regard to rebates," and that Sanofi would "need to rebate aggressively."[294] A separate presentation describes "[c]ontracts that increase Lantus rebates if Auvi-Q is added to [the] formulary thus creating a bundled arrangement," and notes that the company had even considered a "triple product bundle" with Toujeo, despite concerns about the arrangements triggering Medicaid best price.[295]

437. This counterstrategy was not limited to Sanofi. An internal memo shows that Sanofi's competitors were using the same strategy: "Lantus is losing accounts and share within the

---

[292] *Id.*

[293] *Id.*

[294] *Id.*

[295] *Id.*

institutional channel because of aggressive discounting and bundled contract offerings from Novo Nordisk and Lilly."[296]

438. For example, Novo Nordisk secured contract terms from CVS Caremark's Part D business in 2013 that tied its "exclusive" rebates for insulin to formulary access for its Type 2 diabetes drug Victoza.[297] The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. To qualify for the exclusive rebate, the plans would also need to list Victoza, a GLP-1 agonist, on their formulary, exclude all competing insulin products, and ensure "existing patients using a [c]ompeting [p]roduct may not be grandfathered."[298]

### H. Defendants Downplay the Insulin Pricing Scheme and Its Harms

439. On April 10, 2019, the U.S. House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[299]

440. Representatives from all Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past fifteen years.

441. Further, each Defendant conceded that the price that diabetics pay out-of-pocket for insulin is too high. For example:

- Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, testified: "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug

[296] *Id.*

[297] *Id.*

[298] *Id.*

[299] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin,* Hearing before H. Energy and Comm. Subcomm. on Oversight and Investigations, 116th Cong. (2019), transcripts available at https://www.congress.gov/event/116th-congress/house- event/109299?s=1&r=3 (last visited Dec. 30, 2025) [hereinafter *Priced Out of a Lifesaving Drug*].

that is nearly 100 years old, and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."[300]

- Thomas Moriarty, General Counsel for CVS admitted: "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, prices for insulin have increased nearly 50 percent. Over the last ten years, [the] list price of one product, Lantus, rose by 184 percent."[301]

- Mike Mason, Senior Vice President of Eli Lilly, testified when discussing how much diabetics pay out-of-pocket for insulin: "[I]t's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications."[302]

- Kathleen Tregoning, Executive Vice President for External Affairs at Sanofi, testified: "Patients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is clearly failing too many people [W]e recognize the need to address the very real challenges of affordability. . . . [S]ince 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients."[303]

- Doug Langa, Executive Vice President of Novo Nordisk, testified: "On the issue of affordability, I will tell you that at Novo Nordisk we are accountable for the list prices of our medicines. We also know that list price matters to many, particularly those in high-deductible health plans and those that are uninsured."[304]

442. None of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

443. Instead, the written testimony of Novo Nordisk President Doug Langa recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among

[300] *Id.*, Preliminary Transcript.

[301] *Id.*, Preliminary Transcript.

[302] *Id.*, Preliminary Transcript.

[303] *Id.*, Preliminary Transcript.

[304] *Id.*, Preliminary Transcript.

these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."[305] Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of the list price is that there is increased pressure to keep list prices high."[306] The hearing transcript records Mr. Langa's further comments in this regard:

> So as you heard from last week from Dr. Cefalu from the [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And we've been participating in that system because the higher the list price, the higher the rebate. . . . There's a significant demand for rebates. *[W]e're spending almost $18 billion a year in rebates, discount, and fees, and we have people with insurance with diabetes that don't get the benefit of that.* (emphasis added)[307]

444. Eli Lilly admitted that it raises list prices as a quid pro quo for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly, testified:

> Seventy-five percent of our list price is paid for rebates and discounts. $210 of a vial of Humalog is paid for discounts and rebates. We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so that people can use our insulin.

In the very next question, Mr. Langa of Novo Nordisk was asked, "[H]ave you ever lowered a list price?" His answer, "We have not."[308]

[305] *Id.*, Douglas Langa Written Statement.

[306] *Id.*, Douglas Langa Questions for the Record Response.

[307] *Id.*, Preliminary Transcript.

[308] *Id.*, Preliminary Transcript.

445. Sanofi's Executive Vice President for External Affairs, Kathleen Tregoning, similarly testified:

> The rebates [are] how the system has evolved. . . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.[309]

Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."[310]

446. The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

447. In her responses to questions for the record, Amy Bricker—former President of Express Scripts and a former PCMA board member—confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications."[311] Yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, she answered: "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position."[312] When asked why the PBM would not include both costly and lower-priced insulin

---

[309] *Id.*, Preliminary Transcript.

[310] *Id.,* Kathleen Tregoning Questions for the Record Response.

[311] *Id.*, Preliminary Transcript.

[312] *Id.*, Preliminary Transcript.

medications on its formulary, Ms. Bricker stated plainly, "We'll receive less discount in the event we do that."[313]

448. As Dr. Dutta, Senior Vice President of OptumRx, reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is not what the payer is paying. They are paying the net price."[314]

449. But payors do not pay the net price, even when rebates are passed through, because the PBM Defendants receive and retain countless other forms of payments that drive up the gap between the list price and the net price retained by drug manufacturers. By giving preference to drugs with higher list prices based on the illusion of a lower net price, the PBM Defendants are causing health plan payors, such as Plaintiffs, and members, such as their beneficiaries, to pay more while the PBM Defendants keep greater profits for themselves. In other words, under the Insulin Pricing Scheme, PBMs and manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher Manufacturer Payments to the PBM Defendants).

---

[313] Buried in Express Scripts' 2017 10-K is the following provision: "We maintain contractual relationships with numerous pharmaceutical manufacturers, which provide us with, among other things administrative fees for managing rebate programs, including the development and maintenance of formularies that include particular manufacturer's products." That is, the Manufacturers pay the PBMs to effectively participate in the creation of formularies that payors are required to adopt as a condition for obtaining PBM services. Express Scripts Holding Co., Annual Report (Form 10-K) (FYE Dec. 31, 2017). It also notes that its business would be "adversely affected" if it were to "lose [its] relationship with one or more key pharmaceutical manufacturers." *Id.*

[314] *Priced Out of a Lifesaving Drug*, Preliminary Transcript at 1394-95. As noted in the hearing, even the "cheaper" alternative Admelog "costs over $200 a bottle." *Id.* at 3121-26.

450. On May 10, 2023, the U.S. Senate Committee on Health, Education, Labor, and Pensions held a hearing titled, "The Need to Make Insulin Affordable for All Americans." At this hearing, the CEOs and presidents of the Manufacturer and PBM Defendants doubled down on their testimony from 2019. David Ricks, for example, the Chair and CEO of Eli Lilly, testified that his company raised list prices and agreed to pay ever-increasing rebates to secure formulary placement:

> Getting on formulary is the best way to ensure most people can access our medicines affordably . . . . But that requires manufacturers to pay ever- increasing rebates and fees, which can place upward pressure on medicines' list prices Last year alone, to ensure our medicines were covered, Lilly paid more than $12 billion in rebates for all our medicines, and $1 billion in fees.[315]

451. Paul Hudson, the CEO of Sanofi, likewise indicated that PBMs prefer drugs with higher list prices and that the manufacturers have responded accordingly. In discussing a drug Sanofi introduced with a lower list price, Hudson explained: "It just didn't get listed in any way. If price is really the motivator, it would have been listed."[316]

452. While all Defendants acknowledged before Congress their participation in conduct integral to the Insulin Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiffs, were unwittingly suffering. Instead, to obscure the true reason for precipitous price increases, each Defendant group pointed the finger at the other as the responsible party.

453. The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

---

[315] *Hearing on The Need to Make Insulin Affordable.*

[316] *Id.*

454. This testimony is false. The amount the Manufacturer Defendantss kick back to the PBM Defendants is directly correlated to an increase in list prices. On average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price.[317] Thus, reducing or eliminating Manufacturer Payments would lower prices and reduce out-of-pocket expenditures.

455. Further, in large part because of the increased list prices[318] and related Manufacturer Payments, the PBM Defendants' profit per prescription has grown substantially over the same period that insulin prices have steadily increased. For example, since 2003, Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[319]

456. Novo Nordisk's President Doug Langa submitted written testimony to Congress in April 2019 acknowledging "there is no doubt that the WAC [list price] is a significant component" of "what patients ultimately pay at the pharmacy counter."[320] Yet, the Manufacturer Defendants urged upon Congress the fiction that the PBM Defendants were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement. The Manufacturer Defendants claimed their hands were tied and sought to conceal their misconduct by falsely suggesting that they have not profited from rising insulin prices.

457. Given the Manufacturer Defendants' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would

---

[317] Neeraj Sood, *et al., The Association Between Drug Rebates and List Prices,* USC Schaeffer Center for Health Policy and Economics (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/ (last visited Dec. 30, 2025).

[318] *Id.*

[319] David Balto, *How PBMs Make the Drug Price Problem Worse,* THE HILL (Aug. 31, 2016, 5:51 p.m.), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price- problem-worse (last visited Dec. 30, 2025).

[320] *Priced Out of a Lifesaving Drug,* Douglas Langa Written Statement.

decrease list prices if rebates were restricted or eliminated. The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."[321]

458. In addition, a 2020 study from the Institute of New Economic Thinking titled "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that during the time insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion. In fact, during this time, the Manufacturers spent a significantly lower proportion of profits on R&D compared to shareholder payouts. The paper also notes that "[t]he mean price paid by patients for insulin in the United States almost tripled between 2002 and 2013" and that "per-person spending on insulin by patients and insurance plans in the United States doubled between 2012 and 2016, despite only a marginal increase in insulin use."[322]

459. The 2022 Community Oncology Alliance report found:[323]

> [T]here are several important ways that PBM rebates increase the costs of drugs for both plan sponsors and patients. PBMs employ exceedingly vague and ambiguous contractual terms to recast monies received from manufacturers outside the traditional definition of rebates, which in most cases must be shared with plan sponsors. Rebate administration fees, bona fide service fees, and specialty pharmacy discounts/fees are all forms of money received by PBMs and rebate aggregators which may not be shared with (or even disclosed to) the plan sponsor. These charges serve to increase the overall costs of drugs, while providing no benefit whatsoever to plan sponsors The total drug spend of a plan sponsor, regardless of whether it is a federal or state governmental program or a self-funded employer, will inevitably increase because PBMs are incentivized to favor expensive drugs that yield high rebates. . . .

---

[321] *Priced Out of a Lifesaving Drug,* Preliminary Transcript.

[322] Rosie Collington, Profits, Innovation and Financialization in the Insulin Industry, Inst. For New Econ. Thinking (Apr. 2020), https://www.ineteconomics.org/uploads/papers/WP_120-Collington-The-insulin-industry.pdf (last visited Dec. 30, 2025).

[323] Community Oncology Report.

460. In January 2021, the Senate Finance Report detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:

a. The Manufacturer Defendants retain more revenue from insulin than they did in the 2000s. For example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018.

b. The Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs.

c. The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs.

461. The truth is that, despite their finger-pointing in front of Congress, the Manufacturers and PBMs are both responsible for their concerted efforts in creating and effectuating the Insulin Pricing Scheme.

### I. All Defendants Profit from the Insulin Pricing Scheme

462. The Insulin Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants exorbitant, yet secret, Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues from sales without decreasing their profit margins. During the relevant period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

463. Because of the increased list prices, and related Manufacturer Payments, the PBM Defendants' profit per prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more

than 150% from 2014 to 2018. In fact, for transactions in which the PBM Defendants control the PBM and the pharmacy (e.g., CVS Caremark-CVS pharmacy), these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from only 25% just four years earlier), even though they do not contribute to the development, manufacture, innovation, or production of the product.[324]

464. The PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in several ways, including by: (a) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (b) using the inflated list price to generate profits from pharmacies, and (c) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies.

**1. The PBMs Pocket a Substantial Share of Manufacturers' Secret Payments**

465. The first way in which the PBM Defendants profit from the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

466. The amount that the Manufacturers pay the PBM Defendants has increased over time both in real dollars and as a proportion of the ever-increasing list prices.

467. Historically, contracts between PBM Defendants and payors allowed the PBM Defendants to keep most or all of the rebates they received, rather than forwarding them to the payor.

468. Over time, payors secured contract provisions guaranteeing that the PBM Defendants would pay them all or some portion of the rebates that the Manufacturers paid to the PBM Defendants. Critically, however, "rebates" are only one aspect of the total secret

[324] Van Nuys, *supra* note 110.

Manufacturer Payments, particularly as "rebates" are narrowly defined and qualified by vague exceptions in the PBM Defendants' contracts with payors.

469. Indeed, as described in the Senate Insulin Report, the PBM and Manufacturer Defendants coordinate to determine the contract options made available to payors: "Contracts between PBMs and manufacturers provide a menu of options from which their health plan clients can choose certain terms and conditions."[325]

470. The contracts between the PBMs and Manufacturer Defendants also "stipulate terms the plans must follow regarding factors such as formulary placement and competition from other drugs in the therapeutic class."[326] Thus, the Manufacturer Defendants ultimately played a role in dictating the terms and conditions of the contracts that payors like Plaintiffs entered into with PBM Defendants. Of course, the payors were not involved in the coordination or the negotiation of the contracts between the PBM and Manufacturer Defendants, and the PBMs disclosed only the fact that such relationships may exist. But the terms of the contracts, the consideration exchanged between the PBMs and Manufacturers, and the means of reaching these determinations all were—and remain—shrouded in secrecy.

471. The PBM and Manufacturer Defendants thus created a "hide-the-ball" system where payors like Plaintiffs are not privy to rebate negotiations or contracts between the Manufacturer and PBM Defendants. The consideration exchanged between them (and not shared with payors) is continually labeled and relabeled. As more payors moved to contracts that required PBMs to remit some or all manufacturer "rebates" through to the payor, the PBM Defendants

---

[325] Senate Insulin Report at 40.

[326] *Id.* at 44.

renamed the Manufacturer Payments to shield them from scrutiny and from their payment obligations.

472. Payments once called "rebates" in contracts with payors like Plaintiffs were then termed "administrative fees," "volume discounts," "service fees," "inflation fees," or other industry terms designed to obfuscate the substantial sums being secretly exchanged between the PBM Defendants and the Manufacturers.

473. Just last year, the Senate Commerce, Science and Transportation Committee released testimony from David Balto—a former antitrust attorney with the Department of Justice and Policy Director for the Federal Trade Commission's Bureau of Competition—from a hearing on fairness and transparency in drug pricing. Mr. Balto's testimony describes how PBMs "transformed from 'honest brokers' supposedly negotiating with drug companies to obtain lower costs for insurers and patients into oligopolists using the rebates they extract from drug manufacturers and pharmacies to enrich themselves."[327] He further testified:

> The PBM rebate system turns competition on its head with PBMs seeking higher, not lower prices to maximize rebates and profits. In the past decade, PBM profits have increased to $28 billion annually. . . . . PBMs establish tremendous roadblocks to prevent payors from knowing the amount of rebates they secure. Even sophisticated buyers are unable to secure specific drug by drug rebate information. PBMs prevent payors from being able to audit rebate information. As the Council of Economic Advisors observed, the PBM market lacks transparency as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." Without adequate transparency, plan sponsors cannot determine if the PBMs are fully passing on any savings, or whether their formulary choices really benefit the plan and subscribers.[328]

---

[327] *Hearing on Ensuring Fairness and Transparency in the Market for Prescription Drugs before the S. Comm. on Commerce, Science, and Transportation: Subcommittee Consumer Protection, Product Safety, and Data Security* (May 5, 2022) (statement of David Balto), https://www.commerce.senate.gov/services/files/5807DDD6-EA20-42A4-97B1-73541F832839 (last visited Jan. 10, 2026).

[328] *Id.*

474. The renamed, and secret, Manufacturer Payments are substantial. The use of "administrative fees" instead of "rebates" is one example. A heavily redacted complaint filed by Defendant Express Scripts in 2017 revealed that Express Scripts retains up to thirteen times more in "administrative fees" than it remits to payors in rebates. In fact, administrative fees can dwarf rebates. In just one alleged invoice Express Scripts was seeking payment for in that lawsuit, "administrative fees" were more than three-and-a-half times the amount billed for formulary rebates and price protection rebates combined.[329]

475. Although the proportion of rebates retained by PBM Defendants remains a secret, commentators have suggested that PBMs "designate as much as twenty-five or thirty percent of the negotiated rebates as fees to avoid sharing the rebates."[330]

476. A review of Texas-mandated PBM disclosures also showed that PBMs retain a much greater percentage of manufacturer rebates than they lead on.[331] Under Texas law, certain PBMs are required to report "aggregated rebates, fees, price protection payments, and any other payments collected from pharmaceutical drug manufacturers."[332] Between 2016 and 2021, the PBMs reported that they retained between 9% and 21% of total manufacturer payments.[333]

477. In an attempt to quantify the revenue the PBM Defendants receive from retained rebates, a 2023 report found that PBM compensation from rebates and other kickbacks doubled

---

[329] *Express Scripts, Inc. v. Kaleo,* Inc., No. 4:17-cv-01520-RLW (E.D. Mo. 2017).

[330] Joanna Shepherd, *Pharmacy Benefit Managers, Rebates, and Drug Prices: Conflicts of Interest in the Market for Prescription Drugs,* YALE L. & POL. REV., https://openyls.law.yale.edu/server/api/core/bitstreams/fc20e184-b2d6-4b02-a0f6-a495e3fb5cd2/content

[331] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go,* DRUG CHANNELS (Aug. 9, 2022), available at https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html.

[332] *Id.*

[333] *Id.*

between 2018 and 2022, from $3.8 billion to $7.6 billion.[334] "This growth was fueled by increases in traditional administrative fees as well as the emergence of new data and PBM contracting entity fees."[335] Administrative fees, the report estimated, grew from $3.8 billion in 2018 to $5.8 billion in 2022.

478. These so-called administrative fees typically are based on a percentage of the drug price—as opposed to a flat fee—such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive to give preference to more expensive drugs. Moreover, the PBM Defendants' contracts with payors narrowly define "rebates" by tying them to patient drug utilization. Thus, rebates for formulary placement (which are not tied to patient drug utilization) are characterized as "administrative fees" that are not remitted to payors. Such payments are beyond a payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

479. The opaque nature of these arrangements between the Manufacturer and PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members. The Senate Insulin Report observed with respect to these arrangements: "Relatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers."[336]

---

[334] Eric Percher, *Trends in Profitability and Compensation of PBMs and PBM Contracting Entities*, NEPHRON RESEARCH (Sept. 18, 2023), available at https://cdn.ymaws.com/www.wsparx.org/resource/resmgr/legislative_session/2024/pbm_campaign/nephron_pbm.pdf.

[335] *Id.*

[336] Senate Insulin Report at 4.

480. Not surprisingly, the PBM Defendants have gone to great lengths to obscure these renamed Manufacturer Payments to avoid scrutiny from payors and others.

481. For example, as to the Manufacturer Payments now known as "inflation fees," the PBM Defendants often create a hidden gap between how much the Manufacturer Defendants pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

482. In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" to increase the price of their diabetes medications. The thresholds for these payments are typically set at around 6% to 8%—if the Manufacturer Defendants raise their prices by more than the set percentage during a specified period, then they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the list prices).

483. For many of their clients, the PBM Defendants have separate "price protection guarantees," providing that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will remit a portion of the amount to the client.

484. The PBM Defendants set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

485. Thus, if the Manufacturer Defendants increase their list prices more than the 6% (or 8%) inflation fee rate, but less than the 10%-15% client price protection guarantee rate, then the PBMs keep all of these "inflation fee" payments. This is a win-win for the Manufacturer and PBM Defendants—they share and retain the entire benefit of these price increases while the PBM Defendants' contracts with payors imply that payors are protected from price hikes by their price protection guarantees.

486. The PBM Defendants also hide the renamed Manufacturer Payments with "rebate aggregators." Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of PBMs (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

487. These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

488. The PBM Defendants carefully guard the revenue streams from their rebate aggregator activities, concealing them through complex contractual relationships and not reporting them separately in their quarterly SEC filings.

489. Certain rebate-aggregator companies are located offshore, including, for example, in Switzerland (Express Scripts affiliate Ascent Health) and Ireland (OptumRx affiliate Emisar Pharma Services), thereby precluding adequate oversight.

490. As summarized by the recent Community Oncology Alliance report:[337]

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates. In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.

[337] Community Oncology Report.

491. In 2017, for example, in Broward County, Florida, an audit conducted pursuant to its agreement with Defendant OptumRx related to its PBM activities from 2013 to 2015, wherein OptumRx claimed that it was unable to verify the percentage of rebates OptumRx remitted to Broward County because OptumRx did not have access to contracts between the aggregator (and its contractors) and the manufacturer, even though OptumRx has an affiliate relationship with its aggregator, Coalition for Advanced Pharmacy Services (CAPS), which in turn contracted with Express Scripts, to maximize rebate retention for the benefit of OptumRx and to the detriment of the Plan. OptumRx purported that it paid Broward County all rebate funds it received, through Coalition for Advanced Pharmacy Services (CAPS), from the drug manufacturers. However, the rebate funds received by Broward County do not account for the funds retained by CAPS. Therefore, unbeknownst to Broward County, OptumRx improperly benefited from its affiliation with CAPS.

492. A subsequent audit by Broward County, Florida, covering the period September 2017 to September 2018, concluded:

> Several material weaknesses in Broward's agreement with Optum were identified, many of which are commonplace across pharmacy benefit manager agreements in general. Due to contract weaknesses, a comparison of Broward's PBM agreement, including rebate amounts received, to the Consultant's marketplace data is not feasible. Broward could save an estimated $1,480,000 per year in net prescription drug benefit expenses (based upon minimum rebate guarantees) by switching from its current flawed agreement with Optum, to an agreement with its Coalition, which offers clearly defined terms, increased rebate guarantees and cost saving requirements.[338]

[338] Broward Cnty, Fl., Office of the Cnty. Auditor, *Analysis of Broward County's Prescription Drug Coverage,* (July 31, 2019), https://www.broward.org/Auditor/Reports/Reports/082019_Exh1_BCRxDrug_19-15.pdf (last visited Jan. 11, 2026).

493. Among other "loopholes" discovered in the contract were a number of "flawed" (i.e., vague and manipulable) definitions, including (a) the definition of "Rebates," which "allows the exclusion of monies that should be included" and (b) limitations with respect to "Pass Through Transparency Pricing."

494. The January 2021 Senate Insulin Report summarized the Senate Finance Committee's findings from its two-year probe into the Insulin Pricing Scheme and contained the following observation on these rebate aggregators:

> [T]he recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.[339]

495. Federal regulations governing Medicare attempt to capture all possible forms of Direct or Indirect Remuneration (DIR) to PBMs (and plan sponsors), defining the term as "any form of price concession" received by a plan sponsor or PBM "from any source," including "discounts, chargebacks, rebates, cash discounts, free goods contingent on a purchase agreement, up-front payments, coupons, goods in kind, free or reduced-price services, grants, legal judgment amounts, settlement amounts from lawsuits or other legal action, and other price concessions or similar benefits" and specifically including "price concessions from and additional contingent payments to network pharmacies that cannot reasonably be determined at the point of sale."[340]

---

[339] Senate Insulin Report at 83.

[340] Jennifer R. Shapiro, *Final Medicare Part D DIR Reporting Guidance for 2021*, CMS (Mar. 30, 2022), at 7, https://www.cms.gov/files/document/final2021dirreportingreqsmemo508v3.pdf (last visited Dec. 30, 2025).

496. The Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS) considers all of the following as DIR: rebates, grants, reduced price administrative services, PBM-retained rebates, PBM rebate guarantee amounts, all post-point of sale payments by pharmacies that are not included in the negotiating price including dispensing incentive payments, prompt pay discounts, and payment adjustments. On the other hand, "bona fide service fees from pharmaceutical manufacturers" and "remuneration for administrative services with no impact on the sponsor's or PBM's drug cost (e.g., PBM incentive payments)" are *not* considered DIR *but only to the extent they reflect fair market value for services rendered.*[341]

497. Because the PBM Defendants retain and conceal most of the secret Manufacturer Payments that they receive, they reap exorbitant profits from the Insulin Pricing Scheme.

498. Even when payor clients receive a portion of the Manufacturer Payments from their PBM, the payors are significantly overcharged, given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

**2. <u>The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies</u>**

499. A second way the PBM Defendants profit off the Insulin Pricing Scheme is by using the Manufacturers' inflated price to derive profit from the pharmacies with whom they contract nationwide.

500. Each PBM Defendant decides which pharmacies are included in the PBM's network and how much it will reimburse these pharmacies for each drug dispensed.

501. The PBMs pocket the spread between the amount that the PBMs are paid by their clients, like Rentokil, for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less). In other

[341] *Id.* at 6-7.

words, the PBMs charge a client payor more for a drug than the PBM pays the pharmacy and pockets the difference.

502. More specifically, the PBM Defendants negotiate with their client payors a rate that the client pays the PBM for each prescription drug dispensed by a pharmacy. The PBM Defendants negotiate a separate rate that they pay to pharmacies for each drug dispensed.

503. These rates are tied to AWP. For example, a PBM may purchase insulin from the pharmacy at a rate of AWP-15%, and the client may pay the PBM at a rate of AWP-13%. The PBM pockets the spread (2% of AWP in this example) between the rates.

504. Because the PBM Defendants' revenue from the spread pricing is tied to AWP, the higher the AWP, the greater the amount of money made by the PBMs. In the above example, if the AWP is $100 for a drug, the PBM would make $2 on the spread, but if the AWP is $1000 for the same drug, the PBM would make $20 on the spread from the same sale (AWP-15% = $850; AWP- 13% = $870).

505. When a PBM is affiliated with a retail pharmacy, the PBM earns the entire retail margin in addition to the pricing spread described above.

506. The PBM Defendants, therefore, like the Manufacturers, directly benefit from inflated insulin prices.

507. In addition, because the PBM Defendants' client payors pay for thousands of different prescription drugs, the client payors cannot practically keep track of the AWP for each prescription drug on a given formulary or how those prices change over time. The client payors, therefore, are unlikely to independently observe the AWP inflation resulting from the Insulin Pricing Scheme. And the PBM Defendants have no incentive to alert their client payors to increasing AWPs since the PBM Defendants directly profit from those increases.

508. In addressing this form of spread pricing, the National Association of Insurance Commissioners states: "Pharmacy pricing is complex, and the process is not transparent. Plan sponsors are often unaware of the difference between the amount they are billed and the pharmacy reimbursement."[342]

509. A bipartisan bill introduced in the Senate in 2022 (the Pharmacy Benefit Manager Transparency Act—S. 4293)—would have criminalized this practice of spread pricing, which the bill defined as "[c]harg[ing] a health plan or payer a different amount for a prescription drug's ingredient cost or dispensing fee than the amount the pharmacy benefit manager reimburses a pharmacy for the prescription drug's ingredient cost or dispensing fee where the pharmacy benefit manager retains the amount of any such difference."[343] The bill has not yet been enacted.[344]

510. The PBMs often disclose the general concept of spread pricing to payors, but only in vague terms that require no accountability. And because the spread-pricing revenue is not defined as a "rebate" in PBM contracts with payors, it falls outside payors' audit rights.

511. This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from the PBM Defendants to consider the cost-effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

---

[342] *Guide to Understanding Pharmacy Benefit Manager and Associated Stakeholder Regulation—NAIC White Paper Draft as of April 16, 2023*, NAIC, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fncpa.org%2Fsites%2Fdefault%2Ffiles%2F2023-06%2Fpbm-white-paper-draft.docx&wdOrigin=BROWSELINK.

[343] Pharmacy Benefit Manager Transparency Act of 2022, S. 4293, available at https://www.govtrack.us/congress/bills/117/s4293 (last visited Jan. 10, 2026). A new PBM Transparency Act (S.127) was introduced on July 3, 2023.

[344] *Id.*

512. The higher the Manufacturers' list prices, the more money the PBMs make off the spread. At the same time, a Beneficiary's out-of-pocket co-pay or deductible cost often is more than if the client had simply paid cash outside of his or her plan. On top of this, the PBM contracts generally allow no rebates to payors where the Beneficiary is responsible for 100% of the drug cost, e.g., under his or her deductible.

513. The PBM Defendants also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR (Direct or Indirect Remuneration) fees, based on the list prices—and again, the higher the list price for each diabetes medication sold, the greater the fees the PBM Defendants generate. They also apply "retrospective" discounts so, for example, a payor's (and member's co-pay or deductible) cost may be $100, but the price may be discounted post-purchase between the PBM and the (often self-owned) pharmacy to $90, with the spread going to the PBM.

514. The Centers for Medicare & Medicaid Services (CMS) addressed these and similar DIR issues in a proposed rule in 2017. While noting the growth of "pharmacy price concessions" that "are negotiated between pharmacies and their sponsors or PBMs," CMS nevertheless concluded:

> When manufacturer rebates and pharmacy price concessions are not reflected in the price of a drug at the point of sale, beneficiaries might see lower premiums, but they do not benefit through a reduction in the amount they must pay in cost-sharing, and thus, end up paying a larger share of the actual cost of a drug. Moreover, given the increase in manufacturer rebates and pharmacy price concessions in recent years, the point-of-sale price of a drug that a Part D sponsor reports on a PDE record as the negotiated price is rendered less transparent.[345]

---

[345] Dept. of Health and Human Services, Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs and the PACE Program, 82 Fed. Reg. 56336 (Nov. 28, 2017), https://www.govinfo.gov/content/pkg/FR-2017-11-28/pdf/2017-25068.pdf.

CMS expressed further concern that when rebates and other price concessions are not reflected in the negotiated point-of-sale drug price, it "can impede beneficiary access to necessary medications, which leads to poorer health outcomes and higher medical care costs for beneficiaries."[346]

515. So, the PBM Defendants make money "coming and going." In a pre-PBM world, a competitively priced drug might have a (hypothetical) net cost to a health plan of $50, and that is what it paid. Now, the PBM Defendants coordinate with the Manufacturer Defendants to increase the list price to $150. The PBM Defendants then "negotiate" the inflated price down to $100 and take a $50 rebate, some of which may be forwarded to the payor, whose net cost is less than the inflated list price, but whose real-world cost is considerably more than if the PBM Defendants were not involved.

516. At the same time, the PBM Defendants receive "administrative fees" for including certain drugs on its formularies, which are not considered "rebates." The PBM Defendants also receive "service fees" or other payment for "administrative services" provided to the Manufacturer Defendants such as "formulary compliance initiatives," "education services," or the sale of non-patient identifiable claim information. All of these revenue streams are outside the typical definition of "rebates" found in contracts between the PBM Defendants and payors.

517. The PBM Defendants then charge payors administrative fees for providing pharmacy benefit management services and charges for drug costs (a/k/a ingredient costs) and per-prescription dispensing fees, as well as additional administrative fees for services not included in the PBMs' general administrative obligations. The PBM Defendants then receive rebates and/or discounts (pre-purchase or post-purchase) from the pharmacies, which the PBM Defendants often own. These too are excluded from the definition of "rebates." These and other vaguely described

---

[346] *Id.*

revenue streams are sometimes disclosed, but only in hazy, overly generalized terms. And they are beyond a payor's contractual rights to audit for "transparency" purposes because they are not defined "rebates."

518. Additionally, the PBM Defendants may take months to pay rebates to payors and the PBMs retain all interest on, and the time-value of, the rebates pending payment. This is one example of a PBM "disclosure" excerpted from a payor's PBM contract with Express Scripts[347]:

> This disclosure provides an overview of the principal revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. Some of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI may pass through certain manufacturer payments to its clients or may retain those payments for itself, depending on the contract terms between ESI and the client. . . .
>
> Formulary rebate amounts received vary based on client specific utilization, the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to various formulary management controls, benefit design requirements, claims volume, and other similar factors, and in certain instances also may vary based on the product's market-share. ESI pays formulary rebates it receives to a client based on the client's PBM agreement terms and may realize positive margin. In addition, ESI provides administrative services to contracted manufacturers, which include, for example, maintenance and operation of systems and other infrastructure necessary for invoicing and processing rebates, pharmacy discount programs, access to drug utilization data, as allowed by law, for purposes of verifying and evaluating applicable payments, and for other purposes related to the manufacturer's products. ESI receives administrative fees directly from participating manufacturers and indirectly from GPOs. In its capacity as a PBM company, ESI may receive other compensation from manufacturers for the performance of various programs or services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, inflation protection programs, medical benefit management services, cost containment programs, discount programs, and the sale of non-patient identifiable claim information. This compensation is not part of the formulary rebates or

---

[347] *Financial Disclosure to ESI PBM Clients*, EXPRESS SCRIPTS, https://www.evernorth.com/sites/default/files/2024-07/Express_Scripts_Financial%20Disclosure_Statement.pdf (last visited Dec. 31, 2025).

> associated administrative fees, and ESI may realize positive margin between amounts paid to clients and amounts received. ESI retains the financial benefit of the use of any funds held until payment is made to the client.

519. Payors have no access to, and no knowledge of, the intricacies of the dealings between the PBM Defendants and the Manufacturers that are shrouded by such vague "disclosures" (which vary in detail, but not in substance, in all three of the PBM Defendants' adhesive contracts). These disclosures could be summed up in a single sentence: "We pass along 'rebates' to client payors, except when we don't."

### 3. The Insulin Pricing Scheme Increases PBM Mail-Order Profits

520. Another way the PBM Defendants profit from the Insulin Pricing Scheme is through their mail-order pharmacies.

521. Because the PBMs base the prices they charge for the at-issue diabetes medications on the Manufacturers' prices, the more the Manufacturers inflate their prices, the more money the PBMs make.

522. When a PBM has its own mail-order pharmacy, its profits are even greater than when they are dispensed through its retail network pharmacies. When a PBM dispenses prescription drugs through its own mail-order pharmacy, it captures the entire retail margin as increased by the Insulin Pricing Scheme.

523. The PBM Defendants have colluded with the Manufacturers so that the PBMs often know when the Manufacturers are going to raise their prices. The PBMs purchase a significant volume of the at-issue drugs before the price increase goes into effect. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the increased prices and pocket the difference. The PBMs make significant amounts of money through this arbitrage scheme.

524. The PBM Defendants also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, which are directly tied to the Manufacturers' price. Once again, the higher the price is, the more money the PBMs make on these fees.

525. In sum, each way in which the PBM Defendants make money on diabetes medications is tied directly to coordination with the Manufacturers to establish artificially higher prices and inducing ever-increasing secret Manufacturer Payments. The PBMs are not lowering the price of diabetes medications as they publicly represent. On the contrary, they are making billions of dollars at the expense of payor clients and those clients' Beneficiaries by fueling these skyrocketing prices.

### J. Plaintiffs Purchased At-Issue Drugs Directly from Defendants

526. One benefit Plaintiffs provide its beneficiaries of its healthcare plan is payment for a large portion of their pharmaceutical purchases. In this role, Plaintiffs have spent significant amounts on the at-issue diabetes medications during the relevant period.

527. Because Plaintiffs maintain a self-funded plan, they do not rely on a third-party insurer to pay for its insured's medical care, pharmaceutical benefits, or prescription drugs. Rather, Plaintiffs directly contract with, and directly pays, PBMs (and their affiliated pharmacies) for pharmaceutical benefits and prescription drugs, including the at-issue medications.

528. Plaintiffs are the only named party that pay the full purchase price for the at-issue drugs, and the only named party that has not knowingly participated in the Insulin Pricing Scheme. Neither the PBM Defendants nor the Manufacturer Defendants suffer losses from the Insulin Pricing Scheme. Instead, they both benefit from—and have conspired together to orchestrate—the scheme.

529. As part of purchasing the at-issue drugs from the PBM Defendants, Plaintiffs directly pay (and have paid) the PBM Defendants at artificially inflated costs resulting from the Insulin Pricing Scheme, including "administrative fees," "inflation fees," "discounts," and more—all of which are associated with Plaintiffs' purchase of the at-issue drugs from the PBM Defendants. Because the at- issue drugs are potentially life-saving medications, and because the Defendants control the market for these drugs, Plaintiffs have had no choice but to pay these exorbitant, artificially inflated prices directly to the PBM Defendants.

530. To administer its health plans' pharmaceutical program, Plaintiffs rely on the PBM Defendants as its administrative agent, for the supposed purposes of limiting its administrative burden and controlling pharmaceutical drugs costs.

531. During the relevant period, Plaintiffs relied on the PBM Defendants to provide PBM services to its health plans. These PBM services included developing and offering formularies for Plaintiffs' prescription plan, constructing and managing Plaintiffs' pharmacy network (which included the PBM Defendants' retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services to Plaintiffs.

532. In providing PBM services to Plaintiffs, including developing and offering formularies for Plaintiffs' prescription plan, constructing and managing Plaintiffs' pharmacy network (which included the PBMs' retail and mail-order pharmacies), processing pharmacy claims, and providing mail-order pharmacy services, the PBM Defendants—in direct coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme—set the amounts Plaintiffs paid for the at-issue medications. Plaintiffs paid the PBM Defendants directly for the at-issue drugs and also paid the PBM Defendants considerable sums to manage pharmacy benefits related to the at-issue drugs.

### K. Defendants Deceived Plaintiffs

533. At no time has either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

#### 1. <u>The Manufacturer Defendants Deceived Plaintiffs</u>

534. At all times relevant, the Manufacturer Defendants knew that the list prices, net prices, and payors' net costs (purchase prices) generated by the Insulin Pricing Scheme were false, excessive, and untethered to any legal, competitive, or fair market price.

535. The Manufacturer Defendants knew that these prices did not bear any rational relationship to the actual costs incurred or prices realized by Defendants, did not result from transparent or competitive market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

536. The insulin market, and Defendants' business arrangement relating to it, exhibits the key features of an oligopoly—the concentration of numerous competitors into a small group of firms that dominates the market, high barriers to entry, the ability to set and control prices, firm interdependence, and maximal revenues.

537. The Manufacturer Defendants also knew that payors, including Plaintiffs, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs.

538. The Manufacturer and PBM Defendants further knew that Plaintiffs—like any reasonable consumer and particularly one with fiduciary obligations to its beneficiaries—expected to pay a price reflecting the lowest fair market value for the drugs (which was not necessarily the same as the lowest price in the market, given that all prices were inflated due to the Insulin Pricing Scheme).

539. Despite this knowledge, the Manufacturer Defendants published list prices generated by the Insulin Pricing Scheme throughout the United States and Illinois through

publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain, and directly to pharmacies, who then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

540. The Manufacturer Defendants also published these prices to the PBMs, who then used them to charge diabetics and payors for the at-issue drugs.

541. By publishing their prices in every U.S. state, the Manufacturers held each of these prices out as a reasonable price on which to base the prices payors actually pay for the at-issue drugs.

542. These representations are false. The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to their cost, their fair market value in a competitive market, or the net price received for the at-issue drugs.

543. During the relevant period, the Manufacturer Defendants published prices in every state within the U.S. in the hundreds of dollars per dose for the same at-issue drugs that would have been profitable to Manufacturers at prices less than $10 per dose.

544. The Manufacturer Defendants also have publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for Dave Ricks, Eli Lilly CEO, as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant period, executives from Sanofi and Novo Nordisk also falsely represented that research and development costs were key factors driving the at-issue price increases.[348]

[348] Drug Pricing Investigation at 188-94.

545. Contrary to the Manufacturer Defendants' representations, between 2005 and 2018, Eli Lilly spent $680 million on R&D costs related to Humalog while earning $31.35 billion in net sales during that same period. In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant period, i.e., R&D costs amounted to about 2% of net sales (whereas R&D costs for pharmaceuticals typically amount to around 20% of total revenues). Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[349]

546. The Senate Insulin Report found that the PBMs consider insulins to be "interchangeable" from "a clinical perspective" and that Manufacturers "focus their R&D efforts on new insulin-related devices, equipment, and other mechanical parts that are separate from insulin's formulation."[350]

547. A House Oversight Committee staff report concluded that "drug companies' claims that reducing U.S. prescription drug prices will harm innovation is overblown" and that "[m]any drug companies spent a significant portion of their R&D budget on finding ways to suppress generic and biosimilar competition while continuing to raise prices, rather than on innovative research."[351]

548. In sum, the Manufacturer Defendants affirmatively withheld the truth from Plaintiffs and specifically made misrepresentations in furtherance of the Insulin Pricing Scheme and to induce Plaintiffs' reliance to purchase the at-issue drugs.

**2. The PBM Defendants Deceived Plaintiffs**

---

[349] *Id.*

[350] Senate Insulin Report at 5, 17.

[351] Drug Pricing Investigation at 3.

549. The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by preferring the highest-priced at-issue drugs for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

550. The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom at the expense of payors nationwide.

551. At all times relevant, the PBMs have purposefully, consistently, and routinely misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics. Representative examples include:

- CVS Caremark has for the past decade stated in its annual reports that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness, and convenience of prescription drugs. CVS Caremark has further stated that it maintains an independent panel of doctors, pharmacists, and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of CVS Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes. Its annual reports consistently claim that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that must be

included or excluded from the formulary based on their assessment of safety and efficacy.[352]

- OptumRx has stated in its annual reports over the past decade that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit. It has consistently claimed that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost, and effectiveness.[353]

552. In addition to these general misrepresentations, the PBM Defendants have purposefully, consistently, and routinely made misrepresentations about the at-issue diabetes medications. Representative examples include:

- In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[354]

- In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark, stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[355]

[352] *See* supra note 42, Express Scripts and Evernorth entities are subsidiaries of The Cigna Group and in recent years have been included in the same Form 10-k. *See* Cigna Group, Annual Report (Form 10-k) (FYE Dec. 31, 2024), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001739940/64c4c39f-1b4e-4979-8b4a-bfc403377665.pdf.

[353] *See, e.g.,* CVS Health Corp., Annual Reports (Form 10-K) (2010-19); UnitedHealth Group Inc., Annual Reports (Form 10-K) (2010-2019); Express Scripts Holding Co., Annual Reports (Form 10-K) (2010-17).

[354] *CVS Expands Extracare for Diabetes Products,* CHAIN DRUG REVIEW, (May 11, 2010), https://chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/ (last visited Dec. 30, 2025).

[355] *Diabetes Epidemic Growing*, CBS NEWS (June 22, 2010, 11:29 a.m.), https://www.cbsnews.com/news/diabetes-epidemic-growing/ (last visited Dec. 30, 2025).

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[356]

- In 2017, Express Scripts' CEO, discussing a program involving insulin, "disputed the idea that Express Scripts contributes to rising drug costs."[357]

- In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts, said in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[358] Mr. Stettin also claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[359]

- In a 2018 Healthline interview, Mark Merritt, long the President of the PBM trade association, PCMA, misrepresented that: "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."[360]

- CVS Caremark's Chief Policy and External Affairs Officer claimed in the April 2019 hearings that CVS Caremark "has taken a number of steps to

---

[356] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year,* WALL ST. J. (Nov. 8, 2012), Jon Kamp & Peter Loftus, CVS' PBM Business Names Drugs It Plans to Block Next Year, WALL ST. J. (Nov. 8, 2012), http://online.wsj.com/article/SB10001424127887324439804578107040729812454.html (last visited Dec. 30, 2025).

[357] Katie Thomas, *Express Scripts to Offer Cheaper Drugs for Uninsured Customers,* N.Y. TIMES, May 8, 2017, available at https://www.nytimes.com/2017/05/08/health/express-scripts-drug-prescriptions-prices.html (last visited Dec. 30, 2025).

[358] Angela Mueller, *Express Scripts Launches Program to Control Diabetes Costs,* ST. LOUIS BUS. J. (Aug. 31, 2016), https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html (last visited Dec. 30, 2025).

[359] Express Scripts, *Express Scripts Launches Diabetes Care Value ProgramSM, Guaranteeing More Affordable, High-Quality Diabetes Care,* PR NEWSWIRE (Aug. 31, 2016), https://www.prnewswire.com/news-releases/express-scripts-launches-diabetes-care-value-program-guaranteeing-more-affordable-higher-quality-diabetes-care-300320485.html (last visited Dec. 30, 2025).

[360] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?,* Population Health Learning Network (Dec. 2016), https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part (last visited Dec. 30, 2025).

address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[361]

- Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."[362] In May 2023, OptumRX's CEO, Heather Cianfrocco, told the U.S. Senate Committee on Health, Education, Labor, and Pensions that OptumRx "has been at the forefront of efforts to improve access to affordable insulin and provide comprehensive care to patients with diabetes."[363]

553. The PBM Defendants falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue diabetes medications not only for payors, but also for diabetic patients. For example:

- Express Scripts' code of conduct, effective beginning in 2015, states: "At Express Scripts we're dedicated to keeping our promises to patients and clients . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."[364]

- Amy Bricker—former President of Express Scripts and PCMA board member— testified before Congress in April 2019: "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs."[365]

---

[361] *Priced Out of a Lifesaving Drug*, Preliminary Transcript at 715-18.

[362] *Id.* at 903-06.

[363] *Hearing on The Need to Make Insulin Affordable,* Heather Cianfrocco Written Testimony, available at https://www.help.senate.gov/imo/media/doc/Cianfrocco%20Written%20Testimony%20HELP%20Committee%20_Final.pdf.

[364] *Code of Conduct,* EXPRESS SCRIPTS, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf.

[365] *Priced Out of a Lifesaving Drug*, Preliminary Transcript at 803-06.

- Ms. Bricker also testified that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications."[366]

- OptumRx CEO John Prince testified to the Senate: "*We reduce the costs of prescription drugs* [and] we are leading the way to ensure *that those discounts directly benefit consumers*. . . . OptumRx's pharmacy care services business is *achieving better health outcomes for patients, lowering costs* for the system, and *improving the healthcare experience for consumers* OptumRx negotiates better prices with drug manufacturers *for our customers and for consumers*."[367]

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . [I]n 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative."[368]

- The PCMA website touts PBMs as "the only entity in the prescription drug supply and payment chain dedicated to reducing drug costs" and (contradicting the PBM representatives' Congressional testimony), that "when new manufacturers enter the market at a lower list price, PBMs use the competition to drive costs down."[369]

554. Not only have the PBM Defendants intentionally misrepresented that they use their market power to save payors money, but they have also specifically and falsely disavowed that their conduct drives prices higher. Representative examples include:

---

[366] *Id.* at 838-40.

[367] Senate Insulin Report, Hearing Transcript at 174.

[368] 2017 *Drug Trend Report*, CVS HEALTH (Apr. 5, 2018), https://docs.publicnow.com/viewDoc?filename=34267%5CEXT%5C4F636CE6CF7C500B75A272601FEB8D493D976064_E5A9CE50A379B6F1FF8B0CFD6DCB6BD22523324C.PDF.

[369] *PBMs Reduce Insulin Costs: PBMs are working to improve the lives of patients living with diabetes and their families,* PCMA, https://www.pcmanet.org/pbms-reduce-insulin-costs/.

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[370]

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[371]

- In 2017, Express Scripts' Wentworth went on CBS News to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[372]

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer Sumit Dutta answered, "we can't see a correlation just when rebates raise list prices."[373]

- In 2019, when testifying Congress on the rising price of insulins, Amy Bricker— then with Express Scripts, now with CVS—testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."[374]

555. All of the PBM Defendants' public statements regarding insulin pricing have been consistent with the misrepresentations above and below. None has contradicted those misrepresentations or revealed the Insulin Pricing Scheme.

556. Although Plaintiffs' employees responsible for managing Plaintiffs' health plans were not following the various Congressional hearings when they occurred and were not exposed

---

[370] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation',* St. Louis Post-Dispatch (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html (last visited Dec. 30, 2025).

[371] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?,* THE HILL (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices (last visited Dec. 30, 2025).

[372] *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices,* CBS NEWS (Feb. 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited Dec. 30, 2025).

[373] *Priced Out of a Lifesaving Drug*, Preliminary Transcript at 1019-22.

[374] *Id.* at 1016-17.

to all misrepresentations detailed above (or all of those detailed below), the public pronouncements by Defendants were consistent with those misrepresentations.

557. Direct interactions between Plaintiffs and the PBM Defendants reinforced those misrepresentations in furtherance of, and to conceal, the Insulin Pricing Scheme.

558. Throughout the relevant period, the PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with their payor clients; (b) they work to lower the price of the at-issue drugs and, in doing so, achieve substantial savings for diabetics and payors; and (c) that monies they receive from manufacturers and their formulary choices are for the benefit of payors and diabetics.

559. Indeed, the PBM Defendants have promised to avoid conflicts of interest. For example, the PCMA has Principles of Professional and Ethical Conduct to which all PCMA members, including the three PBM Defendants, have agreed.[375] This code of ethics requires the PBM Defendants to "[a]void any and all conflicts of interest and advise all parties . . . of any situations where a conflict of interest exists."[376]

560. Each PBM Defendant has also published a code of conduct requiring employees and entities to avoid conflicts of interest.[377] Despite these obligations, the PBM Defendants have substantial pecuniary interests that conflict with their duties to Plaintiffs. The PBM Defendants

---

[375] *Principles of Professional and Ethical Conduct*, PCMA, https://www.pcma.org/about/principles-of-professional-and-ethical-conduct/

[376] *Id.*

[377] Code of Conduct, Express Scripts, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Dec. 30, 2025); Code of Conduct, CVS Caremark, https://media.corporate-ir.net/media_files/IROL/99/99533/corpgov/CodeofConduct03.pdf (last visited Jan. 13, 2026); Code of Conduct, UnitedHealth Group, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/About/UNH-Code-of-Conduct.pdf (last visited Jan. 13, 2026).

artificially inflate the price of insulin for their profit, to the detriment of payors, including Plaintiffs.

561. The PBM Defendants understand that payors like Plaintiffs rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve access to medications. Plaintiffs did so. Indeed, Express Scripts' CEO told the U.S. Senate that PBMs "exist to help solve the challenge[]" of rising drug prices, including insulin, by "negotiating with large pharmaceutical manufacturers to lower the cost of drugs for employers, health plans, federal and state governments, and most importantly, patients."[378]

562. Throughout the relevant period, the PBM Defendants also falsely claimed they are transparent about the Manufacturer Payments and that the amounts remitted (or not) to payors. In fact, the PBM Defendants' disclosures of their ties to the Manufacturer Defendants were vague, equivocal, and misleading. Their manner of defining "rebates" in payor contracts is misleading and subject to undefined and indeterminable conditions and exceptions. The PBM Defendants thereby facilitated and obtained secret Manufacturer Payments far above and beyond the amounts of "rebates" remitted to payors.

563. The PBM Defendants' internal processes and accounting were and are abstruse and opaque, allowing them to overtly mislead the public and payors like Plaintiffs.

[378] *Hearing on The Need to Make Insulin Affordable*, Testimony of Adam Kautzner, available athttps://www.help.senate.gov/imo/media/doc/Kautzner%20Express%20Scripts%20HELP%20Hearing%20Testimony%2005102023.pdf (last visited Dec. 30, 2025).

564. In 2011, for example, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . . Every day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[379]

565. In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how the dollars flow" with respect to these Manufacturer Payments.[380]

566. When testifying before the Senate Finance Committee, CVS Executive Vice President Derica Rice stated, "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive. We provide full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf. And transparency—today we report and fully disclose not only to our clients, but to CMS [Medicare]."[381]

567. At the same hearing, Steve Miller of Cigna (Express Scripts) testified: "we are really a strong proponent for transparency for those who pay for health care. So the patient should know exactly what they are going to pay. Our plan sponsors need to know exactly what is in their contract."[382]

---

[379] *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards,* UNITEDHEALTH GROUP (Sept. 13, 2011), https://web.archive.org/web/20210805182422/https://www.unitedhealthgroup.com/newsroom/20 1 1/0913tipps.html (last visited Dec. 29, 2025).

[380] *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices*, CBS NEWS (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/.

[381] Senate Insulin Report, Hearing Transcript at 28, 32, available at https://www.govinfo.gov/content/pkg/CHRG-116shrg43563/pdf/CHRG-116shrg43563.pdf (last visited Dec. 30, 2025).

[382] *Id.* at 32.

568. John Prince of OptumRx chimed in: "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively. Our discounts are transparent to our clients."[383]

569. And when testifying before Congress in April 2019, Amy Bricker, then a Senior Vice President of Defendant Express Scripts, touted transparency with payors and echoed Mr. Prince's need for confidentiality around discounts:[384]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . The reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> ***
> Mr. Sarbanes. Yeah, because it is a secret. What about if we made it completely transparent? Who would be for that?
>
> ***
>
> Ms. Bricker. Absolutely not . . . . It will hurt the consumer. . . because . . . prices will be held high.

570. As recently as May 2022, JC Scott—President of the PBM trade group PCMA—testified before the Senate Commerce Committee:

> PBMs are proud of the work they do to reduce prescription drug costs, expand affordable access to medications, and improve patient outcomes. PBMs negotiate with drug companies to lower prescription drug costs PBMs advocate for patients in the fight to keep prescription drugs accessible and affordable.

Mirroring the PCMA website, Mr. Scott also testified, "The PBM industry is the only stakeholder in the chain dedicated to seeking lower costs."[385]

---

[383] *Id.*

[384] *Priced Out of a Lifesaving Drug*, Preliminary Transcript at 2469-2506.

[385] *JC Scott testifies before a Senate panel about PBM value,* PCMA (May 5, 2022), https://www.pcmanet.org/jc-scott-testifies-before-a-senate-panel-about-pbm-value/ (last visited Dec. 30, 2025).

571. During the relevant period—as seen above—the PBM Defendants represented to Plaintiffs that they constructed formularies and negotiated with the Manufacturer Defendants for the benefit of payors and patients to maximize drug cost savings while promoting the health of diabetics.

572. Throughout the relevant period, the PBM Defendants consistently made similar misrepresentations directly to payors nationwide through bid proposals, member communications, invoices, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturer Defendants.

573. All such representations are false—the Manufacturer and PBM Defendants in fact coordinated to publish the false prices and to construct the PBM formularies, causing the price of the at-issue drugs to skyrocket. For example:

a. In 2018, the United States spent $28 billion on insulin compared with $484 million in Canada. The average American insulin user spent $3490 on insulin in 2018 compared with $725 among Canadians.[386]

b. Diabetics who receive their medications from federal programs that do not use the PBMs also pay significantly less. In December 2021, the United States House of Representatives Committee on Oversight and Reform issued its Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (like the Department of Veterans Affairs), and which are thus outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program, which relies on the PBM Defendants to set their at-issue drug prices.[387]

---

[386] Schneider, T., Gomes, T., Hayes, K. N., Suda, K. J., & Tadrous, M., *Comparisons of Insulin Spending and Price Between Canada and the United States*, MAYO CLINIC PROCEEDINGS (2022).

[387] Fraiser Kansteiner, *Lawmakers blast pharma for 'outrageous' prices and 'anticompetitive conduct' in culmination of 3-year probe*, FIERCE PHARMA (Dec. 10, 2021), https://www.fiercepharma.com/pharma/house-oversight-committee-blasts-pharma-for-outrageous-prices-and-anticompetitive-conduct.

574. Defendants knew that their representations were false when they made them and coordinated to withhold the truth from payors, including Plaintiffs.

575. Defendants concealed the falsity of their representations by closely guarding their pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration between them.

576. The Defendants have never revealed the full amount of any drug-specific Manufacturer Payments exchanged between them. Despite the claims of transparency to Plaintiffs and to the public and despite Plaintiffs' contracts with Express Scripts, Plaintiffs do not know, and cannot learn, of the full extent of the Manufacturer Payments and other agreements between the PBM Defendants and the Manufacturer Defendants.

577. The PBM Defendants do not disclose the terms of the agreements they make with the Manufacturers or the Manufacturer Payments they receive. Nor do they disclose the details related to their agreements (formal or otherwise) with pharmacies. All those revenue streams are beyond the scope of the payors' contractual audit rights.

578. Further, although PBMs negotiate drug-specific rebates with Manufacturers,[388] the PBM rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis. It is impossible for payors like Plaintiffs to tease out drug-specific rebates, much less the other undisclosed Manufacturer Payments. This allowed the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

579. The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.

[388] Senate Insulin Report at 40.

580. Even when audited by payors, the PBM Defendants routinely refuse to disclose their agreements with the Manufacturers and pharmacies by relying on overly broad confidential agreements and claims of trade secrets and by erecting other unnecessary roadblocks and restrictions.

581. In sum, the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reasons behind the prices, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBM Defendants' representations that they work to lower prices and promote the health of diabetics—is both unconscionable, deceptive, and unfair and immensely lucrative for Defendants.

582. Plaintiffs did not know, because the Defendants affirmatively concealed, (a) that the Manufacturers and PBM Defendants coordinated to create the PBM formularies in exchange for money and other consideration; (b) that the list prices were falsely inflated; (c) that the list prices were manipulated to satisfy PBM profit demands; (d) that the list prices and net costs (purchase prices) paid by Plaintiffs bore no relationship to the fair market value of the drugs themselves or the services rendered by the PBM Defendants in coordinating their pricing; or (e) that the entire insulin pricing structure Defendants created was false.

### L. The Insulin Pricing Scheme Has Damaged Plaintiffs

583. At times relevant, Plaintiffs were unaware of the Insulin Pricing Scheme. Plaintiffs relied on Defendants' statements and material omissions made in furtherance of the Insulin Pricing Scheme. Plaintiffs relied on Defendants' misrepresentations in paying for the at-issue diabetes medications at prices that would have been lower but for the Insulin Pricing Scheme. The PBM Defendants failed to adhere to principles of good faith and fair dealing in carrying out its PBM contracts with Plaintiffs. Their relationship with Plaintiffs was inherently unbalanced and its

contracts adhesive. PBM Defendants at all times relevant had superior bargaining power and superior knowledge of their relationships with the Manufacturer Defendants, including those that ultimately dictate the drug costs Plaintiffs incurred. Although PBM Defendants were supplying a vital service of a quasi-public nature, they exploited their superior position to mislead Plaintiffs and thwart its expectations, all at great expense to Plaintiffs.

584. The Defendants' misrepresentations, omissions, and misconduct—including and as manifested in the Insulin Pricing Scheme—directly and proximately caused economic damage to Plaintiffs as payors and/or purchasers of Defendants' at-issue diabetes medications.

585. A substantial proportion of the money Plaintiffs spent on diabetes medications is attributable to Defendants' inflated prices, which did not arise from competitive market forces but, instead, are directly attributable to the Insulin Pricing Scheme.

586. Because of Defendants' success in concealing the Insulin Pricing Scheme through act and omission, no payor, including Plaintiffs, knew, should have known, or could have known during the relevant period that the prices for the at-issue diabetes medications were (and remain) artificially inflated due to the Insulin Pricing Scheme.

587. As a result, despite receiving some rebates and incurring drug costs based on discounts off list prices, Plaintiffs have unknowingly overpaid for the Manufacturer Defendants' diabetes medications, which would have cost less but for the Insulin Pricing Scheme.

588. One component of the supra-competitive prices paid by Plaintiffs because of the inflated AWPs caused by the Insulin Pricing Scheme is the Plaintiffs' beneficiaries out-of-pocket expenses (because their co-pays are tied to AWP). Due to the Insulin Pricing Scheme, Plaintiffs' beneficiaries had greater out-of-pocket expenses, and as a result, those beneficiaries reached their

annual spending caps sooner, such that Plaintiffs were obligated to pay more for those Beneficiaries to cover the remainder of the plan year.

589. Consequently, Plaintiffs were the foreseeable, and foreseen, target of the Insulin Pricing Scheme.

590. In short, the Insulin Pricing Scheme has directly and proximately caused Plaintiffs to substantially overpay for diabetes medications.

591. Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiffs is ongoing.

### M. Defendants' Recent Efforts in Response to Rising Insulin Prices

592. Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

593. These affordability measures fail to address the structural issues that caused the price hikes. Rather, these are public relations measures that do not solve the problem.

594. For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."[389]

595. At the time, Eli Lilly told the Senate Finance Committee that "we can provide a lower-priced insulin more quickly without disrupting access to branded Humalog, on which

[389] *Lilly to Introduce Lower-Priced Insulin*, LILLY (Mar. 4, 2019), available at https://investor.lilly.com/news-releases/news-release-details/lilly-introduce-lower-priced-insulin (last viewed Jan. 11, 2026).

thousands of insured patients depend, and which will remain available for people who want to continue accessing it through their current insurance plans."[390]

596. When it launched Lispro, its press release said the drug was the "same molecule" as Humalog yet would be sold at half the price of Humalog. Eli Lilly expressly said it was to help make insulin medications "more affordable."[391]

597. What Eli Lilly failed to tell the Committee, and the public was that its rebate deals with the PBMs incentivized them to exclude Lispro from their formularies. For example, even though Lispro at $137.50 would be available at half the price of Humalog, which remained on-formulary, Express Scripts' exclusion list for 2019[392] specifically blocked it from its formulary.[393]

598. Likewise, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies. Following these news reports, the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized

---

[390] Letter from Joseph B. Kelley, VP of Glob. Gov. Affairs to Hon. Charles E. Grassley & Hon. Ron Wyden (on file with S. Fin. Comm.), available at https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited Jan 10. 2026).

[391] *Lilly to Introduce Lower-Priced Insulin*, LILLY (Mar. 4, 2019), available at https://investor.lilly.com/news-releases/news-release-details/lilly-introduce-lower-priced-insulin (last viewed Jan. 11, 2026).

[392] *See 2019 National Preferred Formulary Exclusions*, EXPRESS SCRIPTS, https:// www.express-scripts.com/art/pdf/Preferred_Drug_List_ Exclusions2019.pdf.

[393] *Id*.

generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[394]

599. Eli Lilly did lower the price of Lispro by 40% effective January 1, 2022; but as of January 2023, Lispro did not appear on CVS Caremark's formulary and Humalog had been removed. The January 2023 formularies for Express Scripts and OptumRx expressly excluded Lispro.

600. In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. For many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In any event, ReliOn is not included on any of the PBM Defendants' formularies as of January 2023.

601. Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem and the PBMs continue to exclude drugs with lower list prices despite their assurances of cost-savings for payors and Beneficiaries.

## VII. TOLLING OF THE STATUTES OF LIMITATION

602. Plaintiffs' claims are timely under multiple accrual doctrines—including the discovery rule and the continuing-violation doctrine—under which Defendants bear the burden of showing untimeliness. Alternatively, and only as needed, Plaintiffs also invoke tolling doctrines including, but not limited to fraudulent concealment, equitable estoppel, and tolling by parallel

---

[394] Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.warren.senate.gov/imo/media/doc/Inaccessible%20Insulin%20report.pdf (last visited Jan. 12, 2026).

state and federal government actions, each of which independently confirms the timeliness of their claims.

**A. Discovery Rule**

603. Plaintiffs did not know about the Insulin Pricing Scheme until shortly before filing this Complaint. Plaintiffs were unaware that they were economically injured and unaware that any economic injury was wrongfully caused. Nor did Plaintiffs possess sufficient information concerning the injury complained of here, or its cause, to put Plaintiffs or any reasonable person on inquiry notice to determine whether actionable conduct was involved. The PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of Defendants' negotiations and payments between each other or their pricing structures and agreements—Defendants labeled these trade secrets, shrouded them in confidentiality agreements, and circumscribed payor audit rights to protect them.

604. Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their Congressional testimonies and through the media. All disavowed wrongdoing and falsely claimed that their dealings with payors like Plaintiffs were honest and transparent.

605. Plaintiffs did not discover until shortly before filing this Complaint facts sufficient to cause a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme or that Plaintiffs had suffered economic injury as a result of any or all Defendants' wrongdoing. Nor would diligent inquiry have disclosed the true facts had Plaintiffs been aware of any cause to undertake such an inquiry. Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants, i.e., the Insulin Pricing Scheme, continue to

obscure Defendants' unlawful conduct from Plaintiffs and the general public. For these reasons, the applicable statutes of limitations did not begin to run until 2024, at the earliest.

### B. Fraudulent Concealment

606. Defendants, through acts, omissions, and misrepresentations alleged throughout this Complaint, fraudulently concealed the existence and cause of Plaintiffs' economic injury. By purposefully concealing the Insulin Pricing Scheme, the generation of false list prices, and the artificial inflation of prices for the at-issue diabetes medications, Defendants are precluded from relying on any statute-of-limitations defense. Defendants deliberately concealed their conduct and their active role in the Insulin Pricing Scheme and other unlawful activity.

607. Defendants' conduct was calculated to, and did, lull and induce payors, including Plaintiffs, to forgo legal action or any inquiry that might lead to legal action. Their acts, omissions, and misrepresentations were intended to and did prevent Plaintiffs from discovering their claims. Defendants knew of the wrongful acts set forth herein, possessed information necessary to their discovery, and concealed that information from the public. As a result, Plaintiffs did not know and could not have known through the exercise of reasonable diligence, the existence or scope of the Insulin Pricing Scheme or the bases for its causes of action.

608. Defendants continually and secretly engaged in the Insulin Pricing Scheme. Only Defendants and their agents knew or could have known about Defendants' unlawful actions, as Defendants undertook deliberate efforts to conceal their conduct. Consequently, Plaintiffs were unable to obtain vital information bearing on their claims despite the exercise of reasonable diligence and without any fault or lack of diligence on their part.

609. As alleged herein, Defendants affirmatively concealed material facts, including: that the Manufacturers and PBMs coordinated to create PBM formularies in exchange for money and other consideration; that list prices were falsely inflated and manipulated; that list prices and

net costs paid by payors and patients bore no relationship to the fair market value of the drugs or to the value of PBM services; that insulin products were selected for inclusion or preferred formulary status based on higher prices and increased revenues for Defendants rather than cost-effectiveness or benefit to payors' beneficiaries; the exchange of various payments and pricing agreements between the Manufacturers and PBMs; and that the entire insulin pricing structure Defendants created was false.

610. The PBM Defendants blocked drug-pricing transparency efforts and further concealed the Insulin Pricing Scheme through vague and manipulable contract definitions, including by hiding fees paid by Manufacturer Defendants that PBM Defendants retained rather than passing through to payors as rebates. PBM Defendants also concealed payments received from Manufacturer Defendants through affiliated rebate aggregators, burying them within complex contractual relationships—often involving other Defendants—and omitting them from quarterly SEC filings. Defendants coordinated to withhold the truth about the Insulin Pricing Scheme from payors, including Plaintiffs, as well as from patients and the public, and concealed the falsity of their representations by closely guarding pricing negotiations, structures, agreements, sales figures, and the flow of money and other consideration.

611. Defendants' public statements reinforced their concealment. Manufacturer Defendants testified to Congress that they were not responsible for skyrocketing insulin prices, disclaimed control over pricing, blamed PBM Defendants for high prices, and suggested they did not profit from elevated prices. In turn, PBM Defendants testified that Manufacturer Defendants were solely responsible for list price increases and claimed that PBM payments from manufacturers were unrelated to rising insulin prices. Despite professed transparency to payors, including Plaintiffs, and to the public, Defendants never disclosed the full amount of drug-specific

payments exchanged or received. Payors, including Plaintiffs, and patients reasonably relied on Defendants' claims of transparency and on affirmative statements, including to Congress and in PBM-client contracts, that Defendants were working to lower insulin prices and provide cost savings.

612. Plaintiffs did not know, and could not reasonably have discovered, the full extent of the agreements between PBM Defendants and Manufacturer Defendants or the payments made by Manufacturer Defendants to PBM Defendants because Defendants actively concealed those agreements and payments. Defendants intended that their actions and omissions would be relied upon by the public, including payors and patients. Plaintiffs did not know, and lacked the means to know, the truth due to Defendants' concealment.

613. The purposes of the statute of limitations are satisfied. Defendants cannot claim prejudice from any alleged late filing where Plaintiffs filed suit promptly upon discovering the facts essential to their claims, which Defendants knowingly concealed. In light of the foregoing, Defendants had actual or, at minimum, constructive knowledge that their conduct was deceptive, as they consciously concealed the schemes described herein. Any applicable statutes of limitation therefore have been tolled.

### C. Equitable Estoppel

614. Defendants owed Plaintiffs a continuing duty to disclose the true character, quality, and nature of the pricing on which payments for diabetes medications were based, as well as the true nature of the services Defendants provided. These facts were material to Plaintiffs at all relevant times.

615. Rather than disclose these material facts, Defendants knowingly misrepresented and concealed them, with the reasonable expectation that Plaintiffs would rely on the resulting misstatements and omissions.

616. Unaware of the concealed facts and the economic harm they were sustaining—and lacking any reason to inquire further—Plaintiffs reasonably and in good faith relied on Defendants' misrepresentations and omissions, to their detriment.

617. Through the acts, omissions, and misrepresentations alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Plaintiffs would act on them, and Plaintiffs did so in good faith to their detriment.

618. Accordingly, Defendants are equitably estopped from invoking any statutes of limitations as a defense to this action.

### D. Continuing Violations

619. Plaintiffs' claims are timely under the continuing violations doctrine because Defendants have engaged in an ongoing pattern of unlawful conduct that persists to the present day and has repeatedly inflicted new injuries within the applicable limitations periods. The acts, omissions, and misrepresentations alleged throughout this Complaint—including a coordinated scheme to inflate and maintain artificially high insulin prices—have continued over time and caused continuous economic harm to Plaintiffs.

620. Defendants' scheme evolved in ways that both perpetuated and concealed the misconduct, including through changes to pricing structures, rebate arrangements, formulary placement strategies, and contracting practices. These changes were designed to continue extracting inflated payments from Plaintiffs while obscuring the nature of the misconduct and impeding detection by Congress, payers, and other stakeholders. Within the limitations periods, Defendants altered strategies that masked ongoing misconduct and adopted new mechanisms that impeded Plaintiffs' ability to identify continuing violations, resulting in distinct injuries.

621. These mechanisms included the establishment and operation of PBM-owned rebate aggregators—Ascent (2019), Zinc (2020), and Emisar (2022)—through which Defendants

outsourced rebate negotiations, often to entities located outside the United States, and imposed additional aggregator fees before passing remaining amounts to PBMs or plan sponsors. The use of these aggregators further distorted pricing, obscured rebate flows, and facilitated misleading representations to Congress, regulators, and payors regarding rebate pass-through, while siphoning substantial sums through aggregator charges. The ongoing use of these rebate aggregators within the limitations periods caused Plaintiffs distinct economic injuries, including payments distorted by undisclosed fees and concealed pricing structures, as well as artificially inflated prices and distorted formulary placements.

622. Because Defendants' wrongful conduct has been continuous and has repeatedly produced new injuries within the limitations periods, Plaintiffs' claims are timely under the continuing violations doctrine.

**E. Bankruptcy Tolling**

623. Certain Plaintiffs commenced proceedings under chapter 11 of the Bankruptcy Code and thereby became debtors in possession with the rights and powers of a trustee for purposes of commencing estate causes of action. As a result, any otherwise applicable nonbankruptcy limitations periods governing these Plaintiffs' claims were extended, and the claims are timely under 11 U.S.C. § 108(a).

**F. Tolling by Parallel Actions by State and Federal Government Entities**

624. Plaintiffs' federal and state law antitrust claims are tolled due to the pendency of government enforcement proceedings arising from the same alleged conduct. Under the Clayton Act, the statute of limitations for private antitrust actions is suspended "during the pendency" of any civil or criminal proceeding brought by the United States and for one year thereafter, where the private claims are based in whole or in part on matters complained of in such proceeding. *See* 15 U.S.C. § 16(i).

625. The statute of limitations for Plaintiffs' federal and state law antitrust claims were tolled by the filing of the Federal Trade Commission's pending enforcement action against the PBM Defendants and Rebate Aggregator Defendants, which the Federal Trade Commission brought on September 20, 2024. The Federal Trade Commission's action challenges the same anticompetitive conduct alleged herein, alleging that:

a. "Three dominant PBMs… administer approximately 80% of all prescriptions… [and] have also become vertically integrated… [leveraging] their power along every link in the pharmaceutical supply chain."[395]

b. "Respondents… began demanding higher and higher rebates… [and] offering formularies that excluded clinically effective drugs from coverage."[396]

c. "When manufacturers launched low WAC, low rebate versions [of insulin products]… the PBM Respondents systematically disadvantaged these products… [and] continue to prefer… high list price… while excluding low WAC alternatives."[397]

d. "Respondents' actions reveal a pattern of anticompetitive… conduct… [and] there are no valid justifications for… prioritizing… rebates over lower net prices."[398]

626. Similarly, many of the antitrust statutes in the states whose laws govern Plaintiffs' claims provide for tolling of private antitrust claims during the pendency of related government actions, including actions brought by the Attorney General of that state, or by the federal government, if Plaintiffs' claims arise out of the same conduct. *See, e.g.*, N.Y. Gen. Bus. Law § 342-c. The pendency of actions by State Attorney Generals in this multi-district litigation toll the

[395] *In re* Caremark Rx, LLC, No. 9437, at ¶¶ 3, 30 (F.T.C. filed Sept. 20, 2024).

[396] *Id.* at ¶¶6, 102.

[397] *Id.* at ¶¶ 218, 244.

[398] Id. at ¶¶ 214, 231.

statutes of limitations for claims brought by Plaintiffs under the laws of those states on whose behalf such actions have been brought.

627. Accordingly, the statutes of limitations applicable to Plaintiffs' claims are tolled for the duration of such parallel federal or state proceedings, rendering Plaintiffs' antitrust claims timely. *See* 15 U.S.C. § 16(i); N.Y. Gen. Bus. Law § 342-c.

## VIII. CLAIMS FOR RELIEF

### Count 1: Violations of Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 (By all Plaintiffs against all Defendants)

628. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

629. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

630. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in the United States, and, in the alternative, all Insulin and GLP-1 Drugs identified herein. The Manufacturer Defendants are horizontal competitors in the relevant market.

631. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

632. There are high barriers to entry into the business of manufacturing insulin in the United States because a potential new manufacture must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

633. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

634. Defendants' conduct occurred in and substantially affected interstate commerce, including nationwide pricing, sale, and reimbursement of Insulin Drugs.

635. Beginning at least as early as 2007, Defendants conspired to coordinate and maintain supracompetitive list prices for Insulin Drugs to expand spreads between list and net prices.

636. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

637. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

638. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

639. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

640. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

641. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

642. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

643. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints.

644. These restraints are unlawful *per se* to the extent they constitute horizontal price-fixing among manufacturers and other inherently anticompetitive conduct.

645. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects-higher prices, reduced output and choice, and exclusion of lower-list-price products-far outweigh any cognizable procompetitive justification.

646. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

647. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

648. Plaintiffs suffered antitrust injury of the types the antitrust laws were designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

649. Plaintiffs seek treble damages, costs of suit, and reasonable attorneys' fees under Section 4 of the Clayton Act, and injunctive relief under Section 16 of the Clayton Act to enjoin Defendants from continuing the unlawful restraints alleged herein.

**Count 2: Violations of the Robinson-Patman Act, 15 U.S.C. § 13(c)**
**(By all Plaintiffs against all Defendants)**

650. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

651. Section 2(c) of the Robinson-Patman Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid. 15 U.S.C. § 13(c).

652. By engaging in the kickback and commercial bribery scheme described herein, Defendants violated Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

653. The PBM Defendants owed a legal duty to Plaintiffs to negotiate rebates and fees and to construct formularies for their benefit.

654. PBM Defendants have represented to Plaintiffs and other payors that they possess superior knowledge of the pharmaceutical industry and specialized expertise in negotiating drug prices and rebates with manufacturers.

655. Because of this superior knowledge and expertise, Plaintiffs retained the PBM Defendants to negotiate on their behalf and for their benefit with the Manufacturer Defendants concerning formulary placement, price, and rebates or fees in connection with the sale of drugs, including the Insulin Drugs.

656. All parties understood that the purpose of Plaintiffs' retention of PBM Defendants was to help Plaintiffs reduce the costs of the at-issue diabetes medications.

657. Plaintiffs trusted the PBM Defendants to make formulary placement decisions, including for the at-issue diabetes medications, in Plaintiffs' best interests and to help them manage and reduce the costs of acquiring drugs.

658. By accepting and retaining unearned rebates and fees from the Manufacturer Defendants—or by having their respective rebate aggregators accept and retain unearned and undisclosed rebates and "fees" on their behalf and for their benefit—the PBM Defendants breached their duties to Plaintiffs.

659. Zinc, Ascent, and Emisar acted as agents for, and at the direction of, their respective PBM Defendants in negotiating price, rebates, and purported "fees" with the Manufacturer Defendants in connection with the sale of Insulin Drugs to Plaintiffs.

660. The rebates and purported "fees" that Zinc, Ascent, and Emisar received from the Manufacturer Defendants in connection with the sale of the at-issue diabetes medications were received on behalf of, and for the benefit of, the respective PBM Defendants.

661. The Manufacturer Defendants knew and understood that Zinc, Ascent, and Emisar were acting as agents for, and at the direction of, their respective PBMs in negotiating price, rebates, and purported "fees" for the acquisition of the at-issue diabetes medications.

662. The Manufacturer Defendants further knew and understood that the rebates and purported "fees" they paid to Zinc, Ascent, and Emisar in connection with the sale of Insulin Drugs were paid for the benefit of, and on behalf of, the PBM Defendants and in exchange for favorable placement by the PBM Defendants of the Manufacturer Defendants' at-issue diabetes medications on Plaintiffs' formularies—placement that was contrary to Plaintiffs' interests.

663. Had the Manufacturer Defendants not paid these unearned and undisclosed rebates and purported "fees" (i.e., bribes) to the PBM Defendants and their rebate aggregator agents/designees, the PBMs would not have granted the unwarranted favorable formulary placement to the Manufacturer Defendants' at-issue diabetes medications.

664. PBM Defendants sought, and Manufacturer Defendants paid, kickbacks, bribes, and other unearned sums to PBM Defendants—who were acting as agents and/or fiduciaries of Plaintiffs—that were not disclosed to Plaintiffs.

665. At the time the kickbacks, bribes, and other unearned sums were paid by the Manufacturer Defendants to the PBM Defendants, the PBM Defendants were under the control of and/or working on behalf of Plaintiffs. The payments accordingly crossed the buyer/seller line.

666. These kickbacks, bribes, and other unearned sums were paid to the PBM Defendants, as agents and/or fiduciaries of Plaintiffs, without the consent of Plaintiffs, and were intended to influence the PBM Defendants to give the Manufacturer Defendants' at-issue diabetes medications favorable formulary placements and to continue participating in the illegal scheme to keep prices artificially high.

667. Pursuant to the kickback and commercial bribery scheme described above, Defendants created illegal inducements that resulted in artificially inflated prices.

668. As a result of Defendants' unlawful conduct, Plaintiffs purchased at-issue diabetes medications at artificially inflated prices due to undisclosed and unearned fees and rebates.

669. There is no appropriate or legitimate business justification for Defendants' conduct; the payments to the PBMs were not for services rendered.

670. Defendants' unlawful conduct has resulted in competitive injury to Plaintiffs by unduly restraining, hindering, suppressing, and/or eliminating competition in the sale of commodities in interstate commerce.

671. As a direct and proximate result of Defendants' actions, Plaintiffs suffered substantial economic losses in the form of overcharges for the at-issue diabetes medications.

672. Plaintiffs are entitled to recover treble damages and costs of suit, including reasonable attorneys' fees, pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**Count 3: Commercial Bribery**
**(By all Plaintiffs against all Defendants)**

673. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

674. Under the common law, it is wrongful for an agent, fiduciary, or intermediary to solicit or accept secret payments, kickbacks, or other things of value from a counterparty to a transaction, without the principal's knowledge and consent, for the purpose of influencing the agent's conduct in the transaction.

675. The PBM Defendants serves as Plaintiffs' agents and/or fiduciaries. As a consequence, the PBM Defendants owed a duty of fidelity to Plaintiffs.

676. The PBM Defendants solicited and accepted benefits from the Manufacturer Defendants, including secret payments, as consideration for knowingly violating their duties to the Plaintiffs.

677. The Manufacturer Defendants conferred the benefits, and the PBM Defendants received them, without the Plaintiffs' knowledge or consent.

678. The Manufacturer Defendants conferred the benefits with the intent to influence the PBM Defendants' execution of their responsibilities to the Plaintiffs.

679. By engaging in the kickback and commercial bribery scheme described herein, Defendants committed common-law commercial bribery.

680. Plaintiffs are entitled to restitution from the PBM Defendants and the Manufacturer Defendants in an amount not less than (a) the difference between the reasonable or fair market value of the drugs for which Plaintiffs paid and the actual value of the drugs the Manufacturer Defendants delivered, and (b) as to the PBM Defendants, the difference between the reasonable or fair market value of the PBM services for which Plaintiffs paid and the actual value of those services as rendered with respect to the at-issue drugs.

681. In the alternative, Plaintiffs are entitled to the value of any payments made by the Manufacturer Defendants to the PBM Defendants in connection with the Insulin Pricing Scheme.

**Count 4: Breach of Implied Covenant of Good Faith and Fair Dealing (By all Plaintiffs against PBM Defendants)**

682. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

683. Implied in the PBM Agreements that Plaintiffs entered into with Defendants are covenants that the parties would deal with each other in good faith and would not act in any manner that undermines or harms the other party's ability to obtain the benefits of the agreement.

684. PBM Defendants failed to perform its obligations in good faith under the PBM Agreements by knowingly, intentionally, and covertly manipulating the prices of the at-issue drugs for its own financial benefit at the expense of Plaintiffs.

685. PBM Defendants understood that Plaintiffs would not have entered the PBM Agreements but for its reliance on Defendant's integrity.

686. PBM Defendants knowingly coordinated with Manufacturer Defendants to benefit itself at Plaintiffs' expense by artificially inflating the prices of the at-issue drugs.

687. PBM Defendants concealed its arrangements with Manufacturer Defendants to prevent Plaintiff sand other payors from realizing they were not receiving the benefits promised under their agreements. PBM Defendants worked with Manufacturer Defendants to hide portions of the Manufacturer Payments by reclassifying rebates as "administrative fees" or other fees that would not be passed through to Plaintiffs, and by channeling additional payments through its affiliated rebate aggregators.

688. Through their conduct, PBM Defendants deprived Plaintiffs of their rights to receive the benefits of the PBM Agreements.

689. As a direct and proximate result of Defendants' knowing, intentional and bad faith violation of the PBM Agreements' implied covenants of good faith and fair dealing, Plaintiffs sustained significant damages, including but not limited to paying excessive and inflated prices for the at-issue diabetes medications.

**Count 5: Common Law Fraud**
**(By all Plaintiffs against all Defendants)**

690. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

691. The Manufacturer and PBM Defendants made false statements and hid important facts regarding at least: (a) the true cost and price of the at-issue drugs; (b) the inflated nature of the list prices for the at-issue drugs; (c) the existence, amount, flow, and purposes of rebates, fees, discounts, and other payments exchanged among PBM Defendants and Manufacturer Defendants; and (d) the role that PBM Defendants and Manufacturer Defendants played in determining the prices that payors—including Plaintiffs—paid for the at-issue drugs, while publicly claiming that their actions lowered costs for purchasers and beneficiaries.

692. These misrepresentations and omissions mattered to Plaintiffs because they concerned key facts about how prices for the at-issue drugs were set, the real costs of the transactions, the claimed cost savings from PBM Defendants' services, and the conflicts of interest and side payments that drove which drugs were placed on formularies and used.

693. PBM Defendants and Manufacturer Defendants knew their representations were false and misleading, and knew the omitted facts were important. PBM Defendants and Manufacturer Defendants knew, among other things, that list prices were set at levels not tied to market value and were intentionally inflated to allow hidden payments to PBM Defendants and affiliated entities, and that such list prices would be used throughout the payment chain to determine what payors—including Plaintiffs—would be charged and would pay.

694. PBM Defendants and Manufacturer Defendants further knew that the gap between inflated list prices and undisclosed net prices would be hidden from payors—including Plaintiffs—by secretive contracts, aggregator structures for rebates, labeling of payments as "administrative" or otherwise, and audit limits that prevented discovery of drug-specific payments and pricing details.

695. PBM Defendants and Manufacturer Defendants made the foregoing misrepresentations and omissions to induce Plaintiffs to rely on them in purchasing, reimbursing, and paying for the at-issue drugs at prices derived from the false list prices, and in selecting and maintaining PBM services and formularies based on false assertions of cost control and alignment with payor interests.

696. Plaintiffs reasonably relied on PBM Defendants' and Manufacturer Defendants' misrepresentations and omissions. Plaintiffs are not privy to PBM Defendants' and Manufacturer Defendants' nonpublic negotiations, contracts, and payment flows, relied on PBM Defendants' and Manufacturer Defendants' public and client-facing statements, and lacked access to the concealed, drug-specific pricing and payment information that PBM Defendants and Manufacturer Defendants exclusively controlled.

697. Plaintiffs reasonably relied on the published prices and on PBM formulary decisions and pricing terms as legitimate, market-based measures—when, in truth, such prices and terms were driven by PBM Defendants' and Manufacturer Defendants' hidden pay-for-preference deals favoring higher-priced products, secret payments, and PBM profits rather than cost-effectiveness or patient benefit.

698. As a direct and proximate result of PBM Defendants' and Manufacturer Defendants' fraud, Plaintiffs paid inflated amounts for the at-issue drugs, incurred higher costs for PBM-related fees and price differences tied to inflated benchmarks, and faced higher plan costs and related harms, including earlier beneficiary accumulations that shifted more costs to Plaintiffs.

699. PBM Defendants' and Manufacturer Defendants' conduct caused Plaintiffs' damages because the prices Plaintiffs paid were calculated by reference to list-price benchmarks and payment terms that PBM Defendants and Manufacturer Defendants knew were artificially

inflated and that they perpetuated through coordinated misrepresentations, omissions, and concealment.

700. PBM Defendants' and Manufacturer Defendants' concealment of the true nature and amount of rebates, fees, discounts, and other payments—including the use of rebate aggregators, "administrative" labels, "inflation" fees, and audit restrictions—prevented Plaintiffs from discovering the fraud despite diligent contracting and plan administration.

701. Plaintiffs would not have paid the amounts it paid for the at-issue drugs, agreed to the pricing terms used to reimburse for those drugs, or accepted PBM Defendants' and Manufacturer Defendants' formulary practices, but for PBM Defendants' and Manufacturer Defendants' scheme and material misrepresentations and omissions.

702. PBM Defendants' and Manufacturer Defendants' knowledge, intent, and reckless disregard are shown by their control over list prices; their awareness that payors—including Plaintiffs—reimburse based on those list prices; their coordination regarding formulary status and payment terms; and their persistent public claims of lowering costs and aligning with payor interests while secretly profiting from inflated list prices and undisclosed payments.

703. As a result of PBM Defendants' and Manufacturer Defendants' fraudulent conduct, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to overpayments for the at-issue drugs, associated fees, price differences, and other costs tied to inflated price benchmarks, together with consequential damages, pre- and post-judgment interest, and all available monetary and equitable relief.

704. PBM Defendants' and Manufacturer Defendants' actions were willful, malicious, reckless, and deliberate, and undertaken with intent to defraud Plaintiffs and to enrich themselves at Plaintiffs' expense. Plaintiffs therefore seek punitive damages in an amount sufficient to punish

PBM Defendants and Manufacturer Defendants and deter similar misconduct, in addition to all other legal and equitable relief the Court deems just and proper.

**Count 6: Unjust Enrichment**
**(By all Plaintiffs against all Defendants)**

705. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

706. Defendants received direct benefits from Plaintiffs, including money, services, and/or other valuable benefits identified in the attached materials.

707. Plaintiffs conferred these benefits to Defendants at their request, direction, or with their knowledge and consent.

708. Defendants knew, or reasonably should have known, that Plaintiffs expected to be paid for the benefits conferred.

709. Defendants accepted and retained the benefits provided by Plaintiffs.

710. Defendants' retention of these benefits, without compensating Plaintiffs, is unjust and inequitable.

711. Plaintiffs provided the benefits in good faith and with the reasonable expectation of fair payment.

712. Defendants were aware of the nature, value, and extent of the benefits at the time they were received.

713. Defendants had the opportunity to decline the benefits but instead chose to accept and retain them.

714. Plaintiffs have not been fully paid for the benefits conferred.

715. No valid and enforceable contract governs the specific subject matter of the benefits conferred, or, if a contract exists, it does not cover the enrichment at issue.

716. Defendants' retention of the benefits has caused Plaintiffs to suffer financial loss.

717. Equity and good conscience require that Defendants not be permitted to retain the benefits without compensating Plaintiffs.

718. Defendants have been unjustly enriched at Plaintiffs' expense in an amount to be proven at trial.

719. Because Defendants should not be permitted to retain the benefit conferred by Plaintiffs, restitution—including disgorgement, rescission, or other relief restoring to Plaintiffs that to which they are entitled—is appropriate to prevent unjust enrichment.

720. Plaintiffs are entitled to restitution from Defendants in an amount not less than (a) the difference between the reasonable or fair market value of the drugs for which Plaintiffs paid and the actual value of the drugs the Manufacturer Defendants delivered, and (b) as to the PBM Defendants, the difference between the reasonable or fair market value of the PBM services for which Plaintiffs paid and the actual value of those services as rendered with respect to the at-issue drugs.

**Count 7: Money Had and Received**
**(By all Plaintiffs against all Defendants)**

721. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

722. PBM Defendants received, and still hold, monies and benefits from Plaintiffs earned through the sale, pricing, and payment negotiations for diabetes medications marketed and sold at artificially inflated prices. PBM Defendants knowingly accepted the monies and benefits that it would not otherwise hold but for its fraudulent conduct.

723. Plaintiffs were compelled to pay the monies and benefits at issue because Defendants' market power—including PBM Defendants' control over formulary access and the

Manufacturer Defendants' dominance in the relevant insulin market—left Plaintiffs with no practical alternative.

724. PBM Defendants have received and retained monies and benefits, for itself and its co-conspirators, from Plaintiffs in connection with the at-issue diabetes medications, including, without limitation, proceeds from hidden fees tied to inflated prices, proceeds from fees charged to pharmacies dispensing the at-issue drugs, and amounts related to the Manufacturer Payments described above.

725. PBM Defendants obtained and retained these monies and benefits by leveraging artificially inflated list prices paid by payors, including Plaintiffs, to generate outsized profits.

726. As a result of the Insulin Pricing Scheme, PBM Defendants hold monies and benefits that rightfully belong to Plaintiffs. Equity and good conscience require PBM Defendants to return the monies and benefits derived from the Insulin Pricing Scheme.

**Count 8: Civil Conspiracy**
**(By all Plaintiffs against all Defendants)**

727. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

728. Plaintiffs' underlying claims include common-law fraud and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c).

729. Defendants combined and agreed to carry out a pricing scheme for the at-issue drugs. The common purpose of the agreement was to raise and maintain prices at artificial levels, thereby defrauding Plaintiffs.

730. The agreement also aimed to secure preferred formulary placement for the at-issue drugs. In furtherance of this agreement, the Manufacturer Defendants raised list prices in tandem.

731. The PBM Defendants demanded and received payments tied to those higher list prices. The payments included rebates, fees, and other consideration. In exchange, the PBM Defendants granted preferred formulary status to the at-issue drugs.

732. Defendants communicated regularly to coordinate pricing and formulary terms. Defendants shared nonpublic information to align pricing and placement decisions. Defendants also used affiliated entities to collect and retain a portion of the payments.

733. Defendants concealed material facts about these payments from Plaintiffs, and further concealed the role those payments played in setting drug prices. Defendants publicly claimed that their conduct lowered costs for payors and patients. Those statements were false and were made to induce reliance by payors, including Plaintiffs.

734. At least one overt act was committed by each Defendant in furtherance of the agreement. These acts included setting list prices, negotiating and collecting payments, and fixing formularies. These acts also included publishing and relying on list prices known to be inflated.

735. Defendants knew the natural and probable result of their conduct would be higher prices. Defendants intended that payors, including Plaintiffs, would pay prices based on inflated benchmarks.

736. Defendants' agreement and overt acts directly caused economic harm to Plaintiffs. Plaintiffs paid more for the at-issue drugs than it would have absent the conspiracy. Plaintiffs' damages include overpayments and related costs tied to inflated list prices.

737. The conspiracy could not have succeeded without the coordinated actions of all Defendants. Each Defendant knowingly joined, supported, and benefitted from the conspiracy.

738. The conspiracy is ongoing, and its effects continue to harm Plaintiffs.

739. Plaintiffs' injuries were the foreseeable and intended result of Defendants' conduct.

740. Plaintiffs seek damages in an amount to be proven at trial, together with all available relief. Plaintiffs also seek punitive damages because Defendants acted willfully and with conscious disregard of Plaintiffs' rights.

**Count 9: Violations of Illinois Antitrust Act, 740 ILCS 10/1 *et seq.* (By all Plaintiffs whose claims are governed by the laws Illinois against all Defendants)**

741. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

742. Plaintiffs bring this Count pursuant to 740 ILCS 10/7.8, which creates a private right of action for antitrust violations.

743. Defendants are engaged in "trade or commerce" within the meaning of 740 ILCS 10/4.

744. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of 740 ILCS 10/2 and 740 ILCS 10/3.

745. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in Illinois, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

746. The Manufacturer Defendants are horizontal competitors in the relevant market.

747. The PBM Defendants are horizontal competitors in the relevant market.

748. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

749. There are high barriers to entry into the business of manufacturing insulin in the United States, including in Illinois, because a potential new manufacturer must overcome or avoid

patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

750. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

751. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

752. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

753. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

754. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

755. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

756. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

757. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

758. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of 740 ILCS 10/3(1).

759. These restraints are unlawful *per se* to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and, consistent with 740 ILCS 10/11, are analyzed in harmony with federal antitrust law.

760. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects-higher prices, reduced output and choice, and exclusion of lower-list-price products-far outweigh any cognizable procompetitive justification.

761. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

762. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

763. Pursuant to 740 ILCS 10/7, indirect purchasers may assert claims for relief under the Illinois Antitrust Act.

764. Plaintiffs suffered antitrust injury of the types that the Illinois antitrust laws were designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

765. Plaintiffs seek treble damages, attorneys' fees, costs, and all other relief available under 740 ILCS 10/7 for Defendants' violations of the Illinois Antitrust Act.

766. Plaintiffs also seek injunctive relief to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 10: Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (By all Plaintiffs whose claims are governed by the laws Illinois against all Defendants)**

767. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

768. Plaintiffs are "persons" within the meaning of 815 ILCS 505/1(c), and PBM Defendants and Manufacturer Defendants are "persons" engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(c) and (f).

769. PBM Defendants and Manufacturer Defendants engaged in unfair and deceptive acts and practices in the course of trade and commerce in Illinois in violation of 815 ILCS 505/2.

770. PBM Defendants and Manufacturer Defendants jointly created and executed a pricing and formulary scheme in which the Manufacturer Defendants published artificially inflated list prices for the at-issue diabetes medications. PBM Defendants used and enforced those inflated prices through its formularies and pricing mechanics, causing Plaintiffs to overpay.

771. Manufacturer Defendants represented—expressly and by necessary implication—that their reported list prices were fair, lawful, competitive, and reasonably related to the net prices actually realized and to the fair market value of the drugs, when they were not.

772. The Manufacturer Defendants further misrepresented and concealed the true reasons for price increases—namely, to fund increasing payments and fees to PBM Defendants to secure preferred formulary placement—while PBM Defendants knowingly accepted, demanded, and leveraged those payments to prefer higher-priced products.

773. PBM Defendants represented to payors, including Plaintiffs, that their negotiations, formularies, and related practices increased savings and promoted health outcomes, when in truth its practices inflated prices, steered utilization to higher-priced products, and concealed and retained undisclosed payments and fees.

774. PBM Defendants used affiliated entities and rebate aggregators to obscure the nature, amount, and flow of payments received from the Manufacturer Defendants, concealing material facts and frustrating transparency to payors, including Plaintiffs.

775. PBM Defendants' and Manufacturer Defendants' conduct constitutes deceptive trade practices under 815 ILCS 510/2, including representing that goods or services have characteristics or benefits they do not have and making false or misleading statements about the reasons for, existence of, or amounts of price reductions.

776. PBM Defendants repeatedly used inflated list prices as a false baseline to tout purported savings, to justify formulary selections, and to represent that payors benefited from rebates or reductions—while failing to disclose that the pricing structure and payments were designed to increase, not decrease, real-world costs.

777. PBM Defendants granted and enforced formulary placements for the at-issue drugs that it represented as cost-effective and beneficial for patients, even though its selections were driven by payments tied to higher list prices, thereby ensuring the inflated prices would be charged to Plaintiffs.

778. PBM Defendants' omissions were material and misleading in light of their statements. PBM Defendants failed to disclose that list prices bore no reasonable relationship to fair market value, that payments between PBM Defendants and Manufacturer Defendants were extensive and retained in undisclosed forms, and that Defendants' practices increased, rather than reduced, payor costs.

779. PBM Defendants' and Manufacturer Defendants' conduct also was unfair under 815 ILCS 505/2 because it caused substantial injury to payors and beneficiaries, that injury was not reasonably avoidable, and any claimed countervailing benefits are vastly outweighed by the harm caused by the scheme.

780. Manufacturer Defendants control nearly all insulin supply, and PBM Defendants exercise substantial formulary power; the at-issue drugs are medically necessary; and the price escalations were untethered to manufacturing cost or legitimate market forces—all of which exacerbated the injury to Plaintiffs.

781. PBM Defendants' and Manufacturer Defendants' conduct violates Illinois public policy, was intended to, and did, cause confusion and misunderstanding, and was carried out

knowingly, willfully, and in reckless disregard of the economic and physical well-being of Illinois payors and patients.

782. Plaintiffs reasonably relied on PBM Defendants' and Manufacturer Defendants' representations and omissions in purchasing and reimbursing the at-issue drugs, including by accepting PBM Defendants' formularies and pricing methodologies and by paying amounts calculated from inflated list prices.

783. As a direct and proximate result of Manufacturer Defendants' and PBM Defendants' unfair and deceptive acts and practices, Plaintiffs suffered actual damages, including but not limited to overpayments for the at-issue medications and increased plan costs tied to inflated list prices and related out-of-pocket burdens on beneficiaries.

784. Manufacturer Defendants' and PBM Defendants' deceptive and unfair practices are ongoing and capable of repetition; Plaintiffs continue to purchase the at-issue drugs and face continued harm absent judicial intervention.

785. Plaintiffs seek all available relief under the Consumer Fraud Act, including actual damages, punitive damages, injunctive relief to stop the unfair and deceptive practices, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**Count 11: Violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.772**
**(By all Plaintiffs whose claims are governed by the laws of Michigan against all Defendants)**

786. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

787. Plaintiffs bring this Count pursuant to Mich. Comp. Laws § 445.778(2).

788. Defendants are engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.771.

789. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of Mich. Comp. Laws § 445.772.

790. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in Michigan, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

791. The Manufacturer Defendants are horizontal competitors in the relevant market.

792. The PBM Defendants are horizontal competitors in the relevant market.

793. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

794. There are high barriers to entry into the business of manufacturing insulin in the United States, including in Michigan, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

795. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

796. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

797. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

798. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

799. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

800. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

801. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

802. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

803. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of Mich. Comp. Laws § 445.772.

804. These restraints are unlawful *per se* to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and, consistent with Mich. Comp. Laws § 445.784(2), are analyzed in harmony with federal antitrust law.

805. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects-higher prices, reduced output and choice, and exclusion of lower-list-price products-far outweigh any cognizable procompetitive justification.

806. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

807. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

808. Pursuant to Mich. Comp. Laws § 445.778(2), indirect purchasers may assert claims for relief under the Michigan Antitrust Reform Act.

809. Plaintiffs suffered antitrust injury of the types that the Michigan Antitrust Reform Act was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

810. Plaintiffs seek treble damages, costs, reasonable attorneys' fees, and all other relief authorized by Mich. Comp. Laws § 445.778 and other applicable law.

811. Plaintiffs also seeks injunctive relief to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 12: Violations of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 et seq.**
**(By all Plaintiffs whose claims are governed by the laws of Michigan against all Defendants)**

812. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

813. Plaintiffs are "persons" under the Michigan Consumer Protection Act, and for the transactions at issue, both Plaintiffs and their beneficiaries are "consumers" who paid inflated prices caused by Manufacturer Defendants' and PBM Defendants' conduct.

814. Manufacturer Defendants engaged in unfair, unconscionable, and deceptive acts or practices by making false or misleading statements concerning the reasons for, existence of, or amount of price reductions, in violation of Mich. Comp. Laws § 445.903(1)(i).

815. Manufacturer Defendants further violated the Michigan Consumer Protection Act by charging prices grossly in excess of the price at which similar property is sold, in violation of Mich. Comp. Laws § 445.903(1)(z).

816. Manufacturer Defendants' pricing conduct produced stark international disparities: in 2018, Manufacturer Defendants charged an average of $98.70 for insulin in the United States, compared to $14.40 in Japan, $12.00 in Canada, $11.00 in Germany, $9.08 in France, $7.52 in the United Kingdom, and under $7.00 in Australia.

817. This differential persisted throughout the relevant period, reflecting domestic pricing untethered to competitive market forces and inconsistent with Manufacturer Defendants' asserted justifications.

818. Manufacturer Defendants misrepresented the prices they published for insulin as reflective of true market value, despite knowing those list prices were grossly inflated and materially higher than net prices, thereby deceiving payors and distorting reimbursement.

819. Manufacturer Defendants concealed and omitted material facts regarding the reasons for list price increases, including the role of PBM-linked payments and formulary considerations in driving list price escalation.

820. PBM Defendants deceptively used inflated list prices to calculate the amounts and fees charged to payors, including Plaintiffs, while concealing the inflated nature of the benchmarks and the retained portions of manufacturer payments.

821. PBM Defendants misrepresented that they worked to lower drug prices for payors and beneficiaries while concealing their role in extracting higher list prices in exchange for favorable formulary status and increased remuneration.

822. PBM Defendants further concealed the amount and nature of rebates and other manufacturer payments, including through opaque definitions and reporting practices that impeded payor visibility into true net pricing.

823. PBM Defendants' unfair and deceptive practices were undertaken with the knowledge, consent, and cooperation of Manufacturer Defendants, and vice versa, in furtherance of the Insulin Pricing Scheme.

824. Manufacturer Defendants' and PBM Defendants' misrepresentations and omissions tended to, and did, deceive consumers, including Plaintiffs, causing Plaintiffs to purchase insulin at inflated prices based on false and misleading price representations.

825. Each purchase of insulin at inflated prices caused by the Insulin Pricing Scheme constitutes a distinct violation of the Michigan Consumer Protection Act and resulted in concrete economic harm to Plaintiffs.

826. Plaintiffs suffered an actual loss equal to the difference between the amounts it paid for insulin and the amounts it would have paid absent Defendants' unfair, unconscionable, and deceptive practices.

827. Manufacturer Defendants' and PBM Defendants' ongoing misrepresentations and concealment continue to cause harm to Plaintiffs and other payors, and absent an injunction, these violations will persist.

828. Plaintiffs seek damages, attorneys' fees, costs, and all other relief authorized by the Michigan Consumer Protection Act, including appropriate injunctive relief to halt Defendants' unlawful practices.

**Count 13: Violations of New Jersey Antitrust Act, N.J.S.A. 56:9-1 *et seq*.**
**(By all Plaintiffs whose claims are governed by the laws of New Jersey against all Defendants)**

829. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

830. Plaintiffs bring this Count pursuant to N.J.S.A. §§ 56:9-10 and 56:9-12, which create a private right of action for antitrust violations.

831. Defendants are engaged in "trade or commerce" within the meaning of N.J.S.A. § 56:9-2.

832. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of N.J.S.A. § 56:9-3.

833. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in New Jersey, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

834. The Manufacturer Defendants are horizontal competitors in the relevant market.

835. The PBM Defendants are horizontal competitors in the relevant market.

836. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

837. There are high barriers to entry into the business of manufacturing insulin in the United States, including in New Jersey, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

838. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

839. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

840. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

841. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

842. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

843. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

844. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

845. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

846. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of N.J.S.A. § 56:9-3.

847. These restraints are unlawful *per se* to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and, consistent with N.J.S.A. § 56:9-18, are analyzed in harmony with federal antitrust law.

848. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects-higher prices, reduced output and choice, and exclusion of lower-list-price products-far outweigh any cognizable procompetitive justification.

849. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

850. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

851. Pursuant to N.J.S.A. §§ 56:9-10 and 56:9-12, indirect purchasers may assert claims for relief under the New Jersey Antitrust Act.

852. Plaintiffs suffered antitrust injury of the types that the New Jersey Antitrust Act was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

853. Plaintiffs seek treble damages, attorneys' fees, costs, and all other relief available under N.J.S.A. § 56:9-12 for Defendants' violations of the New Jersey Antitrust Act.

854. Plaintiffs also seek injunctive relief pursuant to N.J.S.A. § 56:9-10 to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 14: Violations of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.**

**(By all Plaintiffs whose claims are governed by the laws of New Jersey against all Defendants)**

855. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

856. Defendants engaged in unconscionable commercial practices and deception in trade and commerce.

857. The Manufacturer Defendants published list prices for the at-issue drugs while holding those prices out as actual prices despite knowing they were artificially inflated and untethered to costs or realized prices, and they misrepresented and concealed that list-price increases were designed to fund larger payments to PBM Defendants in exchange for formulary position—all with PBM Defendants' knowledge, consent, and cooperation.

858. Defendants' statements and omissions were material to Plaintiffs' purchasing and reimbursement decisions and were intended to, and did, create a misleading impression regarding true drug pricing, net costs, and the drivers of formulary placement.

859. PBM Defendants furthered the scheme by using the inflated list prices to set the amounts paid by payors, including Plaintiffs, while representing to payors and the public that they generated savings and promoted patient health, thereby misleading Plaintiffs about pricing and formulary practices.

860. PBM Defendants leveraged spread pricing and rebate structures to increase list-price benchmarks while obscuring net pricing and the financial incentives tied to formulary access, which deceived Plaintiffs about the actual value of the services provided and the true economic impact of PBM Defendants' practices.

861. As a direct and proximate result of Manufacturer Defendants' and PBM Defendants' deceptive and unconscionable practices, Plaintiffs suffered an ascertainable loss equal

to the difference between the amounts paid for the at-issue drugs and the amounts that would have been paid absent Defendants' unlawful pricing scheme.

862. Plaintiffs' losses include overpayments tied to inflated list-price benchmarks, increased cost-sharing burdens, and diminished access to lower-cost alternatives because of deceptive formulary and pricing representations.

863. Plaintiffs seek all remedies available under N.J.S.A. § 56:8-1, et seq., including actual damages or statutory remedies, treble damages where applicable, attorneys' fees, costs, restitution, disgorgement, and appropriate injunctive relief.

864. Plaintiffs also seek orders compelling corrective disclosures and prohibiting further deceptive practices to protect the public and prevent recurrence.

**Count 15: Violations of New York General Business Law § 340 (By all Plaintiffs whose claims are governed by the laws of New York against all Defendants)**

865. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

866. Plaintiffs bring this Count pursuant to N.Y. G.B.L. § 340(5), which creates a private right of action for antitrust violations.

867. Defendants are engaged in "trade or commerce" within the meaning of N.Y. G.B.L. § 340(1).

868. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of N.Y. G.B.L. § 340(1)

869. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in New York, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

870. The Manufacturer Defendants are horizontal competitors in the relevant market.

871. The PBM Defendants are horizontal competitors in the relevant market.

872. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

873. There are high barriers to entry into the business of manufacturing insulin in the United States, including in New York, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

874. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

875. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

876. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

877. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the

opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

878. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

879. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

880. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

881. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

882. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of N.Y. G.B.L. § 340.

883. These restraints are unlawful *per se* to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and are analyzed in harmony with federal antitrust law.

884. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects-higher prices, reduced output and choice, and exclusion of lower-list-price products-far outweigh any cognizable procompetitive justification.

885. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

886. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

887. Pursuant to N.Y. G.B.L. § 340(6), indirect purchasers may assert claims for relief under the Donnelly Act.

888. Plaintiffs suffered antitrust injury of the types that the Donnelly Act was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

889. Plaintiffs seek treble damages, attorneys' fees, costs, and all other relief available under the Donnelly Act for Defendants' violations of the Donelly Act.

890. Plaintiffs also seek injunctive relief to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 16: Violations of New York General Business Law § 349**
**(By all Plaintiffs whose claims are governed by the laws of New York against all Defendants)**

891. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

892. Plaintiffs are "persons" within the meaning of § 349(h). Each of the above-named Defendants is a "person," "firm," "corporation," or "association" within the statute's meaning.

893. PBM Defendants and Manufacturer Defendants engaged in deceptive acts and practices in the conduct of business, trade, or commerce within New York.

894. PBM Defendants' and Manufacturer Defendants' misconduct included publishing and utilizing false list prices for the at-issue drugs, misrepresenting those prices as lawful, competitive, and reflective of fair market value, and concealing that prices were generated and sustained by the Insulin Pricing Scheme.

895. PBM Defendants and Manufacturer Defendants further misrepresented and omitted material facts concerning manufacturer payments, formulary design, and the impact of such payments on pricing and utilization. They represented that such arrangements lowered overall drug costs and promoted beneficiary health, while knowing that those payments fueled and depended on inflated list prices and entrenched supracompetitive pricing.

896. PBM Defendants' and Manufacturer Defendants' deceptive practices were consumer-oriented, were directed broadly to the marketplace, and affected the public interest by shaping the pricing and availability of life-sustaining diabetes medications throughout New York.

897. PBM Defendants and Manufacturer Defendants acted knowingly and willfully, and at minimum with reckless disregard for the truth. Their deceptive acts were continuous and ongoing during the relevant period. Plaintiffs reasonably relied on the integrity of the published pricing, the stated purpose and impact of rebates and fees, and the PBM formulary representations, and Plaintiffs could not have discovered the concealed scheme through reasonable diligence.

898. As a direct and proximate result of these deceptive acts and omissions, Plaintiffs paid inflated prices for the at-issue drugs, did not receive the benefit of its bargain, and suffered

ascertainable losses each time it paid amounts tied to the inflated list prices. Plaintiffs continue to be harmed so long as these deceptive practices persist.

899. Plaintiffs seek all relief available under § 349, including actual damages, discretionary treble damages up to the statutory cap, punitive damages, reasonable attorneys' fees and costs, and an order enjoining PBM Defendants and Manufacturer Defendants from continuing the deceptive practices described herein and requiring corrective measures to ensure transparent, lawful pricing and formulary practices.

**Count 17: Violations of the Valentine Act, Ohio Revised Code § 1331.01 et seq., (By all Plaintiffs whose claims are governed by the laws of Ohio against all Defendants)**

900. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

901. Defendants are engaged in "trade or commerce" within the meaning of O.R.C. § 1331.01(C)(1).

902. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of O.R.C. § 1331.01 and O.R.C. 1331.06.

903. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in Ohio, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

904. The Manufacturer Defendants are horizontal competitors in the relevant market.

905. The PBM Defendants are horizontal competitors in the relevant market.

906. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

907. There are high barriers to entry into the business of manufacturing insulin in the United States, including in Ohio, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

908. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

909. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

910. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

911. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

912. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

913. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

914. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

915. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

916. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of O.R.C. § 1331.01 and O.R.C. 1331.06.

917. These restraints are unlawful per se to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and are analyzed in harmony with federal antitrust law.

918. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects—higher prices, reduced output and choice, and exclusion of lower-list-price products—far outweigh any cognizable procompetitive justification.

919. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

920. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

921. Plaintiffs suffered antitrust injury of the types that the Valentine Act was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

922. Plaintiffs seek treble damages, attorneys' fees, costs, and all other relief available under O.R.C. § 1331.08 for Defendants' violations of the Valentine Act.

923. Plaintiffs also seek injunctive relief to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 18: Violations of Ohio Deceptive Trade Practices Act, Ohio Revised Code § 4165**
**(By all Plaintiffs whose claims are governed by the laws of Ohio against all Defendants)**

924. Plaintiffs re-allege and incorporate by reference all preceding allegations.

925. Plaintiffs, Manufacturer Defendants, and PBM Defendants are "persons" within the meaning of O.R.C. § 4165.01(D).

926. As detailed above, PBM Defendants and Manufacturer Defendants are engaged in deceptive trade practices in violation of O.R.C. § 4165.02(A). PBM Defendants and Manufacturer Defendants are liable for their own conduct and their coordinated actions in furtherance of an Insulin Pricing Scheme that misled and confused the market regarding the pricing, value, and characteristics of the at-issue diabetes medications and related services.

927. PBM Defendants and Manufacturer Defendants published and maintained inflated list prices for the at-issue drugs while representing, directly and indirectly, that those prices

reflected lawful, competitive, and fair market values. They concealed that list price increases were driven by the pursuit of larger manufacturer payments to PBM Defendants and were untethered to costs or actual net prices. PBM Defendants knew of, consented to, and cooperated in this conduct.

928. PBM Defendants used the inflated list prices to set the prices paid by payors, including Plaintiff, while representing that its formularies and services produced cost savings and promoted patient health. In truth, PBM Defendants demanded and retained substantial manufacturer payments through affiliated entities, prioritized higher-priced drugs for formulary placement, and excluded lower-priced alternatives to increase revenues for itself and the Manufacturer Defendants.

929. PBM Defendants and Manufacturer Defendants misrepresented the characteristics, benefits, standards, and quality of their goods and services; advertised services with the intent not to provide them as represented; and made false statements about the reasons for, existence of, and amounts of price reductions, in violation of O.R.C. § 4165.02(A), including subsections (7), (9), (11), and (12).

930. PBM Defendants' misrepresentations and omissions were material, intended to induce reliance, and did induce reasonable reliance by Plaintiffs in the course of trade and commerce, proximately causing Plaintiffs actual economic damages.

931. PBM Defendants and Manufacturer Defendants acted knowingly and willfully, with reckless disregard for the economic and physical well-being of others. Their conduct is ongoing, repeated, and affects the public interest.

932. Plaintiffs seek actual economic damages, punitive damages, injunctive relief, attorneys' fees, costs, all appropriate penalties and fees, and any other relief the Court deems just and proper.

**Count 19: Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq*.**
**(By all Plaintiffs whose claims are governed by the laws of Pennsylvania against all Defendants)**

933. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

934. The Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) prohibits "[u]nfair methods of competition" and "unfair or deceptive acts or practices," including: representing that goods or services have characteristics or benefits they do not have, 73 P.S. § 201-2(4)(v); making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions, § 201-2(4)(xi); and engaging in any other fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding, § 201-2(4)(xxi).

935. PBM Defendants and Manufacturer Defendants are each a "person" within the meaning of the UTPCPL, 73 P.S. § 201-2(11). Plaintiffs operate as consumers when, through their agents, they purchase goods or services in connection with the procurement and/or reimbursement of diabetes medications.

936. PBM Defendants and Manufacturer Defendants are independently liable for their own misconduct and jointly liable for their collective efforts in furtherance of the Insulin Pricing Scheme. Using a complex structure of interdependent entities, PBM Defendants and Manufacturer Defendants confused and misled consumers about each entity's role to evade accountability for the unfair and deceptive scheme as a whole, and for the acts and omissions of the scheme's interdependent participants.

937. PBM Defendants' and Manufacturer Defendants' misconduct under the UTPCPL includes the creation and implementation of the Insulin Pricing Scheme. Among other conduct, PBM Defendants intentionally selected higher-priced diabetes medications for formulary

placement, excluded lower-priced alternatives to generate larger profits, and coordinated with Manufacturer Defendants to increase the availability and use of higher-priced medications because they were more profitable for both groups.

938. PBM Defendants misled payors and/or their agents as to the true nature and value of its services and reaped profits exponentially greater than the fair market value of the services provided, with the Manufacturer Defendants' knowledge, consent, and cooperation. PBM Defendants also owed a duty to disclose material facts to payor clients, including Plaintiffs, but intentionally concealed them to further and hide the Insulin Pricing Scheme, likewise with the Manufacturers Defendants' knowledge, consent, and cooperation.

939. By jointly carrying out and concealing the Insulin Pricing Scheme, PBM Defendants and Manufacturer Defendants misrepresented the characteristics and benefits of their goods and services, made false or misleading statements about the reasons for or amounts of price reductions, and engaged in deceptive conduct creating a likelihood of confusion or misunderstanding, including but not limited to the following. A product's price is a core characteristic, and every seller represents that the product is sold at a legal, competitive, fair market price.

940. The Manufacturer Defendants reported and published artificially inflated list prices for the at-issue drugs and represented that those prices bore a reasonable relationship to net prices and reflected fair market value, all with PBM Defendants' knowledge, consent, and cooperation. PBM Defendants and Manufacturer Defendants misrepresented to payors, including Plaintiffs through their agents, and to the public that its formularies and disclosed portions of Manufacturer Payments lowered drug prices and promoted health when, in truth, the opposite was occurring.

941. PBM Defendants utilized the artificially inflated prices—which it helped inflate and knew were untethered from actual prices—to make false and misleading statements regarding the savings PBM Defendants purportedly generated for payors, including Plaintiffs through their agents, patients, and the public.

942. PBM Defendants and Manufacturer Defendants represented that insulin prices were legal, competitive, and reflected fair market value while concealing that the prices were not legal or competitive and were generated by the Insulin Pricing Scheme. They undertook a concerted effort to mislead the public and payors, including Plaintiffs through their agents, and to conceal the truth.

943. PBM Defendants and Manufacturer Defendants continue to make these misrepresentations and to publish prices generated by the Insulin Pricing Scheme, and payors, including Plaintiffs, through their agents, and patients continue to purchase diabetes medications at inflated prices. PBM Defendants' and Manufacturer Defendants' concealment of pricing and fee arrangements created inflated, fictitious prices and a likelihood that payors, including Plaintiffs through their agents, and patients did not understand they were paying artificially inflated rather than competitive market prices.

944. PBM Defendants' and Manufacturer Defendants' conduct is also "unfair" under the UTPCPL because it is unconscionable, offends public policy, and is unethical, oppressive, and unscrupulous. PBM Defendants and Manufacturer Defendants exploited their concentrated market power to inflate prices for insulin—a life-saving medication—prioritizing profits over patient safety and jeopardizing access to essential treatment.

945. PBM Defendants and Manufacturer Defendants knew their representations and omissions were false when made. The rebates and formulary positions they agreed upon did not

lower the price paid by payors, including Plaintiffs; instead, they were primary drivers of the exponential increase in insulin expenditures in Pennsylvania during the relevant period.

946. PBM Defendants and Manufacturer Defendants disseminated these falsehoods to payors, including Plaintiffs, through their agents, and to the public through oral and written communications, the inclusion of reported prices in contracts as determinants of price, marketing materials, presentations, publication of artificially inflated prices, and public statements. These misrepresentations targeted and affected payors and the public in Pennsylvania.

947. As a direct result of these unfair or deceptive acts or practices, PBM Defendants and Manufacturer Defendants have received—and will continue to receive—income, profits, and other benefits that they would not have obtained absent their UTPCPL violations. Plaintiffs, as well as Pennsylvania residents in general, have incurred, and continue to incur, substantial costs and expenses, including paying excessive and inflated prices for the at-issue diabetes medications.

948. But for PBM Defendants' and Manufacturer Defendants' deceptive conduct, Plaintiffs would not have expended millions of dollars in connection with the purchase or reimbursement of diabetes medications. PBM Defendants' and Manufacturer Defendants' conduct directly and proximately caused injury to Plaintiffs. Plaintiffs' economic injuries are direct, ascertainable, and quantifiable and constitute both an "ascertainable loss of money or property" and "actual damages" under 73 P.S. § 201-9.2(a).

949. Plaintiffs seek all available relief under the UTPCPL, including injunctive relief, restitution, treble damages up to three times the actual damages sustained, attorneys' fees and costs, and any further relief the Court deems just and proper.

**Count 20: Violations of the Texas Antitrust Act, Tex. Bus. & Com. Code § 15.01-15.52**
**(By all Plaintiffs whose claims are governed by the laws of Texas against all Defendants)**

950. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

951. Defendants are engaged in trade and commerce within the meaning of Tex. Bus. & Com. Code § 15.03.

952. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of Tex. Bus. & Com. Code § 15.05(a).

953. The relevant markets include, at minimum, long-acting analog insulin and rapid-acting analog insulin sold in Texas, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

954. The Manufacturer Defendants are horizontal competitors in the relevant market.

955. The PBM Defendants are horizontal competitors in the relevant market.

956. These markets are highly concentrated. Manufacturer Defendants account for the vast majority of insulin sales, and PBM Defendants control most PBM services, enabling them to steer utilization through formularies and exclusions.

957. There are high barriers to entry into the business of manufacturing insulin in the United States, including in Texas, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

958. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM

business faces a chicken-and-egg situation in that, in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

959. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

960. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

961. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

962. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

963. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

964. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

965. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

966. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of Tex. Bus. & Com. Code § 15.05(a).

967. These restraints are unlawful per se to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and, consistent with Tex. Bus. & Com. Code § 15.04, are analyzed in harmony with federal antitrust law.

968. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects—higher prices, reduced output and choice, and exclusion of lower-list-price products—far outweigh any cognizable procompetitive justification.

969. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

970. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and were deprived of the benefits of free and open competition.

971. Plaintiffs suffered antitrust injury of the types that the TFEAA was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

972. Plaintiffs seek damages, attorneys' fees, costs, and all other relief available under Tex. Bus. & Com. Code § 15.21(a)(1), including up to treble damages for willful or flagrant violations as permitted by statute, subject to any statutory limitations.

973. Plaintiffs also seek injunctive and other equitable relief under Tex. Bus. & Com. Code § 15.21(b) to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 21: Violations of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.46(b) (By all Plaintiffs whose claims are governed by the laws of Texas against all Defendants)**

974. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

975. Plaintiffs are consumers within the meaning of the Texas Deceptive Trade Practices-Consumer Protection Act because they sought and acquired goods and services by purchase, including diabetes medications and pharmacy benefit management services, in Texas.

976. PBM Defendants and Manufacturer Defendants' actions constitute false, misleading, or deceptive acts or practices under Tex. Bus. & Com. Code § 17.46(b).

977. In furtherance of their scheme, the Manufacturer Defendants published and promoted artificially inflated list prices for the at-issue drugs while holding those list prices out as actual or fair market prices, despite knowing those prices were untethered to the actual prices realized in the market and were inflated to fund Manufacturer Payments to PBMs, all with the knowledge, consent, and cooperation of the PBM Defendants.

978. The PBM Defendants used those inflated list prices to determine reimbursement and set out-of-pocket costs, while representing to payors and the public that their negotiations and formularies lowered costs and promoted patient health, when in fact they drove prices upward by

demanding ever-increasing Manufacturer Payments and by preferring higher-priced drugs for formulary placement because those drugs generated larger PBM profits.

979. The PBM Defendants also hid, obfuscated, and laundered Manufacturer Payments through affiliated entities in order to retain a large and undisclosed portion of those payments to the detriment of payors, including Plaintiffs.

980. PBM Defendants and Manufacturer Defendants' scheme in Texas included publishing and transmitting false prices for at-issue drugs while knowing Texas payors, including Plaintiffs, would rely on those prices to reimburse and pay for the medications.

981. PBM Defendants and Manufacturer Defendants expressly published prices throughout Texas with knowledge that payment and reimbursement by Plaintiffs would be based on those false list prices. Plaintiffs purchased and reimbursed the at-issue drugs in Texas at prices based on those false list prices.

982. PBM Defendants and Manufacturer Defendants repeatedly misrepresented the nature and purpose of list prices, rebates, and other Manufacturer Payments, falsely representing that PBM-negotiated rebates were passed through to benefit payors like Plaintiffs and that formularies were designed to lower prices, while concealing the insulin pricing scheme that made list prices a vehicle for kickbacks and supracompetitive prices.

983. The PBM Defendants owed a duty to disclose the true facts to their payor clients, including Plaintiffs, but instead chose to conceal those facts to further and to hide the scheme, thereby misleading Plaintiffs as to the value and nature of PBM services and the true drivers of the prices Plaintiffs paid.

984. PBM Defendants and Manufacturer Defendants' concealment and affirmative misrepresentations were material. Plaintiffs reasonably relied on the false list prices and PBM

Defendants and Manufacturer Defendants' representations in paying for and reimbursing the at-issue drugs.

985. But for PBM Defendants and Manufacturer Defendants' deceptive acts and omissions, Plaintiffs would have paid less for the at-issue drugs. PBM Defendants and Manufacturer Defendants' scheme was a direct and producing cause of Plaintiffs' overcharges and economic damages in Texas.

986. As a result of PBM Defendants and Manufacturer Defendants' violations of the Texas Deceptive Trade Practices-Consumer Protection Act, Plaintiffs seek actual damages and equitable relief.

987. This includes injunctive relief to prevent PBM Defendants and Manufacturer Defendants from misrepresenting, concealing, or suppressing material facts regarding list prices, rebates, and formulary practices in Texas; the recovery of attorneys' fees and costs; pre- and post-judgment interest as provided by law; and all other relief available under Texas law and the equitable powers of the Court.

**Count 22: Violations of the Virginia Antitrust Act, Va. Code Ann. § 59.1-9.1 (By all Plaintiffs whose claims are governed by the laws of Virginia against all Defendants)**

988. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

989. Defendants are engaged in "trade or commerce" within the meaning of Va. Code Ann. § 59.1-9.3.

990. Defendants entered into and engaged in a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation of Va. Code Ann. § 59.1-9.5.

991. The relevant markets include, at minimum, long-acting analog insulin and rapid-acting analog insulin sold in Virginia, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

992. The Manufacturer Defendants are horizontal competitors in the relevant market.

993. The PBM Defendants are horizontal competitors in the relevant market.

994. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

995. There are high barriers to entry into the business of manufacturing insulin in the United States, including in Virginia, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

996. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

997. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

998. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

999. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

1000. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

1001. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

1002. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

1003. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

1004. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints, in violation of Va. Code Ann. § 59.1-9.5.

1005. These restraints are unlawful per se to the extent they constitute horizontal price-fixing and other inherently anticompetitive conduct, and, consistent with Va. Code Ann. § 59.1-9.17, are analyzed in harmony with federal antitrust law.

1006. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects—higher prices, reduced output and choice, and exclusion of lower-list-price products—far outweigh any cognizable procompetitive justification.

1007. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

1008. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and were deprived of the benefits of free and open competition.

1009. Plaintiffs suffered antitrust injury of the types that the Virginia Antitrust Act was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

1010. Plaintiffs seek damages, attorneys' fees, costs, and all other relief available under Va. Code Ann. § 59.1-9.12 for Defendants' violations of the Virginia Antitrust Act, including up to treble damages for willful or flagrant violations as permitted by statute.

1011. Plaintiffs also seek injunctive and other equitable relief under Va. Code Ann. § 59.1-9.12(A) to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 23: Violations of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 et seq.**
**(By all Plaintiffs whose claims are governed by the laws of Virginia against all Defendants)**

1012. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

1013. Plaintiffs are "persons" under the definition of the VCPA.

1014. PBM Defendants and Manufacturer Defendants are "suppliers" engaged in "consumer transactions."

1015. They engaged in fraudulent acts or practices by misrepresenting the characteristics and pricing of at-issue insulin products and pharmacy benefit services.

1016. They used false list prices untethered to fair market value and concealed the role of rebates and other manufacturer payments in driving formulary placement and price inflation.

1017. They made false statements about price reductions and purported savings, in violation of Va. Code § 59.1-200(A), including subsections (A)(5), (A)(9), and (A)(14).

1018. The VCPA prohibits fraudulent acts by suppliers in consumer transactions.

1019. PBM Defendants and Manufacturer Defendants jointly carried out and concealed a pricing scheme.

1020. Manufacturers published artificially inflated list prices. PBMs leveraged and enforced those prices in formularies and reimbursement. Both groups misrepresented the reasons for price levels and the effects of rebates. This conduct deceived payors and the public and caused Plaintiffs to pay inflated prices for diabetes medications.

1021. PBM Defendants' and Manufacturer Defendants' misrepresentations and omissions were material, and were intended to, and did, induce reliance.

1022. They created confusion and misunderstanding regarding the legality, competitiveness, and fairness of prices and purported price reductions. Plaintiffs reasonably relied on those representations in transactions for goods and services used primarily for personal and family healthcare.

1023. As a direct and proximate result, Plaintiffs suffered actual economic damages by paying excessive amounts for the at-issue drugs.

1024. PBM Defendants' and Manufacturer Defendants' conduct was willful.

1025. Plaintiffs seek all available remedies, including damages (up to treble), injunctive relief, civil penalties, restoration/disgorgement, and attorneys' fees and costs.

**Count 24: Violations of the Washington Consumer Protection Act, RCW 19.86.010 et seq.**
**(By all Plaintiffs whose claims are governed by the laws of Washington against all Defendants)**

1026. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

1027. The Washington Consumer Protection Act (the "Washington CPA") broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Wash. Rev. Code § 19.86.010.

1028. Plaintiffs, Manufacturer Defendants, and PBM Defendants are "persons" within the meaning of the Washington CPA.

1029. PBM Defendants and Manufacturer Defendants committed the acts complained of in the course of trade or commerce.

1030. PBM Defendants and Manufacturer Defendants violated the Washington CPA, at a minimum, by engaging in unfair or deceptive acts and practices in trade or commerce. Each such act had the capacity to deceive and did deceive consumers and health plan payors, including Plaintiffs.

1031. PBM Defendants and Manufacturer Defendants made material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead

consumers and health plan payors, such as Plaintiffs, including, but not limited to, by setting, publishing, or distributing the list prices of the insulin products described herein.

1032. PBM Defendants engaged in advertising concerning the role that they played in setting the price paid for the insulin products described herein, including but not limited to marketing materials averring that PBM Defendants make efforts to decrease the price of prescription drugs for consumers.

1033. PBM Defendants used the inflated list prices to determine the prices paid by health plan payors, including Plaintiffs, and failed to disclose the inflated nature of the list prices set and/or charged by the Manufacturer Defendants for the insulin products described herein, with the knowledge, consent, and cooperation of the PBM Defendants.

1034. PBM Defendants made material misrepresentations regarding or failed to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Manufacturer Defendants to the PBM Defendants and/or negotiated by the PBM Defendants in exchange for inclusion and/or tier placement of the Manufacturer Defendants' products on the PBM Defendants' formularies.

1035. PBM Defendants made material misrepresentations regarding or failed to disclose the portion of discounts, rebates, and/or other payments from the Manufacturer Defendants that the PBM Defendants keep.

1036. PBM Defendants misled health plan payors, including Plaintiffs, as to the true nature and value of the services provided and reaped illicit profits exponentially greater than the fair market value of the products and services provided.

1037. PBM Defendants confused and misled health plan payors, including Plaintiffs, regarding each Defendant's respective role in the Insulin Pricing Scheme in an attempt to evade liability.

1038. PBM Defendants hid, obfuscated, and laundered the Manufacturer Payments through the PBM Defendants' affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of health plan payors, including Plaintiffs.

1039. PBM Defendants engaged in misleading, false, unfair, and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at grossly inflated and/or fraudulently obtained price points.

1040. The Washington CPA also prohibits contracts, combinations, and conspiracies in restraint of trade.

1041. Defendants entered into and engaged in such a prohibited a continuing contract, combination, and conspiracy to unreasonably restrain trade in violation.

1042. The relevant markets include, at minimum, long-acting analog insulin, rapid-acting analog insulin sold in Washington, or, in the alternative, all Insulin and GLP-1 Drugs identified herein.

1043. The Manufacturer Defendants are horizontal competitors in the relevant market.

1044. The PBM Defendants are horizontal competitors in the relevant market.

1045. These markets are highly concentrated. Manufacturer Defendants account for the vast majority (approximately 99%) of insulin sales, and PBM Defendants control most (approximately 89%) PBM services, enabling them to steer utilization through formularies and exclusions.

1046. There are high barriers to entry into the business of manufacturing insulin in the United States, including in Washington, because a potential new manufacturer must overcome or avoid patents on analog insulin products held by the Manufacturer Defendants, and have their products and manufacturing facilities approved by the FDA, which is a years-long process.

1047. The PBM business also has high barriers to entry. Among the reasons that end-payors such as Plaintiffs hire PBMs is that a PBM controls a much larger share of the purchasing market than any individual end-payor, which gives the PBM more leverage when negotiating prices with drug manufacturers and distributors. As a result, a potential entrant into the PBM business faces a chicken-and-egg situation in that in order to get new end-payor customers, the new PBM must already control a large dollar volume of end-purchasers.

1048. In furtherance of the conspiracy, Defendants exchanged, demanded, and granted secret rebates, kickbacks, and fees tied to inflated list prices to secure exclusive or preferred formulary placement.

1049. Manufacturer Defendants engaged in shadow pricing by moving list prices in near unison while preserving net prices through rebates and fees instead of competing via transparent price reductions.

1050. It was the PBMs' role to negotiate lower prescription drug prices on behalf of end-payors. In practice, the Manufacturer Defendants and the PBM Defendants took advantage of the opaque and intricate system for payment of prescription drugs to collect excessive, supracompetitive profits.

1051. PBM Defendants agreed to, facilitated, and enforced this scheme through formulary design, preferred-tier placement, and exclusions favoring higher-list-price, higher-rebate products over lower-list-price alternatives without offsetting clinical benefit.

1052. Defendants implemented and policed the conspiracy through repeated opportunities to collude and exchange competitively sensitive information at trade associations and industry fora, followed by aligned price increases.

1053. Defendants reinforced the scheme by bundling insulin rebates with access to GLP-1 and other categories, coercing plan-wide commitments that foreclosed rival insulins and suppressed price competition.

1054. PBM-owned or affiliated rebate aggregators centralized and obscured kickback flows and characterized substantial formulary-placement payments as administrative fees beyond audit and pass-through obligations.

1055. Defendants' concerted conduct included fixing, stabilizing, maintaining, and manipulating insulin list prices; allocating formulary access via exclusionary agreements; boycotting lower-list-price versions; and imposing bundled and exclusive-dealing restraints.

1056. These restraints are unlawful per se to the extent they constitute horizontal price-fixing among manufacturers.

1057. In the alternative, these restraints are unlawful under the rule of reason because their sustained anticompetitive effects-higher prices, reduced output and choice, and exclusion of lower-list-price products-far outweigh any cognizable procompetitive justification.

1058. Government inquiries and reports have found that PBM-centered rebate practices distort competition by prioritizing higher list prices and large rebates, impairing access to lower-list-price alternatives, and entrenching formulary practices that maintain high prices.

1059. As a direct and proximate result of Defendants' unlawful contract, combination, and conspiracy, Plaintiffs have paid—and continue to pay—overcharges for Insulin Drugs tied to artificially inflated list prices and was deprived of the benefits of free and open competition.

1060. Indirect purchasers may assert claims for relief under the Washington CPA.

1061. Plaintiffs suffered antitrust injury of the types that the Washington CPA was designed to prevent, including overcharges and reduced choice, directly caused by Defendants' conduct, which stifled competition in the relevant market.

1062. Manufacturer Defendants and PBM Defendants continue to set and publish false prices generated by the Insulin Pricing Scheme. Consumers and health plan payors, including Plaintiffs, continue to purchase diabetes medications at inflated prices.

1063. These ongoing violations caused harm to Plaintiffs and are likely to cause future harm if PBM Defendants' and Manufacturer Defendants' practices are not stopped. Each at-issue purchase Plaintiffs made of diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the Washington CPA.

1064. PBM Defendants' and Manufacturer Defendants' acts and practices in violation of the Washington CPA caused Plaintiffs to suffer injuries to their business or property, including but not limited to paying excessive and inflated prices for diabetes medications as described herein.

1065. Plaintiffs seek treble damages, attorneys' fees, costs, and all other relief available under the Washington CPA for Defendants' violations.

1066. Plaintiffs also seek injunctive relief to enjoin Defendants from further contracts, combinations, and conspiracies that restrain trade in the insulin market and to restore competitive conditions.

**Count 25: Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)**
**(By all Plaintiffs against all Defendants)**

1067. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

1068. This Count is asserted against all Defendants for violations of 18 U.S.C. § 1962(c), which makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

1069. Each Defendant named herein is a "person" within the meaning of 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property, is distinct from the enterprises alleged below, and acted as a culpable "person" under RICO.

1070. Defendants formed and operated multiple association-in-fact enterprises comprising, at minimum, nine vertical Manufacturer–PBM combinations, including: the Eli Lilly–CVS Caremark Enterprise; Eli Lilly–Express Scripts Enterprise; Eli Lilly–OptumRx Enterprise; Novo Nordisk–CVS Caremark Enterprise; Novo Nordisk–Express Scripts Enterprise; Novo Nordisk–OptumRx Enterprise; Sanofi–CVS Caremark Enterprise; Sanofi–Express Scripts Enterprise; and Sanofi–OptumRx Enterprise (collectively, the "Manufacturer–PBM Enterprises").

1071. Each Manufacturer–PBM Enterprise is an association-in-fact with a common fraudulent purpose: to manipulate and inflate list prices for the at-issue diabetes medications, exchange secret and undisclosed Manufacturer Payments for preferred formulary placement, and thereby extract supra-competitive payments from payors like Plaintiffs in interstate commerce.

1072. The Manufacturer–PBM Enterprises possessed an ongoing decision-making structure and continuity, including regular communications, coordinated contracting, and data sharing regarding formulary positioning, list prices, "rebates," administrative fees, price protection/"inflation fees," and other Manufacturer Payments, all concealed from payors and designed to maximize Defendants' joint profits.

1073. Each Manufacturer–PBM Enterprise functioned as a continuing unit distinct from the racketeering acts themselves, conducting other lines of business (e.g., drug sales, mail-order operations, and PBM administration) while centrally coordinating conduct to inflate insulin list prices and conceal kickbacks behind misleading labels.

1074. To date, no defendant has withdrawn from the Manufacturer-PBM enterprises.

1075. The Manufacturer Defendants knowingly set and published false and inflated list prices (including WAC) for the at-issue drugs that did not reflect their true net realization, costs, or fair market value, and that were intended to finance secret Manufacturer Payments to PBMs in exchange for preferred formulary access.

1076. The PBM Defendants knowingly demanded, received, laundered, and retained Manufacturer Payments—including but not limited to "rebates," administrative fees, inflation/price protection fees, data fees, GPO/aggregator extractions, and spread pricing—conditioned upon and correlated with higher list prices and placement on the PBMs' formularies.

1077. The *quid pro quo* at the core of each Manufacturer–PBM Enterprise was simple: higher list prices and larger Manufacturer Payments in return for favorable formulary access that would drive utilization and thereby increase both the Manufacturer Defendants' gross sales and the PBMs Defendants' retained cash flows. Defendants coordinated and timed list price increases across competing insulin brands in near lockstep to preserve formulary access, accelerate rebate-dollar growth, and maintain spreads, as reflected in parallel price movements and close temporal coordination around industry meetings.

1078. The PBM Defendants systematically excluded lower list-price products in favor of higher list-price versions that generated outsized Manufacturer Payments and fees for the PBM

Defendants, notwithstanding the adverse financial impact on payors and patients; these exclusions increased out-of-pocket costs and total plan spend.

1079. The PBM Defendants further obfuscated and retained Manufacturer Payments by channeling them through affiliated or coordinated rebate aggregators and GPOs—including Zinc (CVS), Ascent (Express Scripts), and Emisar (OptumRx)—to place funds outside pass-through and audit provisions, with opaque reporting and offshore structures that thwart transparency.

1080. In parallel, the PBM Defendants exploited inflated AWPs (which track inflated WACs) to extract spreads between payor payments and pharmacy payments and to levy DIR and other retrospective fees, thereby monetizing the inflated list prices multiple times in the distribution and payment chain.

1081. Defendants made material misrepresentations and omissions to Plaintiffs and the market, including that list prices reflected fair market pricing; that PBM formulary decisions were clinically driven and lowered costs; that rebates and other payments benefited payors; and that the PBM Defendants aligned with clients to reduce spend—statements that were false when made and intended to induce reliance.

1082. Each Manufacturer–PBM Enterprise used the U.S. mails and interstate wires to execute and conceal the scheme, transmitting false pricing publications, formulary decisions, solicitations, rebate agreements, invoices, utilization data, payment remittances, and other communications integral to the Insulin Pricing Scheme.

1083. These uses of the mails and wires number in the thousands, spanned many years, and were essential to the negotiation, documentation, concealment, and monetization of false list prices and related Manufacturer Payments that Plaintiffs were never permitted to verify drug-by-drug.

1084. The predicate acts include:

a. Unlawful bribery, kickbacks, and commercial bribery—including violations of 18 U.S.C. §§ 1952, 1954, 666(a), 666(b), and transactions involving criminally derived property under 18 U.S.C. § 1957—by paying and receiving money to influence formulary placement for drugs paid in whole or in part by employee welfare benefit plans and federally funded plans.

b. Violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), by offering, paying, soliciting, and receiving remuneration to induce or reward the placement and use of Insulin Drugs covered by federal health care programs, including through "rebates," "administrative fees," "data fees," "inflation fees," and other disguised transfers of value.

c. Mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, by sending materially false and misleading statements and omissions about list prices, net prices, rebates, fees, and their purposes and effects, including to secure and maintain formulary placement and to induce Plaintiffs' payments tied to inflated list prices.

1085. The predicate acts are related and continuous, sharing the same purposes, participants, victims, and methods, and they amount to a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

1086. Each Defendant conducted or participated, directly or indirectly, in the operation or management of the Manufacturer–PBM Enterprise(s) with which it was associated, including controlling price publications, designing formularies, setting and timing exclusions, negotiating and collecting Manufacturer Payments, and communicating false or misleading statements to Plaintiffs and the market.

1087. Manufacturers exercised control by setting and publishing false list prices, structuring and paying Manufacturer Payments to PBMs, and jointly coordinating with PBMs on formulary access and conversion campaigns for the at-issue drugs.

1088. PBMs exercised control by determining formulary access, orchestrating exclusions to compel higher rebates and fees, specifying payment bases tied to inflated WAC/AWP, negotiating and retaining non-rebate consideration, and laundering funds through affiliates and aggregators to evade client audit and pass-through provisions.

1089. The scheme's economic logic depended on the false premise that list prices were a fair basis for payment and that PBMs reduced net costs; in reality, PBMs demanded and retained larger consideration as list prices rose, and Manufacturers raised list prices to fund the demands.

1090. Public testimony and government reports confirm the tight coupling between Manufacturer Payments and list price increases, the perverse incentives created by the formulary/rebate model, and PBM retention of significant portions of the consideration—a dynamic central to the Manufacturer–PBM enterprises.

1091. The PBMs' use of affiliated rebate aggregators and off-balance sheet practices, coupled with limiting rebates to patient-utilization-tied definitions, ensured that large categories of consideration—renamed as "administrative fees," "inflation fees," or other labels—were concealed from payors and excluded from audit and pass-through protections.

1092. Defendants' concealment efforts included contract opacity, trade-secret assertions, aggregator intermediation, offshore structures, and aggregated (not drug-specific) reporting, all designed to prevent payors from discovering the truth.

1093. Plaintiffs directly contracted with and paid PBMs for the at-issue drugs and pharmacy benefit services, and Plaintiffs' payments were tied to the Manufacturers' inflated list prices that PBMs insisted on employing as the basis for reimbursement.

1094. The prices Plaintiffs paid for the at-issue drugs were directly determined by and proximately caused by the false list prices and related Manufacturer Payments engineered by the Manufacturer–PBM Enterprises; no intermediary other than these enterprises controlled those list prices or the formulary access that forced utilization at inflated price levels.

1095. But for Defendants' racketeering conduct—namely, their mail and wire fraud in publishing false list prices, structuring secret Manufacturer Payments, excluding lower-priced alternatives, and misrepresenting the nature of rebates and formulary benefits—Plaintiffs would have paid substantially less for the at-issue drugs.

1096. Plaintiffs reasonably relied on Defendants' misrepresentations and omissions, including the purported integrity of published prices, the PBMs' client alignment and savings representations, and the assertion that rebates and fees inured to Plaintiffs' benefit; these were material to Plaintiffs' decision to contract for PBM services and to pay claims priced off inflated list prices.

1097. The Manufacturer–PBM Enterprises' racketeering conduct injured Plaintiffs in their business or property by causing them to overpay for the at-issue drugs, incur inflated plan expenditures driven by AWP/WAC-based methodologies, and suffer increased member cost-sharing burdens that accelerated plan liability within plan years.

1098. The racketeering conduct affected interstate commerce by involving national formularies, national price publications, nationwide distribution through retail and mail-order channels, and multi-state contracting and payment flows.

1099. The Manufacturer–PBM Enterprises' continuity is open-ended: Defendants continue to publish inflated list prices, structure and retain Manufacturer Payments under new labels and channels, exclude lower list-price options, and misrepresent the nature and effects of their formulary and rebate practices.

1100. The Manufacturer–PBM Enterprises' pattern of racketeering activity was the proximate cause of Plaintiffs' injuries because Defendants' conduct directly produced the inflated price terms that governed Plaintiffs' payments; the causal chain does not depend on independent third-party decisions and is not derivative of injuries to others.

1101. Defendants' racketeering scheme was furthered by explicit and implicit coordination, including parallel pricing behaviors and deliberate timing of list price increases around industry conferences dominated by PBMs, which maintained the supracompetitive pricing structure necessary for their joint profits.

1102. Plaintiffs' damages are concrete and quantifiable and include, at minimum, the difference between amounts actually paid for the at-issue drugs and the amounts Plaintiffs would have paid absent Defendants' unlawful conduct and fraudulent inflation of list prices, inclusive of supra-competitive ingredient costs, inflated dispensing/administrative charges tied to WAC/AWP, and the economic effects of formulary exclusions.

1103. Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs for treble damages, plus costs and reasonable attorneys' fees, because Plaintiffs were injured in their business or property "by reason of" Defendants' violation of § 1962(c).

1104. Plaintiffs also seek equitable and injunctive relief under 18 U.S.C. § 1964(a) to prevent continuing publication of false list prices, concealment and retention of Manufacturer

Payments under non-transparent labels or channels, and formulary conduct that conditions access on kickbacks and that prefers higher list prices at the expense of payors and patients.

1105. Absent injunctive relief, Plaintiffs will continue to pay for the at-issue drugs based on Defendants' false list prices and PBM practices that monetize those false prices across multiple revenue streams, causing ongoing and irreparable harm to Plaintiffs' health plans and beneficiaries.

1106. Accordingly, Plaintiffs seek judgment that all Defendants violated 18 U.S.C. § 1962(c), treble damages, attorneys' fees and costs, and appropriate injunctive relief to halt the continuing racketeering conduct and to restore competitive, transparent pricing free of the fraudulent Manufacturer–PBM Enterprises.

**Count 26: Violations of RICO, 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**
**(By all Plaintiffs against all Defendants)**

1107. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

1108. Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). They did so by conducting and participating, directly and indirectly, in one or more RICO enterprises through a pattern of racketeering activity. The goal was to operate an unlawful pricing and kickback scheme that inflated list prices for the Insulin Drugs and skewed formulary decisions, harming Plaintiffs.

1109. As set forth above, the RICO enterprises are associations-in-fact between each Manufacturer Defendant and each PBM Defendant, including their officers, employees, agents, and rebate aggregators. They shared a common purpose: to keep and widen spreads between list and net prices, trade kickbacks disguised as "rebates," "administrative fees," and similar payments, and hide those payments to secure favorable formulary placement and keep list prices inflated.

1110. Defendants knowingly agreed to and helped carry out the scheme by, among other things: coordinating and publishing collusive list price increases unrelated to net prices; structuring, seeking, paying, and receiving bribes and kickbacks disguised as rebates and fees to influence formulary placement; hiding the existence, amount, and purpose of those payments; misrepresenting how list and net prices relate; and using the U.S. mails and interstate wires to negotiate, document, execute, and collect on the scheme, including sending price announcements, contracts, rebate grids, invoices, remittances, and communications with plan sponsors and regulators.

1111. Defendants' agreement is shown by their conduct and communications, including: synchronized and reciprocal list price increases; rebate and "fee" negotiations tied to formulary exclusivity or preferred placement; use of PBM-affiliated rebate aggregators to extract, route, and obscure manufacturer payments; and continued concealment of net prices and manufacturer-to-PBM payments from Plaintiffs.

1112. In furtherance of the conspiracy, Defendants committed, caused to be committed, and/or agreed that one or more co-conspirators would commit multiple overt acts that are racketeering predicates and other unlawful acts, including:

a. Unlawful bribery, kickbacks, and commercial bribery—including violations of 18 U.S.C. §§ 1952, 1954, 666(a), 666(b), and transactions involving criminally derived property under 18 U.S.C. § 1957—by paying and receiving money to influence formulary placement for drugs paid in whole or in part by employee welfare benefit plans and federally funded plans.

b. Violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), by offering, paying, soliciting, and receiving remuneration to induce or reward the placement

and use of Insulin Drugs covered by federal health care programs, including through "rebates," "administrative fees," "data fees," "inflation fees," and other disguised transfers of value.

c. Mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, by sending materially false and misleading statements and omissions about list prices, net prices, rebates, fees, and their purposes and effects, including to secure and maintain formulary placement and to induce Plaintiffs' payments tied to inflated list prices.

1113. Defendants knew these predicate acts were part of a pattern of racketeering activity and agreed that one or more conspirators would commit them to advance the shared goal of keeping and exploiting inflated list prices and spreads for the Insulin Drugs. Their coordinated conduct—repeated over many years—shows an ongoing agreement to pursue the enterprises' unlawful aims and supports a strong inference of concerted action.

1114. The conspiracy and its predicate acts directly and proximately injured Plaintiffs in their business or property. Plaintiffs made direct purchases of Insulin Drugs at prices tied to artificially inflated list prices and paid overcharges they would not have paid but for Defendants' agreement to engage in the racketeering conduct described herein. Plaintiffs are direct victims, and their injuries can be measured by the inflated list-price-based payments for the Insulin Drugs.

1115. No Defendant withdrew from the conspiracy.

1116. The effects of the conspiracy continue. Without injunctive relief, Plaintiffs will keep suffering harm as they make purchases based on inflated, misleading list prices and formulary placement that rewards higher list prices and kickbacks rather than lower net prices and clinical value.

1117. By reason of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, costs of suit, and reasonable attorneys' fees under 18 U.S.C. § 1964(c). They are also entitled to appropriate equitable and injunctive relief to prevent further injury, including orders barring the reporting, use, or enforcement of artificially inflated list prices that do not approximate true net prices and prohibiting payment or receipt of disguised remuneration that influences formulary placement.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of judgment against Defendants for all the relief requested herein and to which Plaintiffs may otherwise be entitled including:

A. That the Court determine that Defendants conspired to violate RICO, violated RICO, violated federal antitrust law, violated federal anti-bribery law, committed common law commercial bribery, committed common law fraud, violated state antitrust laws, violated state consumer protection laws, engaged in a civil conspiracy, and were unjustly enriched at Plaintiffs' expense;

B. Judgment in favor of Plaintiffs and against the Defendants for damages in excess of the minimum jurisdictional requirements of this Court, in a specific amount to be proven at trial;

C. That Plaintiffs be granted the following specific relief:

1. In accordance with Section 16 of the Clayton Act and state consumer protection law, that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein in violation of federal antitrust

law, RICO, anti-bribery law, and state consumer protection law or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, or from continuing to collude to artificially inflate list prices.

D. That Plaintiffs:

1. be awarded treble damages;

2. be awarded restitution, damages, disgorgement, penalties, and/or all other legal or equitable monetary remedies available under the state laws set forth in this Complaint, and the general equitable powers of this Court in an amount according to proof;

3. be awarded punitive damages because Defendants knowingly, willfully, wantonly and intentionally harmed the health, wellbeing, and financial interests Plaintiffs and their Beneficiaries;

4. be awarded injunctive relief to address and prevent the continuation or recurrence of Defendants' business practices that gave rise to the violations alleged herein;

5. be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

6. recover their costs of suit, including their reasonable attorney's fees, as provided by law; and

7. be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## X. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 14, 2026

Respectfully submitted,

/s/ David Schiefelbein
Jon Corey (*pro hac vice* forthcoming)
MCKOOL SMITH, PC
1717 K Street NW, Suite 1000
Washington, D.C. 20006
(202) 370-8300
jcorey@mckoolsmith.com

John C. Briody (*pro hac vice* forthcoming)
James H. Smith (*pro hac vice* forthcoming)
David Schiefelbein
MCKOOL SMITH, PC
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com
dschiefelbein@mckoolsmith.com

*Attorneys for Plaintiffs RAD Sub-Trust A; 20230930-DK-BUTTERFLY-1, Inc.; Sterling Jewelers, Inc.; Mondelez Global LLC; US Foods, Inc.; Tenneco Automative Operating Company; DriV, Inc.; Kraft Heinz Foods Company; The Boeing Company; The Boeing Company Master Welfare Plan; and The Boeing Company Master Retiree Welfare Plan.*